```
 1

 2                IN THE UNITED STATES DISTRICT COURT

 3                FOR THE EASTERN DISTRICT OF TEXAS

 4                        MARSHALL DIVISION

 5   BISCOTTI INC.              )(

 6                              )(    CIVIL DOCKET NO.

 7                              )(    2:13-CV-1015-JRG-RSP

 8   VS.                        )(    MARSHALL, TEXAS

 9                              )(

10   MICROSOFT CORP.            )(    June 5, 2017

11                              )(    9:14 A.M.

12                    TRANSCRIPT OF JURY TRIAL

13           BEFORE THE HONORABLE JUDGE RODNEY GILSTRAP

14                 UNITED STATES DISTRICT JUDGE

15

16   APPEARANCES:

17   FOR THE PLAINTIFF: Mr. Adam R. Alper
                         Mr. Robert Kang
18                       KIRKLAND & ELLIS LLP
                         555 California Street
19                       24th Floor
                         San Francisco, California 94104
20
                         Mr. Michael W. De Vries
21                       Ms. Sharre Lotfollahi
                         Mr. Justin Singh
22                       KIRKLAND & ELLIS LLP
                         333 South Hope Street
23                       29th Floor
                         Los Angeles, California 90071
24

25
```

```
 1
 2                          Ms. Amanda Hollis
                            Mr. Ryan Hubbard
 3                          KIRKLAND & ELLIS LLP
                            300 North LaSalle Street
 4                          Suite 2500
                            Chicago, Illinois 60654
 5
 6                          Mr. Eric Cheng
                            KIRKLAND & ELLIS LLP
 7                          3330 Hillview Avenue
                            Palo Alto, California 94304
 8
 9                          Mr. Michael E. Jones
                            POTTER MINTON
10                          110 North College Avenue
                            Suite 500
11                          Tyler, Texas 75702

12
    FOR THE DEFENDANT: Mr. Michael J. Bettinger
13                          Ms. Irene I. Yang
                            SIDLEY AUSTIN LLP
14                          555 California Street
                            Suite 2000
15                          San Francisco, California 94104

16                          Mr. Richard A. Cederoth
                            Ms. Gwen Hochman Stewart
17                          SIDLEY AUSTIN LLP
                            One South Dearborn Street
18                          Chicago, Illinois 60603

19                          Mr. R. Seth Reich, Jr.
                            SIDLEY AUSTIN LLP
20                          2021 McKinney Avenue
                            Suite 2000
21                          Dallas, Texas 75201

22                          Ms. Melissa R. Smith
                            GILLAM & SMITH, LLP
23                          303 South Washington Avenue
                            Marshall, Texas 75670
24

25
```

1

2

COURT REPORTER:     Shelly Holmes, CSR-TCRR
                            Official Reporter
                            United States District Court
3

4                            Eastern District of Texas
                            Marshall Division
5                            100 E. Houston Street
                            Marshall, Texas  75670
6                            (903) 923-7464

7  (Proceedings recorded by mechanical stenography, transcript
   produced on a CAT system.)
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

<pre>
 1                    P R O C E E D I N G S

 2

 3           (Jury panel in.)

 4           COURT SECURITY OFFICER:  All rise.

 5           THE COURT:  Thank you.  Be seated, please.

 6           Good morning, ladies and gentlemen.  Thank you for

 7  being here.

 8           My name is Rodney Gilstrap, and I am the resident

 9  United States District Judge here in the Marshall Division

10  for the Eastern District of Texas.  I have lived in Marshall

11  since 1981.  I practiced law here for 30 years before I was

12  appointed to the bench.  I've been serving in this capacity

13  since 2011.

14           And I'll make a confession to you, I was not born

15  in Texas; I was born in Florida.  But I got here as fast as

16  I could.  I came to Texas to go to law school and college.

17  Went to college first, obviously, at Baylor, and college at

18  Baylor Law School -- excuse me, law school at Baylor Law

19  School.

20           I'm married.  I have two grown children.  And my

21  wife owns and operates a retail floral business here in

22  Marshall.

23           Now, I tell you all those things because in a few

24  minutes, I'm going to ask each of you to give me the same

25  kind of information about yourselves, and I think you're
</pre>

1  entitled to know as much about me as I'm about to find out

2  about each of you all.

3          We're about to engage in a selection of a jury in a

4  civil case involving allegations of patent infringement.

5  However, before we go any further, I'd like to briefly

6  review with you how we came to have a civil jury trial

7  system.

8          If you look at the first five books of the Old

9  Testament, the Pentateuch, you'll see that the ancient

10  Jewish nation -- nation impaneled juries for the purpose of

11  determining property ownership and property values.  The

12  ancient Greeks developed and started using a jury system

13  about 1500 BC.  The Romans, as they did with many things,

14  adopted the jury system from the Greeks.  And the Romans

15  brought the jury system to what we now know is England about

16  the fourth century AD when they conquered that island.

17          So by the 12th century AD, jury trials had been a

18  part of the judicial system in England for over 800 years.

19  Then in the 12th century AD, a tyrannical king came to the

20  thrown of England known as King John, and he attempted to do

21  away with the right to trial by jury.  And this, along with

22  other disputes, led to a confrontation between the king and

23  his nobles that threatened to put the country into civil

24  war.  And that confrontation was resolved by the nobles and

25  the kings signing a document at a place called Runnymede,

1   resolving their disputes.  And that document we know today

2   as the Magna Carta.  And in that document, the right to

3   trial by jury was guaranteed to Englishmen as a part of

4   resolving that dispute with King John.

5        As a matter of fact, 28 of our 50 United States

6   have adopted into their state constitutions the exact

7   language from the Magna Carta guaranteeing the right to

8   trial by jury as a part of their respective state

9   constitutions.

10       So you can see that the concept and the tradition

11  of jury trials in civil cases was well ingrained in our

12  founding fathers who came to this country as British

13  colonists in settling America.  And after a hundred -- more

14  than a hundred years of the jury system being exercised in

15  colonial America, the British crown, again, attempted to

16  restrict or do away with the right to trial by jury.  This

17  time it was not King John, but it was King George the III.

18  And that led, along with other things, to the separation of

19  our country from England, the American Revolution and the

20  founding of the United States of America.

21       As a matter of fact, Thomas Jefferson, in writing

22  the Declaration of Independence, which sets forth the

23  various reasons why the British colonies should separate

24  from the mother country and from their own independent

25  nation, spells out specifically the king's attempt to

1    restrict and deny the right to trial by jury as one of the

2    precise reasons justifying our revolution and our separation

3    from England in the formation of the United States as a

4    separate and independent nation.

5         The right to trial by jury was recognized by our

6    founding fathers after our independence as a vital part of

7    our nation.  And as a matter of fact, after the adoption of

8    the constitution, the first 10 amendments, which we all know

9    as the Bill of Rights, was quickly adopted thereafter.  And

10   in those first 10 amendments to the constitution, you'll

11   find the Seventh Amendment.  The Seventh Amendment

12   guarantees the right to every American to resolve their

13   disputes in a trial by jury, including those disputes in a

14   civil case.

15        So for over 125 years, because the Seventh

16   Amendment was ratified in 1791, so for over 225 years, every

17   American has had a constitutional right to have their

18   disputes in civil cases resolved by a trial by jury.

19        So by being here today and participating in this

20   process, each of you all are doing your part in a very real

21   sense to preserve, protect, and defend the constitution of

22   the United States.

23        I always tell people who show up, as you have, for

24   jury service this morning that in my personal view and

25   opinion, jury service is the second highest form of public

1   service that any American can render.  In my opinion, the

2   highest form of public service are those young and men --

3   young men and women that wear the uniform of our country and

4   serve in our armed forces.

5          Now, ladies and gentlemen, the lawyers are going to

6   address you later this morning, and they're going to ask you

7   various questions.  I want you to understand that they are

8   not seeking to pry unduly into your personal affairs, but

9   they are entitled to ask the questions they will ask for

10  purposes of securing a fair and an impartial jury to hear

11  the evidence in this case.

12         I don't know if it will happen today, it rarely

13  does, but occasionally, only occasionally one of the lawyers

14  will ask a question that someone on the jury panel perceives

15  as being so personal to them and so private that they are

16  not comfortable answering it in the front of their -- in

17  front of everyone else.  I don't think that's likely to

18  happen, but if it should happen, you need to understand that

19  you have the option of simply saying in that circumstance,

20  I'd like to answer that in front of Judge Gilstrap.  And if

21  that's your answer, then I'll provide an opportunity for you

22  to answer that question outside the presence of everyone

23  else.  Again, that rarely comes up, but in case it does, I

24  want you to know that you have that option.

25         The important thing for each of you to remember is

 1   that the answers that you should give to the questions asked

 2   should be full, complete, and truthful.  There are no wrong

 3   answers to the questions as long as your answers are full,

 4   complete, and truthful.

 5          Now, the trial in this case is going to begin today

 6   after we've selected the jury, and I anticipate that it's

 7   going to last throughout this week and should finish on

 8   Friday of this week.  So for planning purposes, we should

 9   begin today on the 5th, and I anticipate we will be finished

10   on Friday, June the 9th.  If there's anybody on the jury

11   panel who could not possibly be available to serve if you're

12   selected for the jury in this case during that time period,

13   that is, if you have non-refundable airline tickets bought

14   and paid for to go somewhere, if you have a surgery

15   procedure scheduled for you or an immediate family member

16   that's dependent upon you, if you have a serious reason why

17   you could not be available if you were selected to serve,

18   then that's something I need to know about now.  If there's

19   anybody on the panel who has that kind of a problem, if you

20   would raise your hands and keep them raised and let me make

21   a note of that.

22          Okay.  And as I call your numbers you can keep your

23   hands down.

24          I see No. 15 and No. 21.

25          And I can't -- 25, thank you, sir.

1          Anybody else?

2          15, 21, and 25.  I don't see any other hands.

3          All right.  At this time, counsel, I'm going to

4  call for announcements in the case of Biscotti, Inc., versus

5  Microsoft Corp.  This is Civil Case No. 2:13-CV-1015.

6          Counsel, as you make your announcements for the

7  record, please not only identify yourselves and the members

8  of your respective trial teams, but also identify any

9  corporate representatives that you have with you.  And we'll

10  begin with the Plaintiff.

11          What says the Plaintiff?

12          MR. JONES:  Thank you, Your Honor.  My name is Mike

13  Jones.  I represent the Plaintiff, Biscotti, and we're ready

14  to proceed, Your Honor.

15          THE COURT:  All right.  Introduce your trial team,

16  Mr. Jones.

17          MR. JONES:  Thank you, sir.

18          I represent Biscotti with Mr. Adam Alper,

19  Mr. Michael De Vries, and Ms. Amanda Hollis.

20          And here at the very back of the courtroom, Your

21  Honor, is Dr. Matthew Shoemake who is our corporate

22  representative.  He's our founder and president, Your Honor.

23          THE COURT:  All right.  Thank you, counsel.

24          MR. JONES:  Thank you, Your Honor.

25          THE COURT:  What says the Defendant?

1              MR. BETTINGER:  Thank you, Your Honor.

2              Mike Bettinger representing the Defendant in the

3    case, Microsoft.  And we are ready to proceed.

4              THE COURT:  All right.  Introduce your co-counsel.

5              MR. BETTINGER:  Thank you, Your Honor.

6              To my left, your right, is Rick Cederoth and

7    Melissa Smith on behalf of Microsoft, Your Honor.

8              THE COURT:  And do you have corporate

9    representation present?

10             MR. BETTINGER:  Mr. Del Castillo is not here this

11   morning.

12             THE COURT:  All right.  Thank you, counsel.

13             MR. BETTINGER:  Thank you.

14             THE COURT:  As I've told you, ladies and gentlemen,

15   this is a patent case arising under the patent laws of the

16   United States.  And what the Plaintiff, Biscotti, is

17   claiming in this case is that its patent was infringed by

18   the Defendant, Microsoft, and it's seeking money damages

19   because of that alleged infringement.

20             The Defendant, Microsoft, denies that it infringes

21   Biscotti's patent and contends that the patent is invalid.

22             Now, what I've just told you is a very informal

23   shorthand way of describing the case in layman's terms.  I

24   know you've all seen the patent video this morning prepared

25   by the Federal Judicial Center, and having seen that, you

1  know more about patents than most people do when they appear

2  for jury service.

3       As I mentioned, the lawyers for both sides are

4  about to question the panel, seeking to gather information

5  that they need to exercise their peremptory challenges and

6  complete the process of selecting the jurors that will try

7  this case.  I remind you again, there are no wrong answers

8  as long as your answers are full, complete, and truthful.

9       The lawyers' job here is to secure a fair and

10  impartial jury.  They're not seeking to be nosy or intrusive

11  into your personal affairs.  If for any reason the lawyers

12  ask a question that I think is improper, I will certainly

13  stop them and tell them that.  But you should understand,

14  these are all experienced trial counsel.  They are well

15  aware of the rules of the Court and the federal rules of

16  civil procedure, and I don't expect that to happen.

17       One thing I do want to call your attention to,

18  though, before the lawyers begin with their questions,

19  because some of them may ask you about your ability to apply

20  this if you're selected, is the burden of proof.

21       In a patent case, the jury is called upon to apply

22  two different burdens of proof.  The jury may apply the

23  burden of proof known as the preponderance of the evidence,

24  as well as a second burden of proof known as clear and

25  convincing evidence.  Again, those two burdens of proof are

the preponderance of the evidence and clear and convincing

evidence.

When responding to lawyers' questions about the

burden of proof, I need to instruct you that when a party

has the burden of proof on any claim or defense by a

preponderance of the evidence, it means that the jury must

be persuaded by the credible and believable evidence that

that claim or defense is more probably true than not true.

I'll say that again, more probably true than not true.

Sometimes this is talked about as being the greater

weight and degree of credible testimony.  Let me give you an

example that I hope will be helpful.

I think all of you can see in front of me and in

front of our court reporter a statue of the Lady of Justice.

You'll notice that she holds the sword of justice in her

right hand, lowered at her right side, she's blindfolded,

and her left hand is raised holding the Scales of Justice.

Those Scales of Justice are exactly balanced and equal.  And

that's the way both parties in this case start off.  Exactly

the same, exactly equal.

During the course of the trial, you're going to

hear evidence, and that evidence, if you'll think about it

this way, is placed on one side or the other side of those

scales, depending on who offers it.  And when all the

evidence is complete, the jury is going to be asked to

1  answer certain questions.  And in answering those questions,

2  you should look to and think about the evidence that's been

3  placed on those scales during the course of the trial.  And

4  if the party who has the burden of proof by a preponderance

5  of the evidence has those scales tip in their favor, even if

6  those scales tip ever so slightly, then they have met the

7  burden of proof of a preponderance of the evidence.

8         On the other hand, ladies and gentlemen, when a

9  party has the burden of proof of proving a defense by the

10 second burden of proof I mentioned, clear and convincing

11 evidence, that means that the jury must have an abiding

12 conviction that the truth of the party's factual contentions

13 are highly probable.  And I'll say that again.  An abiding

14 conviction that the truth of that party's factual

15 contentions are highly probable.  This is a higher standard,

16 a higher burden of proof than the preponderance of the

17 evidence.

18        If you'll think about the same example I gave you,

19 the Scales of Justice for the parties in this case start off

20 exactly equal.  During the course of the trial, the evidence

21 is presented, and it's placed on one side or the other of

22 those scales, depending on who presents it.  When the trial

23 is complete and the jury deliberates to answer the questions

24 that will be asked of it, if a party has the burden of proof

25 on any defensive matter by clear and convincing evidence,

then to meet that burden of proof, those scales must tip in

their favor and they must tip definitely in their favor.

They must tip more than ever so slightly.  And if they do,

then they have met that higher burden of clear and

convincing evidence.

Now, neither of these two burdens of proof should

be confused with a third burden of proof that you've

probably heard about in media and on television, and that is

a burden of proof known as beyond a reasonable doubt.

Beyond a reasonable doubt is a burden of proof applied in a

criminal case, and it has absolutely no application in a

civil case such as this.  You should not confuse clear and

convincing evidence with evidence beyond a reasonable doubt.

It's not as high a standard as beyond a reasonable doubt,

but clear and convincing evidence is a higher standard than

the preponderance of the evidence.

Now, I give you these instructions in case some of

the lawyers in the case will ask you about your ability to

apply those two burdens of proof to the evidence that's

going to be presented during this trial if you're selected

as a juror in this case.

Now, before the lawyers address you, ladies and

gentlemen, I'm going to give you the opportunity to give me

the same kind of information about you that I gave you about

myself when we started.  Each of you should have and on your

1   screens you'll see nine separate questions.  I'm going to

2   ask each of the members of the panel to answer those

3   questions.  And this is the way that we're going to do it,

4   ladies and gentlemen.

5         Our Court Security Officer, Mr. Johnston, is going

6   to bring a handheld microphone to each member of the panel.

7   We'll start with Panel Member No. 1, and we'll go through

8   everybody on the panel.  When you get that handheld

9   microphone, if you will stand and if you will answer into

10  the mic so we can all hear you, those nine questions.  Then

11  we'll pass the microphone to Panel Member No. 2, and we'll

12  go through the remaining members of the panel and get your

13  answers to those nine questions.

14        Also, I want you to understand that during the

15  remainder of the process, when the lawyers for the parties

16  address the panel, if they should ask specific questions to

17  anyone on the panel, then you should make sure that you

18  stand up before you answer and you should wait until you

19  have the microphone, and you should use the handheld

20  microphone when you answer the questions.  Don't forget to

21  do that and start talking while you're seated before the

22  microphone gets there.  This is a large room.  We've got a

23  lot of people in it, and it's important that everyone hears

24  your answers, not only to these nine questions but to any

25  other questions you might be asked by counsel during the

1    remainder of the process.

2          So with those instructions, we'll start with panel

3    number -- Panel Member No. 1, Ms. Trahan, and we'll have the

4    microphone brought to you.  If you'll answer those nine

5    questions for us, please?

6          JUROR TRAHAN:  Okay.  My name is Lucinda Trahan.  I

7    have two children.  I'm employed by the city of Linden as

8    their one and only utility building clerk.  I've been there

9    since December 9th, 2016.  I do have my high school

10   education, two years of college.  No spouse.  And no prior

11   jury service.

12         THE COURT:  Thank you, ma'am.  If you'll hand that

13   to Panel Member No. 2, Ms. Edney?

14         JUROR EDNEY:  My name is Taira Edney.  I'm from

15   Jefferson, Texas.  I have no children.  I'm working at

16   Pilgrim's Pride for the summer.  I do have a high school

17   diploma, and I'm attending SFA right now.  I don't have a

18   spouse.  And I never did jury.

19         THE COURT:  All right.  Thank you.

20         No. 3, Ms. Cherry.

21         JUROR CHERRY:  Good morning.  My name is Bonita

22   Cherry.  I live in Marshall, Texas.  I have three children.

23   I am employed at Waskom ISD where I am middle school

24   principal.  I've worked there since August of 2004.  I have

25   high school, college, and a Master's degree.  My spouse is

1    Johnny Cherry.  He's employed with Rescar Tank Repair in

2    Longview, Texas, where he is a railcar repairman.  He has

3    worked there for 21 years.  And I have no prior jury

4    service.

5           THE COURT:  Thank you, Ms. Cherry.

6           No. 4, Mr. Smith.

7           JUROR JERRY SMITH:  My name is Jerry Smith.  I

8    live in Upshur County.  I have two girls.

9           I've been working for Applied Introduction

10   Technology for 10 years.

11          THE COURT:  Mr. Smith, hold that microphone a

12   little closer, please, sir.

13          JUROR JERRY SMITH:  And my wife -- I have a high

14   school diploma, two years of college.

15          My wife is a secretary at New Diana High School.

16   And she's been there about five years.

17          And I have no prior jury service.

18          THE COURT:  Thank you, sir.  If you'll hand that

19   mic to Panel Member No. 5, Ms. Chaney.

20          JUROR CHANEY:  My name is Tammy Chaney.  I live in

21   Gladewater.  I have three children.

22          Work at Whataburger.  Been there for a year and a

23   half.  I did not graduate high school.

24          I do not have a spouse.

25          And I've never been on a jury before.

```
 1              THE COURT:  All right.  Thank you.

 2         Panel Member No. 6, Ms. Hodges.

 3         JUROR HODGES:  My name is Jacqueline Hodges.  And I

 4  have two children.  I'm currently a homemaker.  I used to be

 5  a realtor and have high school and some college.

 6         My husband is David Hodges.  He works for Chevron

 7  as an advisor in Nigeria.  He's been with the company for

 8  15 years.

 9         And I have never served on a jury.

10         THE COURT:  Thank you.

11         Panel Member No. 7.

12         JUROR JERGUSON:  My name is Jill Jerguson.  And I

13  live in Hallsville, Texas.  I have three children.

14         I'm currently self-employed, build houses.  My

15  husband and I build houses.

16         And I also was an RN for a while.  I have high

17  school and, of course, a college degree for nursing.

18         My spouse's name is Roger Jerguson.  And he's

19  employed at Strong Services, which is an oil and gas

20  company.  And he works there as a hand.  And he's worked

21  there for five years.  And we also build -- he builds houses

22  with me, so he's doing that, too.

23         I was on a criminal case.

24         THE COURT:  And where was that?

25         JUROR JERGUSON:  It was here in Marshall.
```

```
 1              THE COURT:  In federal court?

 2              JUROR JERGUSON:  No.  It was --

 3              THE COURT:  State court?

 4              JUROR JERGUSON:  Yeah.

 5              THE COURT:  Okay.  Thank you.  If you'll hand the

 6    mic to Mr. Johnston, he'll take it around to Panel Member

 7    No. 8, Mr. Garner.

 8              JUROR GARNER:  Yes, sir.  My name is Tommy Garner.

 9    I've got two kids.

10              Work at Flanders Electric in Longview.  Been there

11    19 years.  High school graduate.

12              My wife's name is Marsha Hess.  She works for Beer

13    Wells here in Longview as second floor receptionist.  She's

14    been there about 18, 19 years.

15              And I have been on the jury before.  It was a civil

16    case.

17              THE COURT:  And where was that?

18              JUROR GARNER:  Here.

19              THE COURT:  In Marshall or --

20              JUROR GARNER:  Marshall.

21              THE COURT:  In state court or federal court?

22              JUROR GARNER:  Federal.

23              THE COURT:  All right.  Thank you, sir.

24              No. 9, Ms. Morgan.

25              JUROR MORGAN:  My name is Brenda Morgan.  I live in
```

1    Daingerfield, Texas.  I have two children.  I work at

2    Daingerfield Lone Star ISD, 20 years.  I have a BS in

3    education.

4           My spouse's name is Jason.  He works at Scot

5    Industries.  He's been there 25 years.

6           And I've never had any prior jury service.

7           THE COURT:  And what does your husband do at Scot

8    Industries?

9           JUROR MORGAN:  He's a salesman.

10          THE COURT:  Okay.  Thank you, ma'am.

11          No. 10.

12          JUROR GUNSOLUS (CLONINGER):  Good morning.  My name

13    is Heather Gunsolus.  I have four children.  I am

14    self-employed.  I have a food trailer.  I've had that for

15    about eight months.  I have a high school grad -- diploma,

16    I'm sorry.

17          My husband is Harold Gunsolus.  He is a

18    superintendent for Ridged Industrial.  He's worked there for

19    about six months.

20          And I have no prior jury service.

21          THE COURT:  All right.  Thank you, ma'am.

22          No. 11, Ms. Lankford.

23          JUROR LANKFORD:  My name is Lauren Lankford.  I

24    live in Pittsburg.  I have two children.  I work for Farmers

25    Insurance and have been with them for six and a half years.

1    I have a high school diploma and an Associates of Business.

2          My spouse is Joshua Lankford, and he works for

3    Priefert Manufacturing and has for 13 years as a shipping

4    supervisor.

5          And I have no prior jury service.

6          THE COURT:  What do you do for Farmers Insurance?

7          JUROR LANKFORD:  I sell casualty and property and

8    life insurance.

9          THE COURT:  Okay.  Thank you ma'am.

10         No. 12.

11         JUROR LAMBRIGHT:  My name is Deanna Lambright.  I

12   live here in Marshall.  I have three children.  Homemaker,

13   have been for almost all of my married life for 46 years.  I

14   have a high school education.

15         My husband's name is Harold Lambright.  And he

16   is -- both of us, I guess, you could say are retired.  He

17   retired from Southern Pacific Railroad as a locomotive

18   engineer.  And he retired after 30 years.

19         And I've -- I've served on a jury in the Harrison

20   County courthouse.

21         THE COURT:  State court?

22         JUROR LAMBRIGHT:  Civil, state court.

23         THE COURT:  And when was that, ma'am?

24         JUROR LAMBRIGHT:  Probably about three years ago.

25         THE COURT:  Okay.  Thank you.

1          No. 13, Mr. White.

2          JUROR WHITE:  My name is Reagan White.  I have two

3  children.  I am currently employed at Halliburton Energy

4  Service, I think about eight months.  I'm a cement operator.

5  I have some college.

6          My wife's name is Lindsey White, and she works at

7  Brookshire's Grocery Company.  She is analyst at the

8  corporate office there in Tyler.  And she's been there about

9  12 years.

10         And I have no prior service.

11         THE COURT:  All right, sir.  Thank you.

12         No. 14, Ms. Kelley.

13         JUROR KELLEY:  My name is Karmen Kelley.  I live in

14  Gilmer.  I have two children.  I work for Union Hill ISD.

15  Been there a year and a half.  Prior to that, I was with

16  Upshur County for 38 years.  I have a high school diploma.

17         My spouse's name is Jim Kelley.  He works for the

18  City of Gilmer.  He's been there about 15 years, and he

19  works for the street department.

20         And I have had no prior jury service.

21         THE COURT:  What did you do for Upshur County?

22         JUROR KELLEY:  I was the assistant auditor at one

23  time, assistant county treasurer, and IT director.

24         THE COURT:  Thank you, ma'am.

25         All right.  Next will be No. 15, Mr. Ellis.

```
 1            JUROR ELLIS:  My name is Jacob Ellis.  I live in
 2   Gilmer, Texas.  No children.  No wife.
 3            I work at Capacity of Longview as a welder.  I've
 4   been there for six years.  High school equivalency.
 5            I've never served on a jury.
 6            THE COURT:  All right, sir.
 7            No. 16, Mr. Ross.
 8            JUROR ROSS:  My name is Kenneth Ross -- my name is
 9   Kenneth Ross.  I live in the City of Gilmer.  I have two
10   children and seven grandchildren.
11            I am semi-retired, I guess, restaurant manager and
12   owner.  Right now I work part time for a medical
13   transportation, and I'm also a pastor of the Gladewater
14   Missionary Baptist Church.  I've been working for about a
15   year currently, and I was -- been a pastor since 2010.  I do
16   not have a high school diploma.
17            My wife's name is Rebecca Ross.  She is a retired
18   homemaker.  She's a granny now.  That's full time.  She's
19   been there for about 14 years, I guess.
20            And I have no prior jury service.
21            THE COURT:  Thank you, sir.  If you'll pass that
22   mic to No. 17, Ms. Alexander.
23            JUROR ALEXANDER:  My name is Patricia Alexander.
24   No children.  I'm from Gilmer.  No spouse.  I am a retired
25   elementary principal.  Spent 30 years with that.  And now
```

1  I'm presently the training coordinator at Walmart in Gilmer.

2  Been there almost six years.

3          THE COURT:  And do you have any prior jury service,

4  ma'am?

5          JUROR ALEXANDER:  Yes, sir, I -- I served in Upshur

6  County, child custody case.

7          THE COURT:  How long ago?

8          JUROR ALEXANDER:  Five years.

9          THE COURT:  Thank you, ma'am.

10          No. 18, Ms. Miller.

11          JUROR MILLER:  I'm Nora Gayle Miller.  I have two

12  children.  I work for Queen City ISD.  I'm the director of

13  instruction and technology there.  I've worked there 35

14  years.  I do have a college degree.

15          My spouse's name is Harley Miller.  He worked for

16  approximately 30 years at -- doing construction work.

17          I was -- I did serve on a jury last November, and

18  it was a criminal case.

19          THE COURT:  And where was that?

20          JUROR MILLER:  Cass County.

21          THE COURT:  Thank you, ma'am.

22          And we'll take the mic around to Panel Member

23  No. 19.

24          JUROR AGUIRRE:  My name is Leno Aguirre.  I have a

25  daughter.  I live here in Marshall.  I work for Harris

1   Potteries.  Been there 11 years.  I do have a high school

2   and associate's degree in electrical instrumentation.

3          My wife's name is Lorena Aguirre.  She owns her own

4   business, which she's a hair stylist.  And she's been doing

5   that for eight years.

6          And I have never done -- have any prior jury

7   service.

8          THE COURT:  Thank you, sir.  If you'll hand that

9   mic to Panel Member No. 20.

10         JUROR LUCE:  My name is Bill Luce.  I have two

11  grown children.  I'm employed at International Paper

12  Texarkana as a mechanic.  Been there eight and a half years.

13  High school education.

14         My wife's name is Kathy.  She stays at home.

15         And I have no prior jury service.

16         THE COURT:  And where do you live, sir?

17         JUROR LUCE:  Queen City, Texas.

18         THE COURT:  Thank you.  If you'll hand that to

19  No. 21, please?

20         JUROR SPURR:  My name is Pamela Spurr.  I live in

21  Marshall.  I've got three children.  I work for Morning

22  Light, Incorporated.  I've worked there 17 years.  I'm a

23  case manager.  I supervise our day lab and do all the

24  company financials.  I have a high school diploma.  My

25  spouse's name is Bill Spurr.  He's a retired teacher.  And I

1   have no prior jury service.

2         THE COURT:  Thank, ma'am.  If you'll hand that to

3   No. 22?

4         JUROR BAUM:  Steve Baum.  Queen City, Texas.  Got

5   four children.  Work for Fluor Corporation, which is based

6   out at the mill at Domino, Texas.  Been there three and a

7   half years.  Bachelor's.  My wife's name is Kelly.  She's

8   also employed at Fluor Corporation.  She's been there three

9   years also.  And no jury service.

10         THE COURT:  And what's your Bachelor's degree in,

11   and where did you get it?

12         JUROR BAUM:  HSE, Health, Safety, and

13   Environmental, Southern Alabama.

14         THE COURT:  Thank you, sir.  If you'll pass that to

15   No. 23, Mr. Ford.

16         JUROR FORD:  My name is Troy Floyd.  I live in

17   Diana.  I have two children.  I work for Circle Z Pumping,

18   which is in the oilfield.  I've been there three months.  I

19   have a high school diploma and college.  My wife's name is

20   Penny Ford.  She works at the East Texas Professional Credit

21   Union as an insurance agent.  She's been there about seven

22   years.  And I've had no prior juries.

23         THE COURT:  Thank you, sir.  We'll take the mic

24   over to No. 24 on the panel, Mr. Smith.

25         JUROR PAUL SMITH:  My name -- excuse me, my name is

1   Paul Smith.  I live here in Marshall, Texas.  I have three

2   children.  I work at Marshall ISD.  I'm in maintenance.

3   I've worked there now for 16 and a half years.  I have two

4   years of college.  My spouse's name is Charlotte Smith.  She

5   works at St. Joseph's Catholic Church as the faith formation

6   director.  She's worked there around 18 years.  I have prior

7   jury service in a civil case here in Marshall.

8          THE COURT:  And was that in state court?

9          JUROR PAUL SMITH:  Yes, sir.

10         THE COURT:  Thank you very much.  If you'll pass

11  that microphone on to No. 25, Mr. Rodgers.

12         JUROR RODGERS:  My name is Danny Rodgers.  I live

13  in Ore City, Texas.  No kids.  Self-employed builder.  My

14  wife -- oh, high school and trade school.  My spouse works

15  at Good Shepherd Hospital in the billing, and she's worked

16  there for 12 years.  And I've never served.

17         THE COURT:  Thank you, sir.  If you'll pass the mic

18  next to Panel Member No. 26?

19         JUROR HOLLIDAY:  My name is Marcus Holliday.  I'm

20  from here in Marshall, Texas.  Been here about eight years.

21  I have three children.  I work at East Texas Baptist

22  University.  I'm the head athletic trainer there and an

23  adjunct instructor, again, starting my 9th year there.  I do

24  have a Master's degree.  My wife's name is Rachel Holliday.

25  She's an accountant.  She works for Accounting Associates in

1   Bradenton, Florida, so my wife works from home part time.

2   And, again, she's been there for -- or worked for them for

3   more than 10 years.  And I have no prior jury service.

4           THE COURT:  Thank you, sir.  If you'll pass the mic

5   to No. 27, Ms. Nicholson?

6           JUROR NICHOLSON:  My name is Denise Nicholson.  I

7   live in Diana, Texas.  I have three children, and I work for

8   Cameron.  It's a Schlumberger company.  I do inventory and

9   office management there.  My husband is Calvin Nicholson,

10  and he works for the Texas State Department of Health

11  Services.  He's a planner.  I have a high school education.

12  My husband's been with the State of Texas, the Health

13  Department for about 10 years.  And I have no prior jury

14  service.

15          THE COURT:  All right.  Thank you, ma'am.  Last

16  member of our panel, No. 28, Mr. Whitten?

17          JUROR WHITTEN:  My name is Lance Whitten.  I live

18  in Big Sandy.  I have two children.  I work for Ingersol

19  Rand - Trane in Tyler, been there for almost 22 years.  The

20  last three years, I've been a production supervisor.  Just

21  have a high school degree -- diploma.  My wife's name is

22  Michelle Whitten.  She works for ECI Advantage out of

23  Lindale.  She's been there approximately 15 years.  And I've

24  never served on a jury.

25          THE COURT:  Thank you, sir.

1          All right.  Thank you very much, ladies and

2     gentlemen.

3          Now, I need to say a couple more things to you

4     before I turn the questioning over to the lawyers.  The

5     jurors that are selected to actually serve in this case will

6     serve in the role of the judges of the facts.  And the

7     jurors selected in this case will make the sole

8     determination about what the facts are in this case.

9          Now, my job as the Judge is to rule on questions of

10    law, evidence, procedure, to maintain the decorum of the

11    courtroom, and oversee the flow of the trial.

12         Also, I want to say a couple things to you about

13    our judicial system that I hope will put things in a proper

14    perspective for you.

15         In any jury trial, besides the actual parties

16    themselves, the Plaintiff and the Defendant, there are

17    always three participants, the jury, the Judge, and the

18    lawyers.

19         With regard to the lawyers, it's important for each

20    of you to understand that our judicial system is an

21    adversary system, which means simply that during a trial,

22    each of the parties will seek to present their respective

23    cases to the jury in the very best light possible.

24         Now, it should be no surprise to any of you that

25    lawyers are frequently criticized in the public and in the

 1   media, but the Court has observed that that often results

 2   from a basic misunderstanding of our adversary system in

 3   which the lawyers act as advocates for the competing

 4   parties.  And as an advocate, a lawyer is ethically and

 5   legally obligated to zealously assert his or her client's

 6   position under the rules of our adversary system.  And by

 7   presenting the best case possible on behalf of their

 8   clients, the lawyers hopefully will enable the jury to

 9   better weigh the relevant evidence and determine the truth

10   and arrive at a just verdict based on that evidence.

11          Our American system of justice, this adversary

12   system, has served our country well for over 200 years, and

13   America's lawyers have always been and continue to be an

14   important and indispensable part of the process.

15          So as we go forward with this trial, even though

16   it's possible that from time to time, I might growl or frown

17   at the lawyers, it's simply because I'm trying to make sure

18   that their advocacy doesn't get outside the boundaries of

19   our adversary system.  But keep in mind, ladies and

20   gentlemen, they are simply doing their jobs, and it's

21   important for all of you to be aware of that as we go

22   forward.

23          Also, ladies and gentlemen, over the course of the

24   trial, I want you to understand that I am going to do my

25   very best to make sure that the jurors in this case have

1    absolutely no idea about what I think about the evidence

2    that's presented because it is the job of the jury to

3    determine the facts based on that evidence, and that is not

4    my job.

5         So you should not -- those of you that are selected

6    for the jury should not take any expressions that you see or

7    you think you see as coming from me as something to consider

8    in determining what the ultimate facts are in this case.

9         All right.  With that, the counsel will now be in a

10   position to address the panel.

11        Mr. Jones, you may address the panel on behalf of

12   the Plaintiff.  Would you like a warning on your designated

13   time?

14        MR. JONES:  Yes, Your Honor, five minutes.

15        THE COURT:  All right.  You may proceed.

16        MR. JONES:  Thank you, Your Honor.

17        Good morning, ladies and gentlemen.

18        First thing I want to do is to thank you on behalf

19   of both myself and Biscotti for your service as jurors.

20        I think Ms. Smith and I will agree today that this

21   is an important case.  I think we will agree today that we

22   cannot resolve the issues in this case without your help.

23   And I thank each of you very much for your time and for your

24   service as jurors.

25        I would also like to follow Judge Gilstrap's

example and tell you just the same things about myself.  My name is Mike Jones.  I'm a lawyer from Tyler, Texas.  I've practiced law in East Texas since 1977.  My wife and I, Pam, live in Tyler.  We have two grown children, and we have three grandchildren.

I want to also thank you for your help in filling out the questionnaires for us before we started this process.  It is very helpful.  It does streamline the process.

I have a few more questions to ask you.  Like Judge Gilstrap said, it is not my intent to pry in any way.  If I ask you anything confidential, please tell me.  If I ask you anything you don't understand, please tell me that.  But I thank you very much for your time and for your patience with me.

As the Court told you, this is a patent case. Dr. Matthew Shoemake has spent his life developing electronic technology.  And he and another inventor obtained a patent and contend in this case that that patent is infringed by Microsoft.  The case will really resolve around three issues.

Now, we will present proof through four different witnesses, and I'd like to ask you if you know any of those witnesses.  We will present proof through Dr. Matthew Shoemake himself.

1          Anybody know anything about him from any source?

2          We will present proof from a Dr. Steve Wicker.  Has

3     anybody heard of Dr. Wicker from any source?

4          We will present proof from a Dr. Ravi Dhar.  Has

5     anybody heard of Dr. Dhar?

6          And finally, we will present proof from Dr. Ray

7     Perryman.  Has anybody ever heard of Dr. Perryman before?

8     Anybody?

9          Okay.  Thank you very much.

10          The first issue that Biscotti will present evidence

11     on in this case is that Microsoft's Xbox One products

12     infringe.  Microsoft will contend that they do not.

13          In the questionnaire, you were asked have you or

14     somebody close to you or your employer ever been involved in

15     a patent dispute.  And the vast majority of you answered

16     that you were unsure whether that was true or not.

17          Now, if I could, and I'll pick on you, if you don't

18     mind, since you're No. 1, Ms. Trahan, I assume by that

19     answer to the question that it means you don't know whether

20     or not someone close to you or your employer has ever been

21     involved in a patent dispute?

22          JUROR TRAHAN:  That's correct.  I've only been

23     employed for six -- six months there, so I don't know them

24     that well.

25          MR. JONES:  Thank you.  Thank you.

```
 1              And I also assume from you that you don't know of
 2    any past patent disputes that -- maybe a past employee
 3    dispute you have been involved in, correct?
 4              JUROR TRAHAN:  I have no idea, correct.
 5              MR. JONES:  And if you'd just keep the microphone
 6    for one more second, but I'll ask the panel in its entirety,
 7    is her answer the same answer I get if I ask those questions
 8    to you, that -- that that's the way you interpreted the
 9    question?  And that's where we are?  Anybody feel
10    differently than that?
11              Thank you.
12              My next question to you, Ms. Trahan, would -- would
13    be this:  Whether it involved an employer of yours or
14    whether it involved a close friend or not, do you have any
15    knowledge from any source, whatsoever, about any particular
16    patent dispute?
17              JUROR TRAHAN:  About 20 years ago, I worked as a
18    transcriber for a court reporter, and she had a case with a
19    patent.  And what I remember is, it was a 300-page
20    deposition that I had to type, and it was extremely boring.
21              MR. JONES:  Thank you, ma'am.  Thank you, ma'am.
22              I would -- I understand.
23              I would -- I would like to expand the question --
24    thank you for answering it.
25              I would now like to expand the question to the
```

1   whole panel and ask each of you to tell me if you have any

2   knowledge of any particular patent dispute like Ms. Trahan

3   did, anybody?

4          Let me ask another question that's very similar to

5   that, and that would be this:  Do you -- any of you have any

6   knowledge or experiences in particular that as you hear

7   Judge Gilstrap tell you this is a patent case, you think of,

8   you know, that particular experience of mine or that

9   particular knowledge of mine is going to be very helpful to

10  me in deciding a patent dispute?  Are any of you in that

11  situation?  If you would, would you please raise your hand

12  and let me know?

13         Thank you.

14         Now, let's do this by rows.  On the first row, how

15  many of you think there are too many lawsuits, anybody on

16  the first row think that?

17         Yes, ma'am.  That would be Ms. Hodges, right?

18         JUROR HODGES:  Right.

19         MR. JONES:  Thank you.  Let me drill down a little

20  deeper on that, if I could.

21         Do you think there are too many patent lawsuits?

22         JUROR HODGES:  I really can't answer that.  I don't

23  know how many patent lawsuits there are out there.

24         MR. JONES:  Does the fact that you think there are

25  too many lawsuits in general, for whatever reason, does that

 1   cause you as we start this case to lean one way or another?

 2          JUROR HODGES:  Absolutely not.

 3          MR. JONES:  Thank you.  I appreciate your honesty.

 4          Can I -- can I ask you one more question -- and I

 5   apologize.

 6          And as I look at this lawsuit issue, it seems to me

 7   like people usually fall into two categories.  There are

 8   some people that think lawsuits are good because they're a

 9   peaceful way to solve problems.  There are some people that

10   think lawsuits are bad because judges and juries make

11   mistakes.  Which camp would you say you fall into?

12          JUROR HODGES:  Not necessarily either.

13          MR. JONES:  Thank you.

14          JUROR HODGES:  I think my opinion comes from -- I'm

15   a big news follower, and I just -- my problem is people seem

16   to be suing for everything, anything and everything.  So

17   that's what I'm coming from.

18          MR. JONES:  Thank you.  I appreciate it.  Thank you

19   so much.  You've answered my questions.

20          I tell you what, let me go row by row on the two

21   camps.  On the first row, is there anybody besides

22   Ms. Hodges that would say -- you didn't say that, you said

23   you didn't fall in either camp.  But is there anybody on the

24   first row that would fall into the second camp that thinks

25   lawsuits are bad?  Anybody on the first row?

1          How about the second row?

2          How about the third row over here, anybody falls

3    into that second camp, thinks lawsuits are bad?

4          Anybody on that row that thinks there are too many

5    lawsuits?

6          Yes, sir.  Okay.  Thank you.

7          That would be Mr. Ellis, and I would drill down

8    with you the same way I did with Ms. Hodges.  Do you think

9    there are too many patent lawsuits?

10          JUROR ELLIS:  I don't know much when it comes to

11   patent lawsuits, just in general lawsuits.  Like, you know,

12   my coffee was hot type of thing.

13          MR. JONES:  Thank you, sir.

14          Now, do -- does that cause you, as we start this

15   case, to lean toward one side or the other?

16          JUROR ELLIS:  No.

17          MR. JONES:  Thank you, sir.  I appreciate that.

18          And I believe I also got a yes from Mr. Ross.

19          Mr. Ross, do you believe there are too many

20   lawsuits?

21          JUROR ROSS:  Yes.  Yes.

22          MR. JONES:  I would -- I would, again, like I did

23   with the other jurors, drill down a little bit and ask the

24   question:  Do you believe there are too many patent

25   lawsuits?

1          JUROR ROSS:  I wouldn't -- wouldn't really know the

2   answer to that.  I don't know how many patented lawsuits

3   there are.

4          MR. JONES:  Does this feeling that you have that

5   there are too many lawsuits, do you lean one way or the

6   other as we start this case, sir?

7          JUROR ROSS:  I'm sorry, could you repeat the

8   question?

9          MR. JONES:  Yes, sir.  Does this feeling you have

10  that there are too many lawsuits cause you to lean toward

11  one side or the other before we even start this case?

12         JUROR ROSS:  No, sir.

13         MR. JONES:  Thank you, sir.  I appreciate it.

14  Thank you so much.

15         Keep -- keep going -- we got everybody that had a

16  response on the third row.

17         Let's go to the fourth row, is there anybody on the

18  fourth row that thinks lawsuits are bad and falls into that

19  second camp?

20         Anybody on the fifth row that thinks lawsuits are

21  bad and falls into that second camp?

22         Thank you very much.

23         Is there anybody, due to a moral or religious

24  conviction, that believes it is improper to file a lawsuit

25  like Biscotti has done in this case?  Anybody feel that way?

1          Let me ask it a little differently, if -- this will

2    be a little bit of a hypothetical question.  But if you were

3    in a situation where somebody owed you a large sum of money

4    and they refused to pay it to you, is there anybody on the

5    panel that has a conviction of any type that causes you to

6    say, I just would never sue them, even if it meant I just

7    had to forego the debt they owed me?  Anybody in that

8    situation, just the way you feel about things?

9          Yes, sir, Mr. Ross, do you find yourself in that

10   situation?

11         JUROR ROSS:  I think so, yeah.  I mean, if they

12   can't pay, they can't pay.  Just forgive, you know, forget.

13         MR. JONES:  I got you.

14         JUROR ROSS:  And go on with life.

15         MR. JONES:  Thank you, sir.

16         In this particular situation, obviously, my client,

17   Biscotti and Dr. Shoemake, have come into Court and filed a

18   lawsuit.  The fact that they would do that when you wouldn't

19   do that, does that cause you to lean against them in any

20   way?

21         JUROR ROSS:  I really don't know how to answer that

22   question.  No, I mean, I guess the truth will prevail, I

23   guess, is the -- but I couldn't tell you from what I know

24   about the case, just from the introduction, I -- I couldn't

25   tell you what would -- I don't think it would make me lean

1   one way or the other, no.

2           MR. JONES:  And I understand, I think --

3           JUROR ROSS:  My kind -- my kind of thing is -- is

4   you just -- you -- you hear -- like one lady, I think, said,

5   this is the news media and everything like that, it kind of

6   maybe -- it might distort people's minds about -- you know,

7   you hear somebody getting, you know, from McDonald's being

8   burned by coffee because they -- they put it to their mouth

9   before they let it cool off and win millions of dollars.  I

10  think it's kind of frivolous and out of control.

11          MR. JONES:  Thank you, sir.  If I understand what

12  you're telling me, you're telling me I just have to decide

13  this case based upon the evidence, right, sir?

14          JUROR ROSS:  Yes, sir.

15          MR. JONES:  Couldn't ask for more.  Thank you so

16  much, sir.

17          The next row, the fourth row, anybody fall into

18  that bad camp -- thinks lawsuits are bad?

19          And the fifth row, anybody think lawsuits are bad?

20          Thank you so much.

21          Now, has anyone read any press reports or seen any

22  media that dealt with the issue of patent lawsuits being

23  filed in Marshall, Texas?  Anybody seen any press reports or

24  read anything about that?

25          How about patent lawsuits being filed in East

1    Texas?  Has anybody seen anything about that?

2         Excuse me, did I see a hand?  I'm sorry, I missed

3    it.  Yes, sir?  I believe that'd be Mr. Holliday?

4         JUROR HOLLIDAY:  Yes.  There was a big article in

5    the news a couple weeks ago or month ago.

6         MR. JONES:  Okay.  And from reading that article,

7    would that cause you, as you go into this lawsuit, to lean

8    one way or the other at all?

9         JUROR HOLLIDAY:  No, not at all.

10         MR. JONES:  Thank you, sir.  I appreciate it.

11         The second issue that we will deal with in this

12    case is the fact that Microsoft says even if they infringe

13    these patents, that they owe nothing to Biscotti because the

14    patents are invalid.  That will be a second issue that

15    you'll decide.

16         Now, like there are two camps with regard to

17    lawsuits, I think there are many times two camps with regard

18    to patents.  Some people think patents are good because they

19    encourage information -- excuse me, encourage innovation.

20    And then there are other people that think patents are bad

21    because they add costs to technology.

22         Is there anyone, say, on the front row that falls

23    into that second category, you think patents are bad?

24         Anybody on the second row?

25         Third row?

1          Fourth row?

2          Fifth row?

3          Thank you.

4          Now, you were asked on your questionnaires if you

5     or someone close to you owned a patent.  If I could,

6     Ms. Miller, I think she's over here in the -- Row 3.

7          Ms. Miller, I believe you told us that your brother

8     invented scaffolding?

9          JUROR MILLER:  Yes, that's correct.

10          MR. JONES:  Did he receive a patent?

11          JUROR MILLER:  As of this date, no.

12          MR. JONES:  Thank you.  Is there anything about

13     that that would cause you to lean one way or another in this

14     lawsuit?

15          JUROR MILLER:  No, sir.

16          MR. JONES:  Thank you, sir -- thank you, ma'am.

17     Excuse me.  I appreciate it.

18          Oh, while we're there, I did have one further

19     question for you.  You indicated that you had worked at

20     Mr. Bill Hannon's law office at one time?

21          JUROR MILLER:  Yes, sir.

22          MR. JONES:  What type of work did you do there?

23          JUROR MILLER:  I was paralegal/legal secretary.

24          MR. JONES:  And what kind of law were you involved

25     in?

```
 1              JUROR MILLER:  Both criminal and civil.

 2              MR. JONES:  Thank you.  I appreciate it.

 3              And if we could, on Row 4, go to Mr. Troy Ford?

 4              THE COURT:  Mr. Jones, you're going to need to

 5    speak up a little bit.

 6              MR. JONES:  Oh, okay.  I'm sorry.

 7              Mr. Ford, did your son obtain a patent?

 8              JUROR FORD:  Yes, sir.  It's a patent pending now.

 9              MR. JONES:  Thank you, sir.  And is there anything

10    about that experience that would cause you to lean one way

11    or the other as we start this lawsuit?

12              JUROR FORD:  No.

13              MR. JONES:  Thank you.

14              The Judge has defined, to some extent in his

15    instructions to us, the roles that we all play in a trial.

16    And obviously, the role of the Court is to instruct all of

17    us on what the law is.  And he instructed us on what the

18    burden of proof was with regard to infringement and what the

19    burden of proof was with regard to invalidity.  And I'm not

20    going to -- I'm not going to go anywhere toward redefining

21    those terms at all because the Court is the one that defines

22    what the burden of proof is in a case like this.

23              My question to you is this:  The Court clearly

24    stated to you that the burden of proof for infringement is a

25    lesser burden than the burden of proof that Microsoft has to
```

 1    meet in order to prove that Biscotti's patent is invalid.

 2         Now, does anybody on the jury panel think that

 3    that's unfair, that their burden of proof with regard to

 4    invalidity is higher than our burden of proof with regard to

 5    infringement?  Anybody think that's unfair on the first row?

 6         Second row?

 7         Third row?

 8         Fourth row?

 9         Fifth row?

10         The third issue in this case that the jurors will

11    contend with that are selected is that Microsoft contends,

12    even if they infringe the patent and even is the -- even if

13    the patent is valid, that they do not owe the amount of

14    money and damages that will be discussed in Biscotti's

15    evidence.

16         Now, in the questionnaire, you were asked if

17    damages in lawsuits are too high today.

18         If we could, Mr. Smith, on Row 1, sir?

19         JUROR JERRY SMITH:  Yes, sir.

20         MR. JONES:  I would like to drill down a little bit

21    with you in connection with that question.

22         Do you believe that damages in patent cases are too

23    high?

24         JUROR JERRY SMITH:  Not to me, patent cases, but

25    some cases, I believe, it's too high.

1          MR. JONES:  I'd like to ask you, again, another

2    question about proof.  If the evidence in this case showed

3    that Micro -- Microsoft owed nothing to Biscotti and you saw

4    proof of that, could you find that?

5          JUROR JERRY SMITH:  I'm pretty sure I can with the

6    evidence.

7          MR. JONES:  Sure.  On the other hand, if the

8    evidence in this case proved to you that Biscotti was owed

9    many millions of dollars, could you find that?

10          JUROR JERRY SMITH:  With proof of evidence.

11          MR. JONES:  Thank you.  So whatever the evidence

12    proved would be what you would find; is that right, sir?

13          JUROR JERRY SMITH:  Yes, sir.

14          MR. JONES:  Thank you, sir.  Appreciate it.  Thank

15    you.

16          JUROR JERRY SMITH:  Thank you.

17          MR. JONES:  First row, is there anybody that thinks

18    damages in patent cases are too high on the first row?

19          Second row?  See anybody on the second row thinks

20    damages in patent cases are too high?

21          Third row, anybody think damages in patent cases

22    are too high?

23          Fourth row?

24          Fifth row?

25          Mr. -- Mr. Smith has just told me that whatever the

 1   evidence showed would be what he would find.  Is that where

 2   we are -- I'm not trying to get anybody to commit to any

 3   figure in evidence.  All I'm asking is whatever the evidence

 4   shows with regard to damages, whatever was proven to you, if

 5   that's what you find, do y'all sit in the same situation as

 6   Mr. Smith?

 7           Thank you.

 8           Before today was there -- yeah, before today and

 9   before the questionnaires, was there anyone that had not

10   heard of Microsoft?

11           Is there anyone, when they really think about

12   things right now, that thinks, you know, Microsoft is so

13   famous, Microsoft has such smart employees, Microsoft is so

14   advanced technologically, that I just -- I just don't

15   believe -- it's hard for me to believe as I sit here today

16   that they would infringe the patent of a small company like

17   Biscotti?  Does anybody feel that way?

18           It's fine if you feel that way.  I'd just like to

19   know.  Does anybody feel like that?  Am I missing anybody?

20           Does anybody know any of Microsoft's attorneys, and

21   their attorneys, I believe, are Ms. Melissa Smith, Mr. Gil

22   Gillam, Mr. Bobby Lamb, and they're all from Marshall.  Does

23   anybody know any of them?

24           Anybody know Mr. Michael Bettinger, Ms. Irene Yang,

25   Mr. Richard Cederoth, Mr. Nathaniel Love, Mr. Gwen Stewart,

1   Mr. Seth Reich, or the law firm of Sidley Austin, anybody

2   know any of them?

3          Before you came today and before you saw your

4   questionnaires, did any of you -- had you ever heard of

5   Biscotti, seen any media reports, press reports, heard

6   anything about the company Biscotti?

7          Keeping in mind as I just said before, we would all

8   agree, I think, that Microsoft is famous; nobody knows

9   Biscotti.  Is there anything about that situation that makes

10  Biscotti start off behind in this case, the fact that

11  everybody knows Microsoft and nobody's heard of Biscotti?

12  Does that cause Biscotti to start out a little bit behind in

13  this case in anybody's mind?  Anybody?

14         Thank you.

15         You were asked in the questionnaire about video

16  games, and the reason you were asked that is because this

17  case will involve a Microsoft product, a gaming console

18  known as Xbox One.  You were also asked whether you own a

19  video game console or what type you owned.

20         I would like to change that question a little bit.

21  Start with the first row, how many of you personally play

22  video games on, say, an Xbox One, a PlayStation, or anything

23  like that?  On the first row, how many of you actually play

24  video games yourself, not just own one and your children may

25  use it, but you say, I play video games?  On the front row,

1   anybody play video games?

2          Yes, ma'am, got two.  No. 1 and No. 2.

3          Ms. Trahan?

4          JUROR TRAHAN:  My son owns almost all of those, and

5   so, yes, I've played in the past.  I haven't recently.

6          MR. JONES:  Thank you.

7          Just one more question.  Do you consider yourself

8   good at it?

9          JUROR TRAHAN:  No.

10         MR. JONES:  Okay.  Thank you.

11         JUROR TRAHAN:  He beats me every time.

12         MR. JONES:   Okay.  Thank you, ma'am.

13         Ms. Edney, do you play video games yourself?

14         JUROR EDNEY:  I did as a teenager growing up.

15         MR. JONES:  Do you consider yourself good at it?

16         JUROR EDNEY:  No.

17         MR. JONES:  Thank you.  I appreciate that.

18         If we go to the second row, how many of you

19   personally play video games?

20         Thank you.

21         Mr. White?  And I would just ask you, sir, do you

22   play them so much that you consider yourself good at it?

23         JUROR WHITE:  No, my children beat me all the time.

24         MR. JONES:  Thank you, just play with your

25   children?

```
 1              JUROR WHITE:  Yes.

 2              MR. JONES:  Thank you, sir.

 3              If we could go to the third row, do any of you

 4   personally play video games?

 5              Thank you.

 6              Mr. Ellis?  The same question to you, sir, do you

 7   play them so much you consider yourself good at them?

 8              JUROR ELLIS:  Play them about six times a week.

 9              MR. JONES:  Thank you.  So you're pretty good?

10              JUROR ELLIS:  Yes.

11              MR. JONES:  Thank you, sir.  I appreciate it.

12   Thank you for your answer.

13              Go to the next row, how many of you personally play

14   video games?

15              Nobody?

16              And the last row, how many of you personally play

17   video games?

18              I think we have Mr. Whitten.  Yes, sir?

19              JUROR WHITTEN:  Yeah, I play video games two or

20   three times a week.  I have both PlayStation and Xbox.

21              MR. JONES:  Thank you, sir.

22              And I presume you're pretty good at it?

23              JUROR WHITTEN:  Well, for my age group I think I'm

24   pretty good.

25              MR. JONES:  Thank you, sir.  I appreciate it.
```

1          Now, who on the panel knows the difference between

2   the gaming console by Microsoft known as Xbox --

3          THE COURT:  You have five minutes remaining,

4   counsel.

5          MR. JONES:  Thank you, sir.

6          -- and the Xbox One, how many of you would know the

7   difference between the two.  Anybody?

8          Yes, sir.  Okay.  And that would be Mr. Ellis,

9   right?

10          JUROR ELLIS:  Yes.

11          MR. JONES:  And Mr. Whitten?

12          JUROR WHITTEN:  What was the question again?  I

13   didn't hear it.

14          MR. JONES:  Yeah, how many of you would know the

15   difference between the Xbox and the Xbox One?

16          Okay, Mr. Whitten, thank you, that's all I needed

17   to know.  I appreciate it.

18          How many of you on the panel have used an

19   application called Beam, anybody?

20          Who on the panel has used an application known as

21   Twitch?

22          I have two final questions that I would just ask

23   you.  The first one is this:  Is there anybody on the panel

24   that after hearing what Judge Gilstrap said and after

25   hearing what I said says, you know, I know something about

1    this case, this is déjà vu or I've heard something about

2    this?  Anybody sitting there and say, I know something about

3    this, can't maybe remember where, but I have some knowledge

4    about this case?  Any of those issues from any source?

5         Second one, final question is this:  Whether I

6    asked it or not, is there anyone out there as you sit there,

7    you say, Mr. Jones, you need to know something, there's

8    something about my experiences, whatever it is, I'd be a

9    great juror in many cases, but for some reason in this case,

10   I just can't be a fair juror to Biscotti?  Anybody sit in

11   that situation?

12        Thank you so much for your patience with me.  I

13   appreciate it to no end.  I look forward to exploring this

14   case with those of you chosen as jurors.  Thank you.

15        THE COURT:  All right.  Defendant may now address

16   the panel.

17        Would you like a warning on your time?

18        MS. SMITH:  Your Honor, I'd like a five-minute

19   warning, please?

20        THE COURT:  All right.  You may proceed, Ms. Smith.

21        MS. SMITH:  Thank you, Your Honor.

22        May it please the Court.

23        Good morning, ladies and gentlemen.  Again, my name

24   is Melissa Smith.  And I, along with my colleagues, who

25   you've already met this morning, we represent Microsoft.

```
 1              I'm going to join Mr. Jones in thanking you for
 2   your service.  I -- I read your questionnaire, and I
 3   listened to you closely this morning.  Some of you have come
 4   from Gladewater and Gilmer and Linden.  We've had some awful
 5   weather lately, and I anticipate we'll have a little bit
 6   more this week, so I know it's kind of a treacherous drive.
 7              I also know, and Microsoft knows, that every hour
 8   that you spend in this courtroom is certainly an hour that
 9   you could be with your friends and your family and your
10   work.
11              And I'll tell you one thing, Microsoft probably
12   doesn't want to be in this courtroom any more than some of
13   you do, but it is an important case, and so we appreciate
14   your time.
15              Now, you all have been generous in providing
16   information both in your questionnaires to Mr. Jones this
17   morning and to the Court, and so I'm going to do a little
18   bit of that as well before I question you individually.
19              I, like Judge Gilstrap, graduated from Baylor Law
20   School.  I did that almost -- or a little over actually
21   20 years ago.  I -- about three days after graduation I
22   moved up the road to Jefferson, Texas, and I've lived there
23   ever since.  I got a job about a week later practicing on
24   this Marshall courthouse square, and I've been practicing in
25   Marshall for the last 20 years.
```

1            At first, like most young lawyers, I kind of had to

2    take every single case that came in the door, and that's

3    what I did for a living.  But I've paid my dues, and I can

4    be a little bit more selective now, to tell you the truth,

5    and that's why I'm representing Microsoft today.  I chose to

6    represent Microsoft in this lawsuit.

7            My law office is Gillam and Smith, as Mr. Jones

8    told you.  I practice with a law partner named Gil Gillam.

9    He has been my law partner for each of those 20 years I've

10   been practicing, which is kind of unusual in this day and

11   age.

12           And on a personal note, I have -- I'm married.  I

13   have a six-year-old baby boy.  Not so much a baby anymore.

14   And I have four-year-old girl and.  So that's what I spend

15   my time doing when I'm not at the office practicing law.

16           Now, Judge Gilstrap has given me about three

17   minutes to introduce you further to Microsoft and to tell

18   you a little bit about our case today.

19           It's a pretty easy -- pretty easy to introduce

20   Microsoft, to tell you the truth.  Mr. Jones asked you all

21   if you knew who Microsoft was, everybody knew who Microsoft

22   was.  And that's because Microsoft has been a technology

23   company since the 1970s.  In the 1970s I certainly wasn't

24   thinking about computers and certainly wasn't thinking about

25   gaming, but they've been doing it the whole time.

1          They made the Xbox, which you're going to hear, if

2     you're lucky enough to be chosen for this jury, you're going

3     to hear a whole lot about the Xbox.  They made that back in

4     2001.  And you're also going to hear a lot about

5     videoconference calling or video calling.  And they've been

6     doing that even before the Xbox back starting in 1996.

7          Microsoft actually employs 50,000 engineer

8     inventors.  And all day, every day Microsoft is investing in

9     technology and -- and really just figuring out what

10     consumers, like each of you, what you guys want next.

11          Now, some of the Microsoft employees that are

12     actually behind the Xbox from the beginning are going to

13     come into the courthouse this week, and they're going to

14     tell you how the Xbox came to be.  But for now, quite

15     simply, I will tell you that Microsoft's position in this

16     lawsuit this week regarding the Xbox and all of its features

17     is this:  We did it first, we did it on our own, we did it

18     very differently, and we did it better.

19          Now, it's time to hear a little more, and you're

20     almost through this 'a little more' -- more about you all.

21          Now, this first question probably won't surprise

22     any of you in the room.  You all know Microsoft.  So my

23     question is this:  Is there anybody out there that came into

24     this courtroom today with a negative view of Microsoft?

25     Anyone on Ms. Trahan's row, juror No. 1, anyone on the first

1   row that came in without hearing any of the evidence or

2   anything about the case we're going to talk about with a

3   negative view of Microsoft?

4          Mr. Garner -- Mr. Garner is the second row.  I'm

5   kind of making you, Ms. Trahan and Mr. Garner, the leaders

6   on the rows.  Anyone on that second row that has a negative

7   opinion or anything you think -- I'm here representing

8   Microsoft -- you think you might want to tell me before I

9   select you to be on my Microsoft jury?

10         These -- these other rows, is there anybody out

11  there that needs to talk to me about a negative feeling

12  about Microsoft or something about Microsoft that's -- I'd

13  want to know before we try this case?

14         Thank you all.

15         All right.  You are all familiar with Microsoft.

16  So my next question is this, and we'll begin with

17  Ms. Jerguson, Juror No. 7, same row.  Have you used

18  Microsoft products?

19         JUROR JERGUSON:  Yes.

20         MS. SMITH:  Can you tell me a little bit about

21  that?

22         JUROR JERGUSON:  Well, I have Windows 7.

23         MS. SMITH:  Okay.  Has it been working all right

24  for you?

25         JUROR JERGUSON:  Yes.

1          MS. SMITH:  Okay.  No complaints?

2          JUROR JERGUSON:  No, no complaints.

3          MS. SMITH:  Okay.  Did you have a prior version

4   or --

5          JUROR JERGUSON:  Yes.  I had XP, I had -- let's see

6   what I had -- we had the XP, and then I have the Windows 7.

7          MS. SMITH:  Thank you, ma'am.  Thank you, ma'am.

8          Ms. Hodges, Ms. Chaney, do either of you have

9   any -- Ms. Chaney, you're nodding your head no, so I want to

10  talk to you first.  Do you have any experience with using

11  Microsoft products?

12         JUROR CHANEY:  No, I don't.

13         MS. SMITH:  Okay.  Thank you.

14         Ms. Hodges, how about you?

15         JUROR HODGES:  Yes.  With my computer, and then my

16  son owned an Xbox.

17         MS. SMITH:  Okay.  And I may want to talk to you

18  about that Xbox in a few minutes.

19         JUROR HODGES:  Okay.

20         MS. SMITH:  Thank you for now.

21         JUROR HODGES:  All right.

22         MS. SMITH:  Mr. Smith, any experience with

23  Microsoft products?

24         JUROR JERRY SMITH:  No, ma'am, I don't have -- I

25  don't have a lot of time to play games.

1          MS. SMITH:  All right.  What about -- what about --

2     what about not just playing games?  What about Microsoft

3     Office --

4          JUROR JERRY SMITH:  I don't even have nothing like

5     that in my house.  My kids keep it in their rooms, so I

6     don't even see stuff like that.

7          MS. SMITH:  Okay.  Fair enough.  Ms. Cherry, how

8     about you?  Do you have any experience using Microsoft

9     products?

10          JUROR CHERRY:  Yes.  On my job, I use Microsoft

11     Word and Windows.

12          MS. SMITH:  Okay.  Any complaints about Word and

13     Windows that I need to know about?

14          JUROR CHERRY:  No.

15          MS. SMITH:  Thank you, ma'am.

16          Ms. Edney, how about you?  Tell me a little bit

17     about your use of Microsoft products.

18          JUROR EDNEY:  I use Word Microsoft, and I have

19     Windows 10.

20          MS. SMITH:  I figured you have a laptop, don't you,

21     for school?

22          JUROR EDNEY:  Yes.

23          MS. SMITH:  What brand laptop do you use?

24          JUROR EDNEY:  PT.

25          MS. SMITH:  Okay.  Thank you, ma'am.

1          JUROR EDNEY:  Thank you.

2          MS. SMITH:  Ms. Trahan, you're the last one on the

3   row.  What kind of experience do you have with Microsoft

4   products?

5          JUROR TRAHAN:  Yeah, we have it at the office, 10,

6   and I have a laptop.

7          MS. SMITH:  Do you do -- you do some work --

8   financial work at all?

9          JUROR TRAHAN:  Yes.  In our accounting system at

10  the city.

11         MS. SMITH:  Is Microsoft -- do you use

12  spreadsheets?

13         JUROR TRAHAN:  I don't know how it's connected to

14  that.  I don't know.

15         MS. SMITH:  Well, then I assume you don't have any

16  complaints if you don't -- you don't remember?

17         JUROR TRAHAN:  No.

18         MS. SMITH:  Thank you, ma'am.

19         All right.  Everyone on the back row, what --

20  Mr. Garner, do you have any experience using Microsoft

21  products?

22         JUROR GARNER:  Yes, I do.

23         MS. SMITH:  All right.  What products are you using

24  of ours?

25         JUROR GARNER:  Basically Flanders computer is

1   Microsoft Word and Excel.

2        MS. SMITH:  Thank you, sir.  Just by -- by showing

3   your hands, Juror No. 9, Ms. Morgan -- Ms. Morgan,

4   Ms. Gonsolus, Ms. Lankford, Ms. Wright -- Lambright, Mr.

5   White, and Ms. Kelley, and any of you by show of hands have

6   experience using Microsoft Word, Microsoft Office?  Is that

7   everyone but Ms. Lambright?  Has that experience all been

8   consistent with the experience of the other jurors pretty

9   good?

10        All right.  Now, I want to turn your attention to

11   another topic.  You haven't heard much about it lately, but

12   you're going to hear a lot about in the case if you're lucky

13   enough to be chosen, and that's video calling.

14        So what I want to know from the first row, from

15   Ms. Trahan's row, is does anybody make video calls?  Anybody

16   on the first row make a video call?  I thought you were

17   about the right age, Ms. Edney, that you might be doing

18   that.  Can you -- Ms. Edney, can you tell me what -- what --

19   what you're doing that on or what app you're using?

20        JUROR EDNEY:  There's this new app called Airtime.

21        MS. SMITH:  Okay.

22        JUROR EDNEY:  I just started using that back in

23   April or May.  I haven't used it lately, but I usually use

24   it to talk to my friends.

25        MS. SMITH:  Okay.  Have you used something before

1  that one, or is that the first app you used?

2       JUROR EDNEY:  When I purchased my iPhone, I got --

3  I used FaceTime --

4       MS. SMITH:  FaceTime.

5       JUROR EDNEY:  -- sometimes.

6       MS. SMITH:  Thank you, ma'am.

7       JUROR EDNEY:  Thank you.

8       MS. SMITH:  All right.  Ms. Trahan, are you doing

9  some video calling?

10       JUROR TRAHAN:  Yes.  And it's mostly my daughter

11  calling me, and I have no idea what the app is.

12       MS. SMITH:  Okay.  Fair enough.  Fair enough.  Does

13  your daughter live away -- far away?

14       JUROR TRAHAN:  Yes, she lives in Utah.

15       MS. SMITH:  Okay.  Thank you, ma'am.

16       All right.  Mr. Garner's row, anyone -- Mr. Garner

17  is shaking his head no.  Anyone -- Ms. Morgan, Ms. Gonsolus

18  -- you're Gonsolus -- I am so sorry.

19       Juror No. 10, what are you doing as far as video

20  conferencing?

21       JUROR GUNSOLUS (CLONINGER):  With my previous job,

22  corporate sales for forklifts --

23       MS. SMITH:  Okay.

24       JUROR GUNSOLUS (CLONINGER):  -- we did a lot of

25  Skyping back and forth to our Dallas branch and also

1   FaceTime with my daughter when I'm out of town -- or was out

2   of town.

3          MS. SMITH:  Okay.

4          JUROR GUNSOLUS (CLONINGER):  But other than that...

5          MS. SMITH:  Thank you, ma'am.  Thank you.

6          Ms. Lankford, did I see a hand from you?  What type

7   of video calling are you doing?

8          JUROR LANKFORD:  I use the Skype app for families

9   in other states, and then I've also used one that was like

10  you can use when you're in a different country, but I don't

11  remember the name of it.

12         MS. SMITH:  Thank you, ma'am.  Ms. Lambright,

13  Mr. White, Mrs. Kelley -- Mr. White, you're shaking your

14  head yes?  Juror No. 13, what kind of video calling are you

15  doing?

16         JUROR WHITE:  I usually use FaceTime or Skype.

17         MS. SMITH:  Okay.  Thank you, sir.  And what -- let

18  me ask you one more question.  When you're using FaceTime

19  and Skype, what kind of device are you using to do that?

20         JUROR WHITE:  With FaceTime, my -- my cell phone.

21  And with Skype, on the computer.

22         MS. SMITH:  Okay.  And -- and I didn't -- thank

23  you, sir.  I appreciate it.

24         And I failed to ask Ms. Lankford, when you're doing

25  your video calling, what type of device are you doing it on?

1          JUROR LANKFORD:  On my cell phone.

2          MS. SMITH:  Thank you, ma'am.

3          And, Ms. Kelley, did you have any experience in

4    video -- video calling?

5          JUROR KELLEY:  No.

6          MS. SMITH:  Okay.  Anyone on these back rows use

7    video calling a bit?  Okay.  We've got Mr. Ross and Ms.

8    Alexander and Juror No. 18, as well, Ms. Miller.  Start with

9    Ms. Miller.

10          JUROR MILLER:  Do I need to stand?

11          Yes.  We use Skype on regular laptop.  We use

12    FaceTime on our iPhone.  We also Viber and WhatsApp.

13          MS. SMITH:  Wow, you're doing a lot.  Who are you

14    calling?  Do you have a lot of family out of state.

15          JUROR MILLER:  I have a daughter in Guatemala.

16          MS. SMITH:  That makes sense.  Thank you.  Thank

17    you, ma'am.

18          Ms. Alexander, did you ever use video calling at

19    work in the school district?

20          JUROR ALEXANDER:  No, we didn't have that

21    technology.  I retired in 2002.

22          MS. SMITH:  All right.  That -- that qualifies as

23    not a -- not a good question.  I apologize.

24          JUROR ALEXANDER:  That's okay.  Skype and FaceTime.

25          MS. SMITH:  Thank you, ma'am.

```
 1              And, Mr. Ross, what are you doing?

 2              JUROR ROSS:  I just normally -- my kids will call

 3    me with my grandkids and like stuff like that and to

 4    aggravate my wife.

 5              MS. SMITH:  Oh.

 6              JUROR ROSS:  Yeah.  She'll be in the other room,

 7    and I'll call her.

 8              MS. SMITH:  You'll call --

 9              JUROR ROSS:  Yeah --

10              MS. SMITH:  You'll use --

11              JUROR ROSS:  -- just to aggravate her.  Yeah,

12    couldn't live without it.

13              MS. SMITH:  Thank you, sir.  I appreciate that.

14              All right.  There were a couple of you -- before we

15    completely leave the topic of Microsoft products, there are

16    a couple of you, I believe, who had Xboxes, Mr. Ellis; is

17    that correct?  What kind of Xbox do you have?

18              JUROR ELLIS:  I have the original Xbox, the Xbox

19    360, and the Xbox One.

20              MS. SMITH:  That is exactly what we want to hear,

21    sir.  We like to hear that.  Tell me what -- I'm not quite

22    finished with you yet.  Tell me what you use your Xbox for

23    other than gaming?

24              JUROR ELLIS:  Netflix or Hulu, other than gaming.

25              MS. SMITH:  Did you have any idea that your Xbox
```

1  could make a video call?

2         JUROR ELLIS:  No, I didn't.

3         MS. SMITH:  Have you -- so I assume you've never

4  seen anyone use it to make a video call?

5         JUROR ELLIS:  No.

6         MS. SMITH:  Thank you, sir.

7         Ms. Lankford, did you have an Xbox in the house?

8         JUROR LANKFORD:  Yes.

9         MS. SMITH:  Okay.  And you have children; is that

10 correct?

11        JUROR LANKFORD:  Yes, ma'am.

12        MS. SMITH:  Tell me -- tell me how you guys are

13 using your Xbox.

14        JUROR LANKFORD:  My son uses it for gaming.  The

15 Xbox 360 is all that he has other than the PlayStation.

16        MS. SMITH:  Okay.  And did you have any idea that

17 you could make a videoconference call using your Xbox?

18        JUROR LANKFORD:  No, ma'am.

19        MS. SMITH:  Do you have a Kinect, do you know, with

20 your Xbox?  It's a separate box that --

21        JUROR LANKFORD:  No, ma'am.

22        MS. SMITH:  -- there would be two consoles?

23        JUROR LANKFORD:  No, ma'am.

24        MS. SMITH:  Okay.  Thank you.

25        And, Mr. Ellis, did you have a Kinect?

1              JUROR ELLIS:  Yes.

2              MS. SMITH:  I apologize, Mr. Johnston, I'm giving

3   you a workout.

4              What do you use your Kinect for?

5              JUROR ELLIS:  I actually don't use it right now.

6   It's unplugged, but I do have it.

7              MS. SMITH:  Thank you, sir.

8              Not -- not our favorite topic at Microsoft, but

9   does anybody have competing products like a Wii or a

10  PlayStation or a console like that?  Ms. Hodges and

11  Ms. Cherry and Ms. Trahan.

12             All right.  Ms. Trahan, let's start because you're

13  closest to Mr. Johnston.  What else do you have?

14             JUROR TRAHAN:  They all sound very familiar.  I

15  just paid for them.  He plays with them.

16             MS. SMITH:  Okay.  Okay.

17             JUROR TRAHAN:  But they all sound very familiar.  I

18  can't tell you what the numbers are, but he's got them all.

19             MS. SMITH:  Okay.  And when you say he, that's --

20             JUROR TRAHAN:  My son.

21             MS. SMITH:  -- your son.  That -- that brings up

22  another -- another question that I want to ask.

23             You would probably agree, I'm sensing, that -- that

24  persons under the age of 18, they can influence decisions,

25  buying decisions in a household?

1          JUROR TRAHAN:  Yes.

2          MS. SMITH:  Wouldn't you say?

3          Would -- would you say that your son probably had a

4     lot to say about which console you purchased?

5          JUROR TRAHAN:  He had everything to say about it.

6          MS. SMITH:  Everything to say?

7          JUROR TRAHAN:  Yes.

8          MS. SMITH:  Fair enough.

9          JUROR TRAHAN:  And he has played since he was a

10    little kid, and he's 21, and we still can't get them off of

11    any of them.

12          MS. SMITH:  I -- I --

13          JUROR TRAHAN:  He still plays a lot.

14          MS. SMITH:  I, obviously, have -- I have an Xbox.

15    So I'm starting mine young as well.  I have a six year old

16    that's probably going to grow up to be just like your son.

17          JUROR TRAHAN:  Good luck.

18          MS. SMITH:  Thank you.

19          JUROR TRAHAN:  Although he's a very smart kid, he

20    did very well in college.

21          MS. SMITH:  I --

22          JUROR TRAHAN:  He's -- he is very intelligent.

23          MS. SMITH:  I hope he's a productive member of

24    society.  That's what I want to hear.

25          THE COURT:  All right.  Ladies, let's get on to

 1   more questions.

 2          MS. SMITH:  All right.  I apologize, Your Honor.

 3          Okay.  We had someone else with a competing

 4   product, Ms. Hodges.

 5          Mr. Johnston, if you wouldn't mind passing the mic.

 6          What do you have?

 7          JUROR HODGES:  We have an Xbox 360 and a Kinect.

 8   And upgraded to the PS4.

 9          MS. SMITH:  Okay.  When you had your Xbox 360 and

10   Kinect, did you ever use that for -- for making video calls?

11          JUROR HODGES:  No.

12          MS. SMITH:  Did you have any idea, whatsoever, that

13   it even had the ability to make a video call?

14          JUROR HODGES:  No.

15          MS. SMITH:  So did you know that your PlayStation

16   actually cannot make video calls?

17          JUROR HODGES:  I did not.

18          MS. SMITH:  All right.  Thank you, ma'am.

19          I think what I want to do next is I want to divide

20   you guys into two groups, and I'll give you some background

21   on what I'm doing.  In this case you're going to hear that

22   it's not enough for the Plaintiff to say, well, you know,

23   the -- you know, the Xbox is accused, it functions like a

24   Biscotti.  You know, you could make a video call with it so,

25   therefore, Microsoft infringes.

1          The -- the Plaintiff is going to have to prove each

2    and every element of the claims at issue in the case, and so

3    that requires people to kind of look under the hood, if you

4    will, at the technology.

5          So I'm going to divide you up in two groups really

6    quickly.  The first group is people that, you know, you --

7    you use technology, you like it, but you really don't like

8    to, quote, look under the hood and know how it works.

9          And the second group is the people that, you know,

10   they're the people that you go to when something's broken.

11   You know, some electronic device is broken, you go to them

12   for help.

13         We'll start with you, Ms. Jerguson, which group

14   would you put yourself in?

15         JUROR JERGUSON:  Number one.

16         MS. SMITH:  Number one.

17         So you use technology, but you don't want to know

18   what's under the hood?

19         JUROR JERGUSON:  I use it, and I don't need to know

20   how it works.

21         MS. SMITH:  Okay.  Thank you, ma'am.

22         Ms. Hodges?

23         JUROR HODGES:  Number two.

24         MS. SMITH:  Number two.

25         Ms. Chaney?

1          JUROR CHANEY:  Number one.

2          MS. SMITH:  Group number one.

3          Mr. Smith?

4          JUROR JERRY SMITH:  One.

5          MS. SMITH:  Ms. Cherry?

6          JUROR CHERRY:  Group one.

7          MS. SMITH:  Ms. Edney?

8          Two.  You're a two, okay.

9          And Ms. Trahan?

10          Don't -- don't care how it works.  All right.

11          THE COURT:  We're going to have to get out -- we're

12   going to have to get verbal answers for the record, counsel.

13   You can have them hold up fingers, but you're going to have

14   to call them out so we have it in the record.

15          MS. SMITH:  Of course, Your Honor, I apologize.

16          So we had -- let's go to Mr. Garner, are you group

17   one or group two, you want to look under the hood of

18   electronic devices?

19          JUROR GARNER:  One.

20          MS. SMITH:  One.

21          No. 9, Ms. Morgan?

22          JUROR MORGAN:  Two.

23          MS. SMITH:  Two.

24          Ms. Gunsolus is a two.

25          A number one, Ms. Lankford?

1          JUROR LANKFORD:  One.

2          MS. SMITH:  All right.  No. 11 is a number one.

3          Ms. Lambright?

4          JUROR LAMBRIGHT:  One.

5          MS. SMITH:  One.

6          Mr. White?

7          JUROR WHITE:  One.

8          MS. SMITH:  And Ms. Kelley?

9          JUROR KELLEY:  A two.

10          MS. SMITH:  Okay.  What I want to know from this

11  group over here is do we have any numbers one in this -- if

12  you can raise your hand so I can see who's number one.

13          Actually, that's actually everybody except for

14  Ms. Miller, it looks like.

15          Thank you.

16          You guys had an opportunity to watch the patent

17  video this morning.  And was there anybody surprised when

18  the gentleman, judge, in the patent video told you all that

19  you would actually have the power to invalidate a patent?

20  Did that surprise anybody?  By a showing of hands.

21          Okay.  We've got some -- some folks shaking their

22  head.

23          Mr. Ross, did that surprise you?

24          JUROR ROSS:  Yes.

25          MS. SMITH:  Okay.  All right.  Well, on that note,

1   do you think it's possible for the government to make a

2   mistake?

3          I usually get -- Ms. Hodges, I usually get a few

4   laughs with that question.  Work with me here.

5          JUROR ROSS:  Yeah, I think everybody can make a

6   mistake.

7          MS. SMITH:  Thank you, sir.  Thank you, sir.

8          JUROR ROSS:  Do I think I can make a -- I don't

9   know nothing about nothing technology.  I mean, I'm -- so I

10  don't -- I don't think I could have the power to do that.

11  But yeah, everybody can make a mistake.

12         MS. SMITH:  Well, and you, sir, Mr. Ross, you have

13  walked right into my next question.

14         JUROR ROSS:  That's awesome.

15         MS. SMITH:  Mr. Cederoth, if you could -- if you

16  could put that up on the screen.

17         Now -- and, Mr. Ross, you're welcome to take a

18  seat.

19         Now, my question is a little bit -- a little bit

20  tricky, so I put it up on the screen for your benefit.

21         If the evidence supports it -- and remember, you

22  haven't heard any evidence in this case.  How comfortable

23  are you in a role where you're going to be saying that the

24  Patent Office got it wrong and they should not have issued a

25  patent?  You heard from the video that jurors have every

 1  ability to say the Patent Office got it wrong.  But what I'm

 2  going to do, I'm going to go through these first two rows,

 3  again, starting with Ms. Trahan, I just want you to give

 4  your number on a scale of zero to 10, zero being, you know,

 5  regardless of what the evidence shows, I just couldn't take

 6  someone's patent away, to 10 being I can -- I can listen to

 7  the evidence and if the evidence supports it, I can

 8  invalidate a patent?

 9          Ms. Trahan, what number are you?

10          JUROR TRAHAN:  I think I would be number 10.

11          MS. SMITH:  Thank you.

12          Ms. Edney?

13          JUROR EDNEY:   Five.

14          MS. SMITH:  All right.  Why -- why do you say five,

15  Ms. Edney?

16          JUROR EDNEY:  I'm in between, like, I guess it

17  depends on the situation.  I really want to know, I guess,

18  if it's -- I guess if it's bad, maybe a 10, but if it's not

19  really that important, then five.

20          MS. SMITH:  Now -- now, I represent Microsoft in

21  the case, so I will tell you that our position is going to

22  be that this Biscotti patent shouldn't have ever been issued

23  by the PTO, that they got it wrong.  Should I be a little

24  worried about the fact that -- that you're saying you might

25  not be able to invalidate a patent under any evidence?

```
 1            JUROR EDNEY:  No.

 2            MS. SMITH:  Thank you.

 3            All right.  Ms. Cherry, what number are you?

 4            JUROR CHERRY:  I believe if the evidence showed

 5    that the patent was issued incorrectly, that I would be able

 6    to, so I would say nine, 10.

 7            MS. SMITH:  Thank you, ma'am.

 8            Mr. Smith?

 9            JUROR JERRY SMITH:  I'm going to say I'm between

10    number five and number six, they would really have to show

11    some evidence to really make me believe.

12            MS. SMITH:  Okay.  Thank you, sir.

13            JUROR JERRY SMITH:  Uh-huh.

14            MS. SMITH:  Ms. Chaney?

15            JUROR CHANEY:  I guess about an eight.

16            MS. SMITH:  Thank you, ma'am.

17            Ms. Hodges?

18            JUROR HODGES:  10.

19            MS. SMITH:  Thank you, ma'am.

20            Ms. Jerguson?

21            JUROR JERGUSON:  10.

22            MS. SMITH:  And Mr. Johnson, we can go straight

23    back to Ms. Kelley, No. 14.

24            JUROR KELLEY:  A 10.

25            MS. SMITH:  10.
```

1          Mr. White?

2          JUROR WHITE:  I'm about an eight.

3          MS. SMITH:  Eight, thank you.

4          Ms. Lambright?

5          JUROR LAMBRIGHT:  If the evidence is there, I'll

6    say a 10.

7          MS. SMITH:  Thank you, ma'am.

8          Ms. Lankford?

9          JUROR LANKFORD:  A 10.

10          MS. SMITH:  Ms. Gunsolus?

11          JUROR GUNSOLUS (CLONINGER):  A 10.

12          MS. SMITH:  Ms. Morgan?

13          JUROR MORGAN:  10.

14          MS. SMITH:  And Mr. Garner?

15          JUROR GARNER:  10.

16          MS. SMITH:  Thank you, sir.

17          On these last three rows over here, do I have

18    anybody that would be around one or a two or a three on that

19    scale?

20          Thank you, all.

21          All right.  And Mr. Jones actually hit a little bit

22    on my next question.  It's what I call my David and Goliath

23    question.  So we're not going to hide it.  Microsoft is --

24    we're a big company, and we're a successful company.  And

25    Biscotti is -- it's a smaller company.

```
 1              So who I'm trying to identify with this question is
 2    a person that is kind of a champion of the underdog.  Is
 3    there anyone on the first row, on Ms. Trahan's row, that
 4    considers themselves kind of a championship of the underdog?
 5    If we're going to start a race and I've got the big company
 6    and there's a small company over here, is the small company,
 7    are you going to be pulling for the small company without
 8    hearing any of the evidence?
 9              Anyone on the second row that believes that?
10              Anyone on these back rows that would consider
11    themselves kind of the champion of the underdog?
12              Thank you.
13              Now, I have another slide that kind of plays on
14    this theme.  And, again -- and Mr. Jones got into this a
15    little bit, but I want to hear it from these first two rows
16    again on this question.
17              You haven't heard any evidence yet, but I want to
18    know how comfortable you would be awarding a Plaintiff zero
19    dollars if they don't meet their burden to prove the case?
20    Again, smaller company, big company, could you award the
21    Plaintiff zero dollars if they didn't meet their burden?
22              Mr. Garner, yes, sir?
23              JUROR GARNER:  Are we supposed to be able to see
24    this slide because we can't see anything?
25              MS. SMITH:  Yes, you are.
```

1          THE COURT:  Is it not on the screen, sir?

2          JUROR GUNSOLUS (CLONINGER):  No, the screens aren't

3    on.

4          JUROR TRAHAN:  I don't have a screen.

5          JUROR GARNER:  We couldn't see theirs either.

6          THE COURT:   Well, we obviously have a technical

7    issue, but I'm not going to stop the process to try and fix

8    the technical issue.

9          JUROR GARNER:  They turned theirs around.

10         THE COURT:  Okay.  If you need to, look around each

11   other so you can see the monitors on the counsel table.

12         MS. SMITH:  Thank you.  Thank you, Mr. Jones, for

13   doing that.

14         THE COURT:  Go ahead, Ms. Smith.

15         MS. SMITH:  Thank you, Your Honor.

16         All right.  So this will be a lot more helpful now

17   that you see -- you've got my scale up there.  So on the 0

18   end, we've got regardless of the evidence, you could never

19   look at the smaller Plaintiff and award them zero dollars.

20   And then on the 10 end, if the evidence supports it, I could

21   absolutely award zero dollars to a Plaintiff.

22         I'm going to have you go through real quick, the

23   first two rows, and just give me your number on a scale of 0

24   to 10 starting with Ms. Trahan.

25         JUROR TRAHAN:  10.

```
 1          MS. SMITH:  Thank you, ma'am.

 2          Ms. Edney?

 3          JUROR EDNEY:  10.

 4          MS. SMITH:  Ms. Cherry?

 5          JUROR CHERRY:  10.

 6          MS. SMITH:  Thank you, ma'am.

 7          Mr. Smith?

 8          JUROR JERRY SMITH:  7.

 9          MS. SMITH:  Well, I want to hear a little more

10   about this --

11          THE COURT:  You have five minutes remaining,

12   Ms. Smith.

13          MS. SMITH:  Thank you.

14          Tell me a little bit why you're a seven.

15          JUROR JERRY SMITH:  Well, my daddy got a mechanic

16   shop, and we don't have a lot of people try to sue us for

17   work saying that we didn't do it and all that stuff, and if

18   they want to prove that we did it, it was their word against

19   ours and knowing they won the case, so...

20          MS. SMITH:  Okay.

21          JUROR JERRY SMITH:  It's kind of hard, you know, by

22   me being through lawsuit with my daddy company and stuff,

23   you know, you have show me a lot of proof about stuff for me

24   to do stuff.

25          MS. SMITH:  But at the same time, I'm on the -- I'm
```

1    defending against a lawsuit that they brought.

2         JUROR JERRY SMITH:  I understand.

3         MS. SMITH:  Do you -- in some ways do you have a

4    pretty -- a perspective at some point in life kind of like

5    Microsoft --

6         JUROR JERRY SMITH:  Well, if you're not familiar

7    with the stuff that -- you know, I would rather have the

8    evidence because a lot of people say they know something

9    about mechanic and don't know nothing about mechanic, but

10   they can win the lawsuit.

11        MS. SMITH:  Fair enough.  Thank you, Your Honor.

12   Finish out this row.

13        JUROR CHANEY:  10.

14        MS. SMITH:  Thank you, Ms. Chaney.

15        Ms. Hodges?

16        JUROR HODGES:  10.

17        MS. SMITH:  Ms. Jerguson?

18        JUROR JERGUSON:  10.

19        MS. SMITH:  Thank you.

20        Ms. Kelley?

21        JUROR KELLEY:  A 10.

22        MS. SMITH:  Okay.  Mr. White?

23        JUROR WHITE:  10.

24        MS. SMITH:  Ms. Lambright?

25        JUROR LAMBRIGHT:  10.

```
 1            MS. SMITH:  Ms. Lankford?

 2            JUROR LANKFORD:  10.

 3            MS. SMITH:  Ms. Gunsolus?

 4            JUROR GUNSOLUS (CLONINGER):  10.

 5            MS. SMITH:  Ms. Morgan?

 6            JUROR MORGAN?  10.

 7            MS. SMITH:  And Mr. Garner?

 8            JUROR GARNER:  10.

 9            MS. SMITH:  Okay.  Now, Ms. Chaney, I had a

10   question for you.  On your jury questionnaire, you checked

11   the box that said you might not be able to be fair and

12   impartial.  You checked yes on that.  Can you tell me a

13   little bit about that?

14            JUROR CHANEY:  Might have been an accident.

15            MS. SMITH:  And I thought it might have been an

16   accident, but I had to ask.

17            JUROR CHANEY:  Yeah, it might have been an

18   accident.

19            MS. SMITH:  Okay.  Ms. Alexander, you said you had

20   a friend that was a lawyer or in legal community, close

21   friends?

22            JUROR ALEXANDER:  Yes, but it's in a town three

23   hours away from here.

24            MS. SMITH:  Okay.  Thank you.  Well, you know,

25   where -- where -- who is it?
```

```
 1              JUROR ALEXANDER:  In Jasper, Texas.

 2              MS. SMITH:  Okay.  Who is that friend?

 3              JUROR ALEXANDER:  Gary Gatlin.  He's also a Judge.

 4    He was a personal attorney.

 5              MS. SMITH:  Okay.  All right.  That answers what he

 6    does -- what type of law he does.

 7              Mr. Ellis, you had an interesting comment on

 8    your -- on your jury questionnaire.  You said that you --

 9    and I apologize if I'm not reading your writing correctly,

10    but that you might think that the system is -- is a little

11    bit flawed?

12              JUROR ELLIS:  Oh, I think our justice system shows

13    us all the time that it is very flawed.

14              MS. SMITH:  Well, tell me a little bit more about

15    your thoughts on that.  Is it because of some personal

16    experience you've had or something you've read?

17              JUROR ELLIS:  It's through watching the news.  I

18    see one person get so many years for something, somebody

19    else gets probation for, depending who they are, money,

20    something of that nature.

21              MS. SMITH:  Thank you, sir.

22              Mr. Garner, you've been a juror -- a juror in a

23    case before that went to verdict; is that correct?

24              JUROR GARNER:  Yes.

25              MS. SMITH:  Okay.  Was that at this courthouse, you
```

1    said?

2              JUROR GARNER:  Yes.

3              MS. SMITH:  Okay.  Was I involved in that case?

4              JUROR GARNER:  No.

5              MS. SMITH:  Because I had a case with similar

6    facts, so I had to ask.  And I was going to apologize if I

7    didn't remember you.  And you were not the foreperson on

8    that case?

9              JUROR GARNER:  No.

10             MS. SMITH:  And what was the outcome?

11             JUROR GARNER:  I think the guy that was being sued

12   ended up winning the case.

13             MS. SMITH:  Okay.  Thank you, sir.

14             Now, you heard a lot from Mr. Jones, but I will

15   tell you he's going to be joined by a number of other

16   lawyers in this courtroom representing Biscotti, Adam Alper,

17   Eric Cheng, Elliot Hales, Mike De Vries, Sharre Lotfollahi,

18   Justin Singh, Amanda Hollis, Ryan Hubbard.  Mr. Jones has

19   nine or 10 partners, as well.  I don't know if any of them

20   will be in the courtroom.  But does anybody recognize the

21   names of any of those lawyers?

22             All right.  I'm going to end on a question

23   strikingly similar to Mr. Jones's question, and I'll tell

24   you, I had jury duty when I was probably about eight months

25   and three weeks pregnant with my second child in Marion

 1   County.  And it was a criminal case.  And it was about

 2   some -- somebody that did intentional harm to a child.  And

 3   sitting there eight and a half plus months pregnant, I could

 4   not have been a worst juror for that case, quite frankly.

 5   And as a lawyer, you know, I want to say I'll be fair, but I

 6   just was not a good choice.  But those lawyers -- neither of

 7   the lawyers asked me the question that I'm about to ask you

 8   because we can't think of all the questions.

 9        Is there anything somebody wants to tell me or

10   anybody want to tell us anything -- any reason why you might

11   not be the best fit for this case?  And I know you haven't

12   heard the evidence, but you get an idea of where we're

13   headed on this case.  Is there anything you think as a

14   lawyer defending Microsoft in this case, you think I might

15   need to know before we select you for our jury?

16        Ms. Trahan?

17        THE COURT:  Ms. Smith, your time has expired.  I'll

18   allow Ms. Trahan to answer this question.

19        JUROR TRAHAN:  And I'll be quick.  You -- during

20   the years of my son owning consoles, he got real frustrated

21   with several of them.  I can't tell you who they were, but

22   -- and his comment was always, well, there's a new one out

23   so this one's going to break right in time for me to buy the

24   new one, and, you know, so he had that attitude about it

25   which sort of stuck with me.

1          MS. SMITH:  I appreciate your honesty.  Thank you,

2    Ms. Trahan.

3          Was there anybody else?

4          Thank you, Your Honor.

5          THE COURT:  All right.  Counsel, approach the

6    bench, please.

7          (Bench conference.)

8          THE COURT:  Mr. Jones, does the Plaintiff have any

9    challenges for cause?

10         MR. JONES:  No, Your Honor.

11         THE COURT:  Ms. Smith?

12         MS. SMITH:  No, Your Honor.

13         THE COURT:  All right.  I need to tell you that

14   just before I came into the courtroom, the clerk advised me

15   that Mr. Ross, Panel Member No. 16, told her that he had a

16   medical condition that caused him not to be able to sit for

17   long periods of time.

18         I intend to bring him up to the bench when I talk

19   to these that have scheduling problems and at least ask him

20   if he's physically able to serve if selected.

21         MS. SMITH:  Yes, Your Honor.

22         THE COURT:  All right.

23         MR. JONES:  Yes, Your Honor.

24         THE COURT:  All right.  If you'll take your seats,

25   I'm going to send the rest of the panel out for recess, and

1  then we'll bring up those who have indicated scheduling

2  problems -- would be Mr. Ellis; Mr. Ross for the reasons

3  I've mentioned; Ms. Spurr, No. 21; and Mr. Rodgers, No. 25.

4        And Mr. Rodgers informed the clerk that he has a

5  mother in intensive care in Longview hospital.  So I want to

6  make sure that -- that's probably why he raised his hand

7  that he may have a scheduling problem.

8        All right.  Take your sheets seats.

9        MS. SMITH:  Thank you.

10       (Bench conference concluded.)

11       THE COURT:  All right.  Ladies and gentlemen, I'm

12  going to excuse the panel for recess, except I'm going to

13  keep a couple of you -- few of you behind, and I'm going to

14  ask these juror panel members that I call your numbers, if

15  you would stay where you are while the rest of the panel

16  recesses.

17       Those of you that are about to leave for recess,

18  I'll ask you to exit through the double doors in the back of

19  the courtroom.  I'm going to ask you to stay inside the

20  courthouse.  Don't leave the building.

21       Just for your convenience and knowledge, if you

22  take a left going out of the double doors, around the

23  corner, you'll find water fountains and restrooms.  And

24  you're welcome to take advantage of those.

25       Don't discuss anything that's happened in the

 1   courtroom this morning.  Talk about all this rainy weather

 2   we're having, talk about whatever you'd like, but don't

 3   discuss anything that's happened in the courtroom this

 4   morning.  You have not heard any evidence in this case as of

 5   right now.

 6          So I'm going to ask the following members of the

 7   panel to remain behind.  Those members are No. 15,

 8   Mr. Ellis; No. 16, Mr. Ross; No. 21, Ms. Spurr; and No. 25,

 9   Mr. Rodgers.

10          Everyone else on the panel, with those

11   instructions, is excused for recess.

12              COURT SECURITY OFFICER:  All rise.

13              (Jury panel out.)

14              THE COURT:  All right.  Be seated, please.

15              Counsel, approach the bench, please.

16              And, Mr. Ellis, would you come up and join us,

17   please, sir?

18              (Bench conference.)

19              THE COURT:  Good morning, Mr. Ellis.

20              These are our microphones, and you and I are going

21   to talk quietly into those.

22              When we started this morning, I asked if anybody

23   had a potential scheduling issue that would keep them from

24   being able to serve all week if they were selected, and you

25   raised your hand.  Can you tell me about that?

1          JUROR ELLIS:  I have religious duties to perform on

2     Friday preparing for our festival on Saturday.  I will be

3     out in Troup from Thursday night until Sunday night.

4          THE COURT:  Okay.  All right.  Can you give me any

5     more detail about that?

6          JUROR ELLIS:  It's our midsummer celebration for my

7     religion.

8          THE COURT:  Can -- what religion is that?

9          JUROR ELLIS:  I'm a heathen, a pre-Christian

10    polytheistic beliefs of northern Europe.

11         THE COURT:  Okay.  And that -- that -- that

12    religious exercise will start when, did you say?

13         JUROR ELLIS:  Our -- it actually starts Saturday

14    morning, but I am part of the crew that comes out and

15    prepares everybody the day before.

16         THE COURT:  Okay.

17         JUROR ELLIS:  And my work schedule usually doesn't

18    include Fridays.

19         THE COURT:  Okay.  And that preparation the day

20    before, is that an all day operation?

21         JUROR ELLIS:  Yes.  Yes, sir.  Yes, Your Honor.

22         THE COURT:  All right.  Mr. Jones, do you have any

23    questions --

24         MR. JONES:  No, sir.

25         THE COURT:  -- of Mr. Ellis?

1          Ms. Smith?

2          MS. SMITH:  No, Your Honor.

3          THE COURT:  Okay.  Mr. Ellis, I'm going to ask you

4    to join the rest of the group outside.  Just don't discuss

5    anything that we've talked about in here.

6          JUROR ELLIS:  Yes, Your Honor.

7          THE COURT:  Thank you.

8          (Juror Ellis leaves courtroom.)

9          THE COURT:  I'm going to excuse Mr. Ellis.

10         (Open court.)

11         THE COURT:  Mr. Ross, would you come up, please,

12   sir?

13         (Bench continues.)

14         JUROR ROSS:  Yes, sir?

15         THE COURT:  Good morning, Mr. Ross.

16         JUROR ROSS:  Good morning.

17         THE COURT:  These are our microphones.  You and I

18   are just going to talk quietly into those.

19         JUROR ROSS:  Okay.

20         THE COURT:  The clerk indicated to me that you told

21   her this morning after you appeared that you had medical

22   issues about sitting for long periods of time.

23         JUROR ROSS:  Yes, sir, I've got --

24         THE COURT:  That's why you're up here.

25         JUROR ROSS:  Yeah, I've got diabetic neuropathy.

1    And -- and it's pretty effective.  Just even sitting this

2    long was almost too long.

3             THE COURT:  Okay.

4             JUROR ROSS:  I get no feeling in my legs and stuff

5    like that.

6             THE COURT:  Well, just so you'll know, and you can

7    tell me how this might affect you.  In a typical trial, we

8    will take breaks and recesses during the day, but there are

9    times where we could go as much as two hours without having

10   a break.

11            Now, if you were on the jury and if we were to go

12   as much as two hours without a chance to stand up and take a

13   break, how would your situation play with that?

14            JUROR ROSS:  Yeah, it would make me very

15   uncomfortable for me.  I -- after -- even after about an

16   hour I start squirming trying to get some blood flow to my

17   legs and stuff like that.

18            THE COURT:  Okay.  And --

19            JUROR ROSS:  If I were to sit that long, my foot

20   would go to sleep, and when I fall -- I mean, when I stand,

21   you know, I'd have to stand there and move around a little

22   bit and get things going right.

23            THE COURT:  Okay.

24            JUROR ROSS:  I guess that makes sense.

25            THE COURT:  Well, you know your condition better

1    than I do.  But in light of what I've told you about

2    potentially going as much as two hours between breaks, do

3    you think you could serve under those circumstances, or do

4    you think -- I mean, would it be --

5            JUROR ROSS:  No, sir, I don't think so.

6            THE COURT:  You don't think so?

7            JUROR ROSS:  No, I don't believe.  It would make it

8    very -- make it very, very difficult.

9            THE COURT:   Okay.  Mr. Jones, any questions?

10           MR. JONES:  No, Your Honor.

11           THE COURT:  Ms. Smith?

12           MS. SMITH:  No, Your Honor.

13           THE COURT:  All right.  Mr. Ross, I'm going to ask

14   you to join the rest of the panel outside --

15           JUROR ROSS:  Okay.

16           THE COURT:  -- on recess.  Just don't discuss

17   anything we've talked about in here.

18           JUROR ROSS:  Okay.  Thank you.

19           THE COURT:  Thank you, sir.

20           (Juror Ross leaves courtroom.)

21           THE COURT:  I'm going to excuse Mr. Ross.

22           (Open court.)

23           THE COURT:  Ms. Spurr, would you join us, please,

24   ma'am?

25           (Bench continued.)

1          THE COURT:  Good morning.

2          JUROR SPURR:  Good morning.

3          THE COURT:  These are our microphones.  If you'll

4    step up and you and I can just talk quietly in those.

5          When we began this morning I asked about people

6    that might not be able to serve all week if they were

7    selected, and you raised your hands.

8          JUROR SPURR:  Yes.

9          THE COURT:  Can you tell me -- you raised your

10   hand.  Can you tell me about that.

11         JUROR SPURR:  My daughter is having surgery

12   Wednesday morning in McKinney.

13         THE COURT:  Okay.

14         JUROR SPURR:  She's got a little six month old that

15   she needs some help with.

16         THE COURT:  Okay.  Is it just in and out day

17   surgery, or is it major surgery?

18         JUROR SPURR:  It's a day surgery, but it's taking a

19   rod out of her arm.

20         THE COURT:  Okay.

21         JUROR SPURR:  And she won't be able to use her arm.

22         THE COURT:  Okay.  If you were on the jury and not

23   able to be there, is there anybody else that could take care

24   of her child for her?

25         JUROR SPURR:  My sister was going to help, and she

1 broke her foot last week.

2      THE COURT:  Okay.  So anyone else that you're aware

3 of that could fill the gap, if necessary?

4      JUROR SPURR:  No.

5      THE COURT:  Okay.

6      JUROR SPURR:  Not that I'm aware of.

7      THE COURT:  All right.  Well, Ms. Spurr, I'm not

8 going to keep you from being with your daughter when she has

9 surgery.  But I am going to ask you just to join the rest of

10 the group outside on recess and not to discuss anything that

11 we've talked about in here.

12      JUROR SPURR:  Okay.

13      THE COURT:  Okay.  Thank you.

14      JUROR SPURR:  Thank you.

15      (Juror Spurr leaves courtroom.)

16      THE COURT:  I'm going to excuse Ms. Spurr.

17      (Open court.)

18      THE COURT:  Mr. Rodgers, would you join us, please.

19      (Bench continues.)

20      THE COURT:  I don't think we're going to strike

21 through 25 anyway, are we?

22      MS. SMITH:  No, Your Honor.

23      THE COURT:  Okay.

24      Mr. Rodgers, I understand from the clerk that

25 your -- is it mother --

```
 1              JUROR RODGERS:  Yes.

 2              THE COURT:  -- is in ICU?

 3              JUROR RODGERS:  Uh-huh.

 4              THE COURT:  All right.

 5              JUROR RODGERS:  Put her in there three days ago.

 6              THE COURT:  All right.  Which hospital is she in?

 7              JUROR RODGERS:  Good Shepherd, fifth floor.

 8              THE COURT:  Here in Marshall or Longview?

 9              JUROR RODGERS:  Longview.

10              THE COURT:  Okay.  I'm not going to require you to

11    serve on this jury.

12              JUROR RODGERS:  I don't think it would be a good

13    idea.

14              THE COURT:  Well, I'm going to ask you -- I'm going

15    to ask you just to join the rest of the group outside and

16    not discuss anything that's happened in here.

17              JUROR RODGERS:  Yes, sir.

18              THE COURT:  And you'll be back in, and you'll be

19    formally excused in just a minute.  But if you'll just join

20    the rest of the group.

21              JUROR RODGERS:  All right.  Thank you, sir.

22              THE COURT:  Thank you, sir.

23              (Juror Rodgers leaves courtroom.)

24              THE COURT:  I'm going to strike Mr. Rodgers, even

25    though we won't reach him.
```

1           Okay.  With those that have been struck, eight to

2   be seated, four strikes per side, that gets us through,

3   what, 18?

4           MR. JONES:  I believe so, Your Honor.

5           THE COURT:  Okay.  How long do you all need to

6   strike your list?

7           MR. JONES:  Fifteen minutes.

8           MS. SMITH:   That'd be wonderful.

9           THE COURT:  All right.  Quarter after 11:00.  If

10  you'll have your list to Ms. Lockhart, all right?

11          MS. SMITH:  Thank you.

12          MR. JONES:  Thank you.

13          (Bench conference concluded.)

14          THE COURT:  All right.  Court will stand in recess

15  while counsel exercise their peremptory challenges.  The

16  Court is in recess.

17          COURT SECURITY OFFICER:  All rise.

18          (Recess.)

19          COURT SECURITY OFFICER:  All rise.

20          THE COURT:  Be seated, please.

21          All right.  Ladies and gentlemen, if you will

22  listen carefully as your name is called, if you'll come

23  forward and have a seat in the jury box.  We're going to

24  seat eight jurors in this case, and I'm going to ask that

25  the first four be on the first row of the jury box, and the

 1   second four be on the second row of the jury box.

 2          To ensure that the jury, once they're in the box,

 3   are centrally located, I'm going to ask the first juror

 4   called to come to Row 1 of the jury box and stand in front

 5   of the third chair from the end.  Leave two vacant chairs

 6   past where Juror No. 1 stands, and then 2, 3, and 4 will

 7   follow in behind.  And then the second four will go to the

 8   second row and stand behind their -- the chairs that

 9   correspond with the jurors standing in front of them.  And

10   that way we'll have four and four centrally located in the

11   middle of the jury box.

12          So with that, Ms. Lockhart, if you will call the

13   names of the eight members of the panel who have been

14   selected as the jury in this case.

15          COURTROOM DEPUTY:  Lucinda Trahan, Taira Edney,

16   Tammy Chaney, Jill Jerguson -- Jerguson, Tommy Garner,

17   Brenda Morgan, Deanna Lambright, and Reagan White.

18          THE COURT:  Please be seated.

19          All of you that were not selected to serve on the

20   jury, I'm about to excuse you, but I want to excuse you with

21   the sincere and heartfelt thanks of the Court.  I know that

22   the parties and counsel, as well as the Court staff, join me

23   in that.

24          I want you to all understand that though you were

25   not selected to serve on this jury, you have performed very

1  real and important public service by being here.  This Court

2  and our entire third branch of our national government could

3  not function as we're required to under the Constitution

4  unless ordinary American citizens responded positively as

5  you have and answered the call of jury duty, came to court,

6  presented yourself to serve, and even though you weren't

7  selected, you have done very important public service by

8  being here.

9        I know that every one of you had other places to be

10  this Monday morning, things to do that were important in

11  your lives, and other responsibilities that you set aside to

12  answer the call of jury service and come and present yours

13  as a part of the jury panel this morning.

14        So you should -- you should feel very persuaded

15  that what you've done is important.  The Court is persuaded

16  that it's important, and the Court recognizes it and thanks

17  you.

18        The only thing I would ask is at such date in the

19  future when you are called again, if you will do as you have

20  this time and present yourself with the same positive

21  attitude that each of you have shown this morning.  We can't

22  ask for any more than that.  We appreciate what you've done.

23        If you need anything for an employer to verify

24  where you've been, if you need any other documentation or

25  any other questions about your service, if you'll see Ms.

1   Martin in the clerk's office when you leave, I know she's

2   going to want to recover those very valuable buttons and

3   pins from you.  If you'll make sure she gets those.

4          And, again, ladies and gentlemen, thank you for

5   being here.  Thank you for being good citizens and

6   responding to the call of jury duty.  You are excused and

7   released.

8          COURT SECURITY OFFICER:  All rise.

9          (Jury panel out.)

10          THE COURT:  All right.  If everyone except the

11   members of the jury would have a seat, please.

12          I'm going to ask our courtroom deputy, Ms.

13   Lockhart, to administer the oath to the members of the jury

14   at this time.

15          (Jurors sworn.)

16          THE COURT:  Please have a seat.

17          Ladies and gentlemen, I'm about to excuse you for

18   lunch.  I'm going to ask that you be back assembled in the

19   jury room a few minutes before 1:00 o'clock, and we will try

20   to start as promptly and as close to 1:00 o'clock as

21   possible.

22          But before you recess for lunch, I have a few

23   additional instructions I need to give you.

24          First of all, I think it would be a good idea, as

25   you leave for lunch, if you will stop by the clerk's office,

 1   make sure they have a good cell phone number or a way to

 2   reach you outside of your normal contact information at home

 3   if for any reason during the day or any other time outside

 4   of normal hours we may need to reach you, if you'll make

 5   sure they have that contact information.

 6          Also, speaking of cell phones, when you come back

 7   from lunch today, I'm going to ask that you leave your cell

 8   phones either in your automobiles or leave them in the jury

 9   room, but I'm going to ask that you not bring cell phones or

10   any electronic devices into the courtroom.

11          No matter how sure you are that they are silenced,

12   invariably one of them will not be and it will ring and

13   disrupt the process in the middle of the trial.  And part of

14   my job is to ensure that we have as few disruptions as

15   possible.  I don't want anything to interrupt your

16   concentration as the evidence is presented to you during the

17   trial.

18          Counsel and the parties are entitled to have

19   electronics in the courtroom because it's part of their

20   working tools, if you will, in conducting the trial.  But

21   they're under the same instruction to make sure that they're

22   silent, to make sure that they don't disrupt the process.

23   And if that should happen, I'll deal with it, but I'm going

24   to ask you, if you will, to leave your cell phones in the

25   jury room or in your cars.

1        If you are expecting an important email or need to

2 make an important phone call, there will be breaks and

3 recesses every day throughout the trial that you'll have an

4 opportunity to do that, but if you will, just leave them in

5 your vehicles or in -- not bring them back into the jury

6 room.

7        Also, I have a couple other instructions for you.

8 First of all, and all of these instructions are important,

9 but none of them are more important than this one.  Do not

10 discuss the case with anyone.  I'll say that again.  Do not

11 discuss the this case with anyone.

12        It is absolutely essential, ladies and gentlemen,

13 that when this trial is complete, and you are instructed by

14 me to retire to the jury room and to deliberate on your

15 verdict to consider and answer the questions that the

16 Court's going to submit to you in that verdict form, it is

17 absolutely essential that the sole source of any and all

18 information that you will draw upon to answer those

19 questions must have come from the evidence presented in open

20 court from the witness stand subject to cross-examination.

21 That is why it is essential that you not communicate about

22 this case with anyone, because if you do, there is an

23 exceedingly high risk that you will have information that

24 did not come to you through the process of trial in open

25 court under oath and subject to cross-examination.

1          And that instruction not to discuss the case with

2     anyone applies to the eight of you.  Until all the evidence

3     has been presented, until you retire to the jury room to

4     deliberate on your verdict, you are not to discuss the case

5     among the eight of yourselves at all during recesses, lunch

6     breaks, at any time until all the evidence is in, until I

7     instruct you to retire and deliberate on a verdict.

8          Now, when that time comes, it will be your duty

9     to discuss the evidence and the case among yourselves,

10    but until all the evidence has been presented, you're not

11    to discuss the case among yourselves in any fashion.  And

12    until I discharge you from your duty as jurors, you are

13    not to discuss the case with anyone.  And when I say not

14    discuss the case, I mean that in the broadest possible

15    sense, I mean don't communicate about the case with

16    anyone.

17         That -- that also includes not only oral

18    communications, that includes emails, that includes texts,

19    that includes posts on Facebook or tweets on Twitter.  If

20    you are a social media person, you are going to need to be

21    unsocial throughout the rest of this trial.  Do not

22    communicate with the case -- about the case with anyone.

23         And I can tell you, ladies and gentlemen, when the

24    day is over today and I release you to go home at the end of

25    the day, unless you live by yourselves, whoever meets you

1   when you get home, the first question they're going to ask

2   when you walk through the door is tell me what happened in

3   federal court in Marshall today.  Well, just don't even try

4   to answer that question.  Because if you do, you will

5   invariably violate the instruction that I'm giving you.

6   Just say, that very stern federal judge told me not to talk

7   about the case with anyone.  When the trial is over, when

8   he's released me, then I can talk with you about it, but not

9   until then.  Don't even try to answer that question.

10          Another thing, ladies and gentlemen, again, getting

11  back to the same point that the sole universe of the

12  evidence and the information you have to answer the

13  questions in the verdict form must come from the evidence

14  presented in open court under oath from the witness stand

15  subject to cross-examination.

16          Getting back to that same principle, you're not to

17  do any outside research, whatsoever.  You are not to go on

18  the Internet and search regarding any of the parties in this

19  case, any of the terms or facts or issues in the case.

20  You're not to look up any of the lawyers in the case.

21  You're not to do any research of any kind.  And that means

22  online research, the old fashion kind in the local library

23  research, any kind of research.

24          And for those of you that have any of the products

25  that will be mentioned during the trial, you're not to

1  examine them.  You're not to pick up an Xbox One and see how

2  it works or investigate it in any way.  If there's one in

3  your house, leave it alone and ignore it.  If there's one

4  somewhere you're going to be, don't look at it, don't

5  examine it, don't have anything to do with it.

6        Again, it is absolutely essential that all the

7  information you base the answers to the important questions

8  that you will answer at the end of this trial come from this

9  courtroom, come under oath, and come before you subject to

10  cross-examination.

11        And if that principle is violated in any way, then

12  we risk having lost all the time, and all the effort, and

13  all the expense that's gone into this trial in going back to

14  the beginning and starting over again.  And that is a very,

15  very high cost.

16        So I want you to understand, throughout this trial,

17  I'll repeat some of these instructions to you.  I guarantee

18  you, you will be sick and tired of hearing me tell you not

19  to discuss the case with anyone by the time the trial is

20  over because I'm going to say it again almost every time you

21  get up out of those seats, you're going to hear me say that.

22  And that is because though all of my instructions are

23  important, that one is at the top of the list.  It is that

24  important, it is that critical.  And the risk to all of us

25  if that's violated is so high that you're going to hear me

1   repeat that over and over and over again.

2          Also, ladies and gentlemen, I don't know if it will

3   happen, I don't think it will happen.  I will tell you this

4   is an important case, and there's a lot at stake, and it's

5   of vital interest to both of these parties, but now that you

6   are the -- the impaneled jury in this case, it is within the

7   realm of possibility that someone, some third-party, some

8   outside source might approach you and try to influence you,

9   try to persuade you in the worst possible scenario, might

10  try to bribe you.  I don't think that is going to happen,

11  but you need to know it is within the realm of possibility.

12  If at any time before I discharge you, if anyone from any

13  source contacts you in any way that you have the least doubt

14  or discomfort about that you think is odd, strange, or out

15  of the ordinary in any way, then you are to advise the clerk

16  immediately, she will bring it to my attention, and the

17  Court will deal with it.

18          I do not think it's likely, but you are jurors in a

19  case in federal court, and there's a lot at stake, and you

20  need to be aware that it is within the realm of possibility.

21  Again, not likely, but you need to be at least aware it is

22  possible.

23          Also, ladies and gentlemen, during the course of

24  the trial, you'll be coming in each morning, leaving each

25  evening, you'll be in and around this courthouse and on the

1   front steps and the sidewalks coming and going.  There are

2   going to be times when you're going to pass in close contact

3   to some of these lawyers, some of these witnesses, some of

4   these corporate representatives.

5           I want you to understand when that happens, they're

6   not going to speak to you.  Some of you may have walked up

7   on a group of lawyers this morning who then turned around

8   and walked away when you came up.  That -- that is going to

9   happen.  If it -- if you come in contact -- close contact

10  with them, they're not going to talk to you, they're not

11  going to say good morning, how are you, how was your night

12  last night.  They're not going to be the friendly,

13  gregarious, open people that most Texans are.  And the

14  reason they're not is because I've instructed them not to.

15          Again, it all goes back to that very

16  foundational -- foundational principle that the only

17  information, the only communication, the only input of any

18  source you should have regarding anything related to this

19  trial must come in open court under oath from the witness

20  stand.

21          So when the lawyers walk past you in the morning

22  and don't stop and visit, when you pass them on the front

23  steps over the lunch break and they just walk right by, do

24  not think they're being rude, do not think they're being

25  unfriendly, do not hold it against them in any way, they're

1    simply doing what I've instructed them to do.  And you need

2    to be aware of that.

3         All right.  Ladies and gentlemen, with those

4    instructions, I'm going to release you for lunch.  I'm going

5    to ask you, as I've said, to be back in the jury room a

6    little bit before 1:00, and we'll try to start as close to

7    1:00 o'clock as we can.  Follow all my instructions.

8         And with that, ladies and gentlemen, you are

9    excused for lunch.

10        COURT SECURITY OFFICER:  All rise for the jury.

11        (Jury out.)

12        THE COURT:  All right.  Be seated, please.

13        Who might I expect to give opening statement for

14   the Plaintiff?

15        MR. ALPER:  Your Honor, I will.

16        THE COURT:  All right.  And who's going to give the

17   opening statement for the Defendant?

18        MR. BETTINGER:   Your Honor, I will.

19        THE COURT:  All right.  Are there any questions

20   from either Plaintiff or Defendant before we recess for

21   lunch?

22        MR. ALPER:  No, Your Honor.

23        MR. BETTINGER:  No, Your Honor.

24        THE COURT:  We stand in recess until 1:00 o'clock.

25        COURT SECURITY OFFICER:  All rise.

1          (Recess.)
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1    CERTIFICATION

2

3         I HEREBY CERTIFY that the foregoing is a true and

4    correct transcript from the stenographic notes of the

5    proceedings in the above-entitled matter to the best of my

6    ability.

7

8

9    /S/ Shelly Holmes                          6/5/17
     SHELLY HOLMES, CSR-CRR             Date
10   OFFICIAL REPORTER
     State of Texas No.: 7804
11   Expiration Date: 12/31/18

12

13

14

15

16

17

18

19

20

21

22

23

24

25