1              IN THE UNITED STATES DISTRICT COURT

2              FOR THE EASTERN DISTRICT OF TEXAS

3                      MARSHALL DIVISION

4   BISCOTTI INC.            )(

5                           )(    CIVIL DOCKET NO.

6                           )(    2:13-CV-1015-JRG-RSP

7   VS.                      )(    MARSHALL, TEXAS

8                           )(

9   MICROSOFT CORP.          )(    June 9, 2017

10                          )(    8:40 A.M.

11                  TRANSCRIPT OF JURY TRIAL

12       BEFORE THE HONORABLE JUDGE RODNEY GILSTRAP

13              UNITED STATES DISTRICT JUDGE

14

15  APPEARANCES:

16  FOR THE PLAINTIFF:      Mr. Adam R. Alper
                            Mr. Robert Kang
17                          KIRKLAND & ELLIS LLP
                            555 California Street
18                          24th Floor
                            San Francisco, California 94104
19
                            Mr. Michael W. De Vries
20                          Ms. Sharre Lotfollahi
                            Mr. Justin Singh
21                          KIRKLAND & ELLIS LLP
                            333 South Hope Street
22                          29th Floor
                            Los Angeles, California 90071
23

24

25

```
 1                              Ms. Amanda Hollis
                                Mr. Ryan Hubbard
 2                              KIRKLAND & ELLIS LLP
                                300 North LaSalle Street
 3                              Suite 2500
                                Chicago, Illinois 60654
 4

 5                              Mr. Eric Cheng
                                KIRKLAND & ELLIS LLP
 6                              3330 Hillview Avenue
                                Palo Alto, California 94304
 7

 8                              Mr. Michael E. Jones
                                POTTER MINTON
 9                              110 North College Avenue
                                Suite 500
10                              Tyler, Texas 75702

11
     FOR THE DEFENDANT:         Mr. Michael J. Bettinger
12                              Ms. Irene I. Yang
                                SIDLEY AUSTIN LLP
13                              555 California Street
                                Suite 2000
14                              San Francisco, California 94104

15                              Mr. Richard A. Cederoth
                                Ms. Gwen Hochman Stewart
16                              SIDLEY AUSTIN LLP
                                One South Dearborn Street
17                              Chicago, Illinois 60603

18                              Mr. R. Seth Reich, Jr.
                                SIDLEY AUSTIN LLP
19                              2021 McKinney Avenue
                                Suite 2000
20                              Dallas, Texas 75201

21                              Ms. Melissa R. Smith
                                GILLAM & SMITH, LLP
22                              303 South Washington Avenue
                                Marshall, Texas 75670
23

24

25
```

```
 1   COURT REPORTER:            Ms. Shelly Holmes, CSR-TCRR
                                Official Reporter
 2                              United States District Court
                                Eastern District of Texas
 3                              Marshall Division
                                100 E. Houston Street
 4                              Marshall, Texas  75670
                                (903) 923-7464
 5
     (Proceedings recorded by mechanical stenography, transcript
 6   produced on a CAT system.)

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

P R O C E E D I N G S

1

2          (Jury out.)

3          COURT SECURITY OFFICER:  All rise.

4          THE COURT:  Be seated, please.

5          All right.  Before we bring in the jury, it's my

6   understanding that counsel, in reviewing the various items

7   from the list of pre-admitted exhibits that have been used

8   during the trial so far, have discovered that inadvertently

9   four Defendant's exhibits were omitted from the earlier

10  renditions into the record.  And it's my understanding that

11  those four inadvertently omitted Defendant's record -- or

12  exhibits are DX-65, DX-67, DX-918, and DX-923.

13         I'd like to confirm on the record that both sides

14  agree with that, and upon both sides' agreement noted in the

15  record, we will consider that those four exhibits are a part

16  of the trial record and are admitted and used before the

17  jury in the trial.

18         Does Plaintiff agree with that offering?

19         MR. DE VRIES:  Yes, Your Honor.

20         THE COURT:  Does Defendant?

21         MR. BETTINGER:  Yes, Your Honor.

22         THE COURT:  Then those four Defendant's exhibits

23  are made a part of the record for the trial.

24         All right.  I also want to remind those of you

25  present of what I said yesterday when there were fewer

1    people in the courtroom than there are this morning, and

2    that is that the Court considers its final instructions to

3    the jury and counsel's closing arguments to be the most

4    serious part of a very serious process.  And so I'm

5    instructing that those of you in the gallery not move, talk,

6    shuffle papers, or do anything that might disrupt or detract

7    from the jury's concentration during the Court's final

8    instructions to it and the closing arguments offered by the

9    parties.

10         If you need to get up and move, do it before I

11   bring the jury in.  Once I bring the jury in, I expect

12   everyone to be as respectful, still, and quiet as reasonably

13   possible.

14         Also, counsel, I want to say that it's been my

15   pleasure to conduct this trial with both trial teams.  I've

16   had fewer disputes, fewer objections, a higher level of

17   professionalism in meeting and conferring and resolving

18   matters amicably between counsel in this case than in most

19   cases.

20         I have no idea what the jury's going to do as far

21   as a decision and a verdict, but I want to compliment both

22   trial teams for the manner in which you've presented the

23   case so far.

24         All right.  With that, let's bring in the jury.

25         COURT SECURITY OFFICER:  All rise for the jury.

1          (Jury in.)

2          THE COURT:  Good morning, ladies and gentlemen.

3  Welcome back.  Please have a seat.

4          Ladies and gentlemen of the jury, you've now heard

5  the evidence in this case, and I'll now instruct you on the

6  law that you must apply.

7          You are each going to have your own written copy of

8  these instructions that I'm about to give you orally, so

9  there's no pressing need for you to make notes unless you

10  just want to.  And I'll -- I'll provide a written copy for

11  each of you to take with you when you retire to the jury

12  room in a little while.

13          It's your duty to follow the law as I give it to

14  you.  On the other hand, as I've said previously, you, the

15  jury, are the sole judges of the facts in this case.

16          Do not consider any statement that I have made in

17  the course of the trial or make in these instructions as an

18  indication to you that I have any opinion about the facts in

19  this case.

20          Now, you're about to hear closing arguments from

21  the attorneys for both sides.  Statements and arguments of

22  the attorneys are not evidence, and they are not

23  instructions on the law.  They're intended only to assist

24  the jury in understanding the evidence and the parties'

25  contentions in this case.

1           A verdict form has been prepared for you.  You'll

2    take this form with you to the jury room when you -- when

3    you retire, and when you've reached a unanimous agreement as

4    to your verdict, you'll have your foreperson fill in the

5    answers reflecting those unanimous decisions, sign the

6    verdict form, and date it.

7           Answer the questions in the verdict form from the

8    facts as you find them to be.  Do not decide who you think

9    should win the case and then answer the questions to reach

10   that result.  Again, ladies and gentlemen, your answers and

11   your verdict must be unanimous.

12          In determining whether any fact has been proven in

13   this case, you may, unless otherwise instructed, consider

14   the testimony of all the witnesses, regardless of who may

15   have called them, and all the exhibits received and admitted

16   into evidence, regardless of who may have introduced them.

17          As I said, you, the jury, are the sole judges of

18   the credibility and believability of all the witnesses and

19   the weight and effect that you deem proper to give to the

20   evidence in this case.

21          By -- by allowing the testimony or other evidence

22   to be introduced over the objection of an attorney, the

23   Court did not indicate any opinion as to the weight or

24   effect of such evidence.

25          As I've told you previously, the attorneys in this

1   case are advocates for their competing parties, and they

2   have a duty to object when they believe evidence is offered

3   that should not be admitted under the rules of the Court.

4        When the Court sustained an objection to a question

5   addressed to a witness, you must disregard the question

6   entirely, and you may draw no inference from its wording or

7   speculate about what the witness would have said if the

8   Court had allowed them to answer the question.

9        If an objection was overruled, however, you are to

10  treat the answer and the question just as if no objection

11  had been made, and as you would any other question.

12       Now, at times during the trial, it's been necessary

13  for the Court to talk with the lawyers either here at the

14  bench outside of your hearing or by calling a recess and

15  talking to them while you were outside the courtroom.  This

16  happens during a trial because there are often things that

17  arise that do not involve the jury.  You should not

18  speculate about what was said during such discussions that

19  took place outside of your presence.

20       There are two types of evidence that you may

21  consider in properly finding the truth as to the facts in

22  this case.

23       One is direct evidence, such as the testimony of an

24  eyewitness.

25       The other is indirect or circumstantial evidence,

1   that is, the proof of a chain of circumstances that

2   indicates the existence or non-existence of certain other

3   facts.

4          As a general rule, the law makes no distinction

5   between direct or circumstantial evidence but simply

6   requires that you find the facts, based on the evidence as

7   presented, both direct and circumstantial.

8          The parties may have stipulated or agreed to some

9   facts in this case.  When the lawyers for both sides

10  stipulate as to the existence of a fact, you must, unless

11  otherwise instructed, accept the stipulation as evidence and

12  regard the facts as proven.

13         Now, certain testimony in this case has been

14  presented to you through depositions.  As I've told you, a

15  deposition is the sworn, recorded answers to questions asked

16  of a witness in advance of the trial.

17         If a witness cannot be present to testify in person

18  from the witness stand, that witness's testimony may be

19  presented under oath in the form of a deposition.

20         Before the trial, the attorneys representing both

21  sides in this case questioned these deposition witnesses

22  under oath.  A court reporter was present and recorded the

23  testimony.  Deposition testimony is entitled to the same

24  consideration as testimony given by a witness in person from

25  the witness stand.  And accordingly, you should determine

1  the credibility and the importance of deposition testimony

2  to the best of your ability, just as if the witness had

3  testified in person in open court.

4          Now, while you should consider only the evidence in

5  this case, you are permitted to draw such reasonable

6  inferences from the testimony and exhibits as you feel are

7  justified in the light of common experience.  In other

8  words, ladies and gentlemen, you may make deductions and

9  reach conclusions that reason and common sense lead you to

10 draw from the facts that have been established by the

11 testimony and the evidence in this case.

12         However, you should not base your decision on any

13 evidence not presented by the parties during the case,

14 including your own personal experiences with any particular

15 electronic device.

16         Unless I instruct you otherwise, you may properly

17 determine that the testimony of a single witness may be

18 sufficient to prove any fact, even if a greater number of

19 witnesses may have testified to the contrary if after you

20 consider all of the evidence you believe that single

21 witness.

22         Now, when knowledge of technical subject matters

23 may be helpful to you, the jury, a person who has special

24 training or experience in that technical field called an

25 expert witness is permitted to give his or her opinions on

1    those technical matters.  However, you're not required to

2    accept those opinions.  As with any other witness, it's

3    solely up to you to decide whether to rely upon it or not.

4         Now, certain exhibits were shown to you during the

5    trial as illustrations only.  We call these demonstrative

6    exhibits or demonstratives.  Demonstratives are a party's

7    description, picture, model, or description of something

8    involved in the trial.

9         If your recollection of the evidence differs from

10   the demonstratives, you should rely on your recollection.

11   Demonstrative exhibits are sometimes referred to as jury

12   aids.

13        These demonstrative exhibits are not evidence, but

14   the witness's testimony concerning a demonstrative is

15   evidence.  Demonstrative exhibits will not be available to

16   you to review in the jury room during your deliberations.

17        In any legal action, facts must be proven by a

18   required amount of evidence known as the burden of proof.

19        The burden of this -- the burden of proof in this

20   case is on the Plaintiff, Biscotti, for some issues and on

21   the Defendant, Microsoft, for other issues.

22        There are two burdens of proof that you, the jury,

23   are to apply in this case.  Those are the preponderance of

24   the evidence and clear and convincing evidence.

25        The Plaintiff, Biscotti, has the burden of proving

1   patent infringement by a preponderance of the evidence.

2           Biscotti also has the burden of proving willful

3   patent infringement by a preponderance of the evidence.

4           Additionally, Biscotti has the burden of proving

5   damages for patent infringement by a preponderance of the

6   evidence.

7           A preponderance of the evidence means evidence that

8   persuades you that a claim is more probably true than not

9   true.  Sometimes this is talked about as being the greater

10  weight and degree of credible testimony.

11          The Defendant, Microsoft, has the burden of proving

12  patent invalidity by clear and convincing evidence.  Clear

13  and convincing evidence means evidence that produces in your

14  mind an abiding conviction that the truth of the parties'

15  factual contentions are highly probable.

16          Although proof to an absolute certainty is not

17  required, the clear and convincing evidence standard

18  requires a greater degree of persuasion than is necessary

19  for the preponderance of the evidence standard.

20          If proof establishes in your mind an abiding

21  conviction in the truth of the matter, then the clear and

22  convincing standard has been met.

23          These standards are different from what you may

24  have heard about in criminal proceeding where a fact must be

25  proven beyond a reasonable doubt.

1          On a scale of these various standards of proof, as

2     you move from preponderance of the evidence where proof need

3     only be sufficient to tip the scale in favor of the proving

4     party, to beyond a reasonable doubt where the fact must be

5     proven to a very high degree of certainty, you may think of

6     clear and convincing evidence as being between these two

7     standards.

8          Now, in determining whether any fact has been

9     proven by a preponderance of the evidence or by clear and

10    convincing evidence, you may, unless otherwise instructed,

11    consider the stipulations of the parties, the testimony of

12    all the witnesses, regardless of who called them, and all of

13    the exhibits received into evidence during the trial

14    regardless of who may have produced them.

15         Now, as I did at the start of the case, I'll first

16    give you a summary of each side's contentions, and I will

17    then provide you with detailed instructions on what each

18    side must prove to win on each of its contentions.

19         As I previously told you, this case concerns one

20    single United States patent, being U.S. Patent No.

21    8,144,182, which you've heard referred to throughout the

22    trial as the '182 or the '182 patent.

23         The Plaintiff, Biscotti, seeks money damages from

24    Microsoft, the Defendant, for allegedly infringing the '182

25    patent by making, importing, using, selling, and offering

1  for sale products that Biscotti argues are covered by Claims

2  12, 13, 23, 27, 28, 35, and 86 of the '182 patent.

3       These are the asserted claims of the '182 patent.

4  Biscotti also argues that Microsoft has actively induced

5  infringement of Claims 12, 13, 23, 27, 28, 35, and 86 of the

6  '182 patent by others.

7       The products that are alleged to infringed are

8  Microsoft's Xbox One and Xbox One S video game consoles,

9  combined with both the Kinect motion sensing device and one

10  of the Skype application, the Twitch application, or the

11  Beam application software installed on the console.

12       Accordingly, throughout these instructions, the

13  Court may refer to the accused product with such reference

14  meaning:  Microsoft's Xbox One and Xbox One S video game

15  consoles, combined with both the Kinect motion sensing

16  device and with one of the Skype application, the Twitch

17  application, or the Beam application software installed on

18  the console.

19       Biscotti, the Plaintiff, also contends that the

20  alleged infringement by Microsoft was willful.  Biscotti

21  seeks damages from Microsoft in the form of a reasonable

22  royalty.

23       Microsoft denies that it has infringed the asserted

24  claims of the '182 patent.  Microsoft contends that during

25  the term of this patent, Microsoft did not make, use, sell,

1   or offer for sale or import any products that infringe any

2   of the asserted claims of the asserted patent.  Microsoft

3   also denies that any infringement you might find was

4   willful.

5          Separately, Microsoft also contends that all of the

6   asserted claims -- again, those claims are Claims 12, 13,

7   23, 27, 28, 35, and 86 -- are invalid.

8          Microsoft contends that the asserted claims are

9   anticipated by prior art that existed before Biscotti's

10  alleged invention, and, therefore, the asserted claims are

11  invalid.

12         Microsoft further contends that the asserted claims

13  were obvious in view of the prior art that existed before

14  Biscotti's alleged inventions, and, therefore, that the

15  asserted claims are invalid.

16         Invalidity, ladies and gentlemen, is a defense to

17  infringement.  Invalidity and infringement are separate and

18  distinct issues, and they must be separately decided by you,

19  the jury.

20         Now, your job is to decide whether Microsoft has

21  infringed any of the asserted claims of the '182 patent and

22  whether any of the asserted claims of the '182 patent are

23  invalid.  If you decide that any claim of the '182 patent

24  has been infringed and is not invalid, you'll then need to

25  decide any money damages that are to be awarded to Biscotti

1    to compensate it for that infringement.  You'll also need to

2    make a finding as to whether any infringement was willful.

3           If you decide that any infringement was willful,

4    that decision should not affect any damages or any damage

5    award that you make.  I will take willfulness into account

6    later.

7           Now, before you can decide any of the issues in

8    this case, you'll need to understand the role of the patent

9    claims.  The patent claims are those numbered sentences at

10   the end of each patent -- in this case, the '182 patent.

11          The claims are important, ladies and gentlemen,

12   because it's the words of the claims that define what a

13   patent covers.  The figures and the text in the rest of the

14   patent provide a description and/or examples of the

15   invention and provide a context for the claims, but it is

16   the claims that define the breadth of the patent's coverage.

17          Each claim is effectively treated as if it were a

18   separate patent, and each claim may cover more or less than

19   another claim.  Therefore, what a patent covers depends, in

20   turn, on what each of its claims covers.

21          Claims may describe methods or products such as

22   machines or processes for making or using a product.  In

23   this case, Biscotti has asserted product claims.

24          The law says it's my role to define the terms of

25   the claims, and it's your role to apply my definitions to

1   the issues that you are asked to decide in this case.

2         Accordingly, as I explained to you at the beginning

3   of the case, I have determined the meanings of the claims,

4   and I'll -- and I have provided you with my definitions to

5   certain claim terms, as well as certain definitions that

6   have been agreed to by the parties.

7         These claim terms and my definitions are included

8   in your juror notebooks, and you've had them since the

9   beginning of the trial.  You must accept these definitions

10  of these words in the claims as being correct.  It's your

11  job to take these definitions and apply them to the issues

12  that you are deciding, including the issues of infringement

13  and invalidity.

14        You should disregard any evidence presented at

15  trial which contradicts or which is inconsistent with the

16  constructions and definitions that I have given you.

17        For claim limitations that I have not construed --

18  that is, interpreted or defined -- you are to use the plain

19  and ordinary meaning of the terms as understood by one of

20  ordinary skill in the art, which is to say, in the field of

21  technology of the patent at the time of the alleged

22  invention.

23        The meaning of the words in the patent claims must

24  be the same when deciding both infringement and when

25  deciding invalidity.

1          Keep in mind, however, that everyone has the right

2     to use existing knowledge and principles.  A patent cannot

3     remove from the public the ability to use what was known or

4     obvious before the invention was made or patent protection

5     was sought.

6          You've been provided with copies of the asserted

7     patent, the '182 patent, and this is inside your juror

8     notebooks, and you may certainly use this during your

9     deliberations.

10          I'll now explain to you how a claim defines what it

11     covers.

12          A claim sets forth in words a set of requirements.

13     Each claim sets forth its requirements in a single sentence.

14     If a device satisfies each of these requirements in that

15     sentence, then it is covered by and infringes the claims.

16          There can be several claims in a patent.  A claim

17     may be narrower or broader than another claim by setting

18     forth more or fewer requirements.

19          The coverage of a patent is assessed on a

20     claim-by-claim basis.  The requirements of a claim are often

21     referred to as the claim elements or the claim limitations.

22     Those words all mean the same thing.

23          And when a product meets all of the requirements or

24     limitations of a claim, the claim is said to cover the

25     product, and the product is said to fall within the scope of

the claim.

In other words, ladies and gentlemen, a claim covers a product where each of the claim elements or limitations is present in that product.  If a product is missing even one limitation or element of a claim, the product is not covered by the claim.  If a product is not covered by the claim, the product does not infringe the claim.

The beginning portion or preamble of a number of the claims use the word "comprising."  The word "comprising," when used in a preamble, means including or containing.  When comprising is used in the preamble, a device that includes all of the limitations of the claim is covered by the claim even if the device contains additional elements.

For example, a claim to a table comprising a tabletop, legs, and glue would be infringed by a table that includes a tabletop, legs, and glue, even if the table also contains other features, such as wheels on the ends of the legs.

Patent claims may exist in two forms referred to as independent claims and dependent claims.

An independent claim does not refer to any other claim in the patent.  An independent claim sets forth all the requirements that must be met in order to be covered by

1  that claim.  Therefore, it's not necessary to look at any

2  other claim to determine what an independent claim covers.

3          However, a dependent claim covers at least one

4  other claim in the patent.  A dependent claim includes each

5  limitation or requirement of the other claim or claims to

6  which it refers, as well as the additional limitations or

7  requirements recited within the dependent claim itself.

8          In this way, the claim depends on another claim or

9  claims.  To determine what a dependent claim covers, it's

10  necessary to look at both the dependent claim and any other

11  claim or claims to which it refers or from which it depends.

12          In this case, all of the asserted claims are

13  dependent claims.  Some of them depend on one other claim,

14  and some depend on more than one other claim.  For example,

15  Claim 12 depends on one other claim, Claim 6.  Claim 12,

16  therefore, includes all the limitations of Claim 6, as well

17  as the additional limitations of Claim 12.

18          As another example, Claim 27 depends on other

19  claims.  It depends on Claim 25, which, in turn, depends on

20  Claim 24, which, in turn, depends on Claim 6.  Therefore,

21  Claim 27 includes all the requirements of Claims 25, 24, and

22  6, as well as the additional limitations or requirements of

23  Claim 27.

24          Now, in order to find infringement of a dependent

25  claim, you must consider all the limitations or requirements

1  of both the dependent claim and the other claim or claims on

2  which it depends.  If you decide that one of the other

3  claims on which the dependent claim depends has not been

4  infringed, then the dependent claim cannot be infringed.

5        If you decide that all of the other claims on which

6  the dependent claim depends have been infringed, then you

7  must separately determine whether each of the additional

8  requirements or limitations within the dependent claim

9  itself have also been met.  If each of these additional

10  requirements has been met, then the dependent claim has been

11  infringed.

12        A patent owner has the right to prevent others from

13  using the invention covered by its patent claims in the

14  United States during the life of the patent.

15        If any person makes, uses, sells, or offers for

16  sale within the United States or imports into the United

17  States what is covered by the patent claims without the

18  patent owner's permission, that person is said to infringe

19  the patent.

20        Now, in reaching your decision -- decision on

21  infringement, keep in mind, ladies and gentlemen, that only

22  the claims of a patent can be infringed.  You must compare

23  the asserted claims, as I've defined each of them, to the

24  accused product and determine whether or not there is

25  infringement.

1          You should not compare the accused product with any

2     specific example set out in the patent -- patent or with

3     Biscotti's commercial products or with the prior art in

4     reaching your decision on infringement.

5          The only correct comparison is between the accused

6     product and the language of the claims themselves, as the

7     Court has construed them or as the parties have agreed to

8     their meaning.

9          You must reach your decision as to each assertion

10    of infringement based on my instructions about the meaning

11    and scope of the claims, the legal requirements for

12    infringement, and the evidence presented to you over the

13    course of the trial by the parties.

14         You must determine separately for each of the

15    asserted claims whether there is or there is not

16    infringement.

17         A patent can be directly infringed even if the

18    alleged infringer did not have knowledge of the patent and

19    without the infringer's knowing that what it was doing was

20    infringement of the claim.

21         A patent may also be directly infringed even though

22    accuse -- even though the accused infringer believes in good

23    faith that what it is doing is not infringement of the

24    patent.

25         If you find that an independent claim on which

1    other claims depend is not infringed, there cannot be

2    infringement of any dependent claim that refers to or

3    depends from that independent claim.

4            On the other hand, if you find that an independent

5    claim has been infringed, you must still then decide

6    separately whether the additional requirements of each

7    dependent claim have been satisfied.  That's because a

8    dependent claim includes all the requirements of any of the

9    claims to which it refers, plus the additional requirements

10   of its own claim.

11           I'll now instruct you on how to decide whether or

12   not Microsoft has infringed any of the asserted claims of

13   the '182 patent, the patent-in-suit.

14           Infringement is assessed on a claim-by-claim basis,

15   therefore, there may be infringement as to one claim but no

16   infringement as to another.

17           To prove infringement, the Plaintiff, Biscotti,

18   must prove that the accused product includes every

19   limitation or element of the asserted claims.

20           If the accused product omits any requirement

21   recited in an asserted claim, it does not infringe that

22   claim.

23           In this case, there are two possible ways that a

24   claim may be infringed.  The two types of infringement are

25   called, one, direct infringement, and, two, indirect

infringement.

There cannot be indirect infringement without someone else engaging in direct infringement.

To prove indirect infringement, Biscotti must also prove that Microsoft's indirect infringement caused direct infringement.

In this case, Biscotti has alleged that Microsoft directly infringes Claims 12, 13, 23, 27, 28, 35, and 86 of the '182 patent.

In addition, Biscotti has alleged that Microsoft's customers directly infringe Claims 12, 13, 23, 27, 28, 35, and 86 of the '182 patent, and Microsoft is liable for indirect infringement by actively inducing that direct infringement.

In order to prove infringement, Biscotti must prove that the requirements for one or more of these types of infringement are met by a preponderance of the evidence, that is, that it is more likely true than not that all of the requirements for one or more of these types of infringement have been proven.

I'll now explain each type of infringement in more detail.

There are two types of direct infringement.  There is literal infringement, and there is infringement under the Doctrine of Equivalents.

1              In order to prove literal -- literal infringement

2    of a patent claim, the Plaintiff, Biscotti, must show by a

3    preponderance of the evidence that the accused product

4    includes each and every requirement or limitation of the

5    claim.

6              In determining whether the accused product

7    literally infringes one of the asserted claims in this case,

8    you must compare the accused product with each and every one

9    of the requirements or limitations of that claim to

10   determine whether the accused product contains each and

11   every limitation recited in a claim.

12             A claim requirement is present if it exists in an

13   accused product just as -- as it is described in the claim

14   language, either as I have explained the language to you, or

15   if I did not explain it, as it would be understood by its

16   plain and ordinary meaning by one skilled in the art.

17             If any accused product omits any requirement

18   recited in a claim, then you must find that the particular

19   product does not literally infringe that particular claim.

20             Biscotti also alleges that Microsoft directly

21   infringes certain claims under the Doctrine of Equivalents.

22             If a person makes, uses, sells, or offers for sale

23   within the United States a product which does not meet all

24   the requirements of a claim and thus does not literally

25   infringe that claim, there can still be direct infringement

1   if that product satisfies that claim under the Doctrine of

2   Equivalents.

3          Under the Doctrine of Equivalents, a product

4   infringes a claim if the accused product performs steps or

5   contains elements corresponding to each and every

6   requirement of the claim that is equivalent to, even though

7   not literally met by the accused product.

8          You may find that a step or element is equivalent

9   to a requirement of a claim that is not literally met if a

10  person having ordinary skill in the field of the technology

11  of the patent would have considered the differences between

12  them to be insubstantial or would have found that the action

13  or structure performs substantially the same function in

14  substantially the same way to achieve substantially the same

15  result as the requirements of the claim.

16         In order to prove infringement by equivalents,

17  Biscotti, the Plaintiff, must prove the equivalency to a

18  claim element by a preponderance of the evidence.

19         Biscotti alleges that Microsoft is liable for

20  infringement by actively inducing Microsoft's retailers and

21  customers to directly infringe Claims 12, 13, 23, 27, 28,

22  35, and 86 of the '182 patent literally or under the

23  Doctrine of Equivalents.

24         As with direct infringement, you must determine

25  whether or not there has been active inducement on a

1   claim-by-claim basis.

2          Microsoft is liable for active inducement of a

3   claim if Biscotti proves by a preponderance of the evidence:

4          (1) that the acts are actually carried out by

5   Microsoft's retailers or customers and directly infringe

6   that claim.

7          (2) that Microsoft took -- took action intending to

8   cause the infringing acts by its retailers and customers.

9          And, (3), that Microsoft was aware of or willfully

10  blind to the patent and knew that the acts, if taken, would

11  constitute infringement of the patent or that Microsoft was

12  willfully blind to that infringement.

13         To prove willful blindness, Biscotti must prove by

14  a preponderance of the evidence that there was a high

15  probability that a fact exists and that Microsoft took de --

16  deliberate acts to avoid learning of that fact.

17         In order to establish active inducement of

18  infringement, it is not sufficient that the other party or

19  parties themselves directly infringe the claim, nor is it

20  sufficient that Microsoft was aware of the acts of its

21  customers using the accused products that allegedly

22  constitute the direct infringement.

23         Rather, you must find that Microsoft specifically

24  intended its customers using the accused products to

25  infringe the patent or that Microsoft believed there was a

1   high probability that its customers would infringe the

2   patent but deliberately avoided learning of the infringing

3   nature of its customers' acts.

4           In this case, Biscotti argues that both Microsoft

5   infringed and further that Microsoft infringed willfully.

6           Conversely, Microsoft denies that it is -- that it

7   infringed or willfully infringed any of the asserted claims.

8           If you have decided that Microsoft has infringed,

9   you must go on and address the additional issue of whether

10  or not this infringement was willful.

11          Willfulness requires you to determine whether

12  Biscotti proved that it was more likely than not -- that is,

13  by a preponderance of the evidence -- that the infringement

14  by Microsoft was especially worthy of punishment.

15          You may not determine that the infringement was

16  willful just because Microsoft knew of the '182 patent and

17  infringed it.  Instead, willful infringement is reserved

18  only for the most egregious behavior such as where the

19  infringement is wanton, malicious, deliberate, consciously

20  wrongful, or done in bad faith.

21          To determine whether Microsoft acted willfully,

22  consider all the facts.  And these facts may include but are

23  not limited to:

24          (1) whether or not Microsoft, through its

25  employees, acted consistently with the standards of behavior

1  for its industry.

2          (2) whether or not Microsoft, through its

3  employees, intentionally copied a product of Biscotti that's

4  covered by the '182 patent.

5          (3) whether or not Microsoft reasonably believed

6  that it did not infringe or that the patent was invalid.

7          (4) whether or not Microsoft made a good faith

8  effort to avoid infringing the '182 patent.  For example,

9  whether Microsoft attempted to design around the '182

10  patent.

11          (5) whether or not Microsoft tried to cover up its

12  infringement.

13          (6) whether or not Microsoft, through its

14  employees, acted in bad faith.

15          (7) whether or not Microsoft, through its

16  employees, acted with malice.

17          (8) whether or not Microsoft, through its

18  employees' accused acts, were wanton.

19          Now, none of these factors, ladies and gentlemen,

20  alone is determinative, and this list is not an exhaustive

21  list of things that you should consider.  Your determination

22  of willfulness should incorporate the totality of the

23  circumstances based on all the evidence presented during the

24  trial.

25          If you decide that any infringement was willful,

1  that decision should not affect any damages award that you

2  might make.  I will take willfulness into account later.

3        Now, Microsoft has challenged the validity of the

4  asserted claims on a number of grounds, including that they

5  are anticipated and/or rendered obvious by the prior art.

6  Patent invalidity is a defense to patent infringement.

7        Even though the Patent Office examiner has allowed

8  the claims of a patent, you, the jury, have the ultimate

9  responsibility for deciding whether the claims of the patent

10 are valid.

11       I'll now instruct you on the rules that you must

12 follow in deciding whether or not Microsoft has proven that

13 the asserted claims of the asserted patent are invalid.

14       An issued United States patent is accorded a

15 presumption of validity based on the presumption that the

16 U.S. Patent and Trademark Office acted correctly in issuing

17 the patent.

18       To prove that any claim of a patent is invalid,

19 Microsoft must persuade you by clear and convincing evidence

20 that the claim is invalid.  Again, the ultimate

21 responsibility for deciding whether the claims of the

22 patent-in-suit are valid is up to you, the members of the

23 jury.

24       Keep in mind, however, ladies and gentlemen, that

25 everyone has the right to use existing knowledge and

1   principles.  A patent cannot remove from the public the

2   ability to use what was known or obvious before the

3   invention was made or patent protection was sought.

4        I'll now explain to you Microsoft's grounds for

5   asserting invalidity of the claims of the asserted patent.

6        In making your determination as to invalidity, you

7   should consider each claim separately.  Claims are construed

8   the same way for determining infringement as for determining

9   invalidity.

10        Microsoft, the Defendant, contends that some of the

11   asserted claims of the patent-in-suit are invalid for being

12   anticipated by prior art.  Microsoft bears the burden of

13   establishing anticipation by clear and convincing evidence.

14        A patent claim is invalid if it is not new.  For a

15   claim to be invalid because it is not new, all of its

16   requirements must have existed in a single system that

17   predates the patent or must have been described in a single

18   publication or another patent that predates the

19   patent-in-suit.

20        In patent law, a previous device, system, method,

21   publication, or patent that predates the claimed invention

22   is called a prior art reference.  If a patent claim is not

23   new, we say it is anticipated by the prior art reference.

24        Anticipation requires that a single reference not

25   only disclose all of the element of a claim, but it must

1  also disclose those elements arranged or combined in the

2  same way as in the claim as that claim has been construed or

3  interpreted by the Court.

4        Microsoft must prove with clear and convincing

5  evidence that an asserted patent claim was anticipated by

6  the prior art reference.  Microsoft may prove anticipation

7  by proving:

8        (1) the invention was known or used by others in

9  this country or patented or described in a printed

10  publication in this or a foreign country before the

11  invention thereof by the applicant.

12        Or, (2), the invention was patented or described in

13  a printed publication in this or a foreign country or in

14  public use or on sale in this country more than one year

15  prior to the date of the application for the patent in the

16  United States.

17        No patent shall be granted on any application for a

18  patent for an invention which has been patented or described

19  in a printed publication in any country more than one year

20  before the date of the actual filing of the application in

21  this country or which -- or which has been in public use or

22  on sale in this country more than one year prior to such

23  filing.  The date of invention in this case is no later than

24  September the 16th, 2008.

25        In determining whether or not the invention is

1   valid, you must determine the scope and content of the prior

2   art at the time the invention was made.

3          For prior art to anticipate a claim of a patent,

4   the disclosure in the prior art reference does not have to

5   be in the same words as in the claim but shall have all of

6   the elements of the claim.  They must all be there, either

7   stated or necessarily implied so that someone of ordinary

8   skill in the field of the invention looking at one of the

9   references would be able to make and use at least in -- at

10  least one embodiment of the claimed invention.

11         Anticipation can occur when the claimed invention

12  inherently and necessarily results from the practice of what

13  is disclosed in the written reference, even if the inherent

14  disclosure was unrecognized or unappreciated by one of

15  ordinary skill in the field of the invention.

16         If you find that a patent claim is not new, as

17  explained above, you should find that claim is invalid.

18         Microsoft also contends separately that all of the

19  asserted claims of the '182 patent are invalid as being

20  obvious.  Even though an invention may not have been

21  identically disclosed or described in a single prior art

22  reference before it was made by an inventor, the invention

23  may have been obvious to a person of ordinary skill in the

24  field of technology of the patent at the time the invention

25  was made.

1        Microsoft has the burden of establishing

2   obviousness by clear and convincing evidence.

3        In determining whether a claimed invention is

4   obvious, you must consider the level of ordinary skill in

5   the field of technology of the patent that someone would

6   have had at the time the claimed invention was made, the

7   scope and content of the prior art, any differences between

8   the prior art and the claimed invention, as well as the

9   ordinary knowledge of the person of ordinary skill at the

10  time of the invention.

11       The skill of the actual inventor is not necessarily

12  relevant because inventors may possess something that

13  distinguishes them from workers of ordinary skill in the

14  art.

15       Keep in mind, ladies and gentlemen, that the

16  existence of each and every element of the claimed invention

17  in the prior art does not necessarily prove obviousness.

18  Most, if not all inventions, rely on the building blocks of

19  prior art.

20       In considering whether a claimed invention is

21  obvious, you should consider whether as of September the

22  16th, 2008, there was a reason that would have prompted a

23  person of ordinary skill in the field to combine the known

24  elements in a way that the claimed invention does, taking

25  into account such facts as:

1          (1) whether the claimed invention was merely the

2    predictable result of using prior art elements according to

3    their known function.

4          (2) whether the claimed invention provides an

5    obvious solution to a known problem in the relevant field.

6          (3) whether the prior art teaches or suggests the

7    desirability of combining elements in the manner of the

8    claimed invention.

9          (4) whether the prior art teaches away from

10   combining elements in the manner of the claimed invention.

11         (5) whether it would have been obvious to try the

12   combination of elements in the claimed invention, such as

13   when there is a design need or market pressure to solve a

14   problem, and there -- and where there are a finite number of

15   identified, predictable solutions.

16         And, (6), whether the change resulted more from

17   design incentives or market forces.

18         In determining whether the claimed invention was

19   obvious, consider each claim separately and consider only

20   what was known at the time of the invention.

21         In making these assessments, you should take into

22   account any objective evidence, sometimes called secondary

23   considerations, that may have existed at the time of the

24   invention and afterwards that may shed light on

25   non-obviousness.

1          The following are possible secondary

2   considerations, but it's up to you to decide whether

3   secondary considerations of non-obviousness exist at all.

4          They are:

5          (1) whether the invention was commercially

6   successful as a result of the merits of the claimed

7   invention, rather than the result of design needs or market

8   pressure, advertising, or similar activities.

9          (2) whether the claimed invention satisfied a

10  long-felt need.

11         (3) whether others had tried and failed to make the

12  invention.

13         (4) whether there were changes or related

14  technologies or market needs contemporaneous with the

15  invention.

16         (5) whether the invention achieved unexpected

17  results.

18         (6) whether others in the field praised the

19  invention.

20         (7) whether others sought or obtained rights to the

21  patent from the patentholder.

22         And, (8), whether the inventor proceeded contrary

23  to accepted wisdom in the field.

24         If you find that one or more of these secondary

25  considerations exist, then you may accord it substantial

1  weight only if you find that there is a nexus between the

2  evidence of the consideration and the claimed invention.

3          In support of obviousness, you may also consider

4  whether others independently invented the claimed invention

5  before or about the same time as the named inventor thought

6  of it.

7          If you find that Microsoft has proved the

8  obviousness of a claim by clear and convincing evidence,

9  then you must find that that claim is invalid.

10          Now, several times in my instruction, I referred to

11  a person of ordinary skill in the field of the invention.

12          It's up to you to decide the level of ordinary

13  skill in the field of the invention.  You should consider

14  all the evidence introduced at trial in making this

15  decision, including:

16          (1) the levels of education and experience of

17  persons working in the field.

18          (2) the types of problems encountered in the field.

19          (3) prior art solutions to those problems.

20          (4) speed with which innovations are made.

21          And, (5), the sophistication of the technology.

22          A person of ordinary skill in the art is a

23  hypothetical person who is presumed to have known of all the

24  relevant prior art at the time of the claimed invention.

25          If you find that Microsoft infringed any valid

1   claim of the '182 patent, you must then consider what amount

2   of damages to award to Biscotti.

3          I'll now instruct you about the measure of damages,

4   but by instructing you on damages, I'm not suggesting which

5   party should win this case on any issue.

6          If you find that Microsoft has not infringed any

7   valid claim of the patent, then Biscotti is not entitled to

8   any damages.

9          The damages award you make must be adequate to

10  compensate Biscotti for any infringement you may find.  You

11  must not award Biscotti more damages than are adequate to

12  compensate for the infringement, nor should you include any

13  additional amount for the purpose of punishing Microsoft.

14         Biscotti has the burden to establish the amount of

15  its damages by a preponderance of the evidence.  The patent

16  owner is not entitled to damages that are remote or

17  speculative.

18         The determination of a damage award, however, is

19  not an exact science, and the amount need not be proven with

20  unerring precision.  You may approximate, if necessary, the

21  amount to which the patent owner is entitled.

22         Damages, however, may not be determined by mere

23  speculation or guess.  It may be proper to award a damages

24  amount if the evidence shows the extent of the damages as a

25  matter of just and reasonable inference.

1          I'll give you more detailed instructions regarding

2   damages shortly.  Note, however, that under the patent laws,

3   if infringement of a patent not determined to be invalid is

4   found, Biscotti is entitled to recover no less than a

5   reasonable royalty for each infringing sale or use of its

6   invention.  In this case, Biscotti seeks damages in the form

7   of a reasonable royalty.

8          A royalty is a payment made to a patentholder in

9   exchange for the right to make, use, sell, or import the

10  claimed invention.

11         A reasonable royalty is the amount of money to be

12  paid for a license to make, use, sell -- or sell the

13  invention that a willing patent owner and a willing

14  prospective licensee would have agreed to immediately before

15  the infringement began as a part of a hypothetical

16  negotiation.

17         In considering this hypothetical negotiation,

18  ladies and gentlemen, you should focus on what the

19  expectations of the patentholder and the alleged infringer

20  would have been had they entered into an agreement at that

21  time and had they acted reasonably in their negotiations.

22         In determining this, you must assume that both

23  parties believed that the patent-in-suit was valid and

24  infringed and that both parties were willing to enter into

25  an agreement.

1          Evidence of things that happened after infringement

2   first began may be considered in evaluating the reasonable

3   royalty only to the extent that the evidence aids in

4   assessing what royalty would have resulted from the

5   hypothetical negotiation.

6          Biscotti must prove the amount of its damages with

7   reasonable certainty but need not prove its damages with

8   mathematical precision.  Biscotti is not entitled to damages

9   that are remote or speculative.

10         Now, in determining the reasonable royalty, you

11  should consider all the facts known and available to the

12  parties at the -- at the time the infringement began.  Some

13  of the kinds of factors that you may consider in making your

14  determination are:

15         (1) the royalties received by the patentee for

16  licensing of the patent-in-suit proving or tending to prove

17  an established royalty.

18         (2) whether the patent owner had an established

19  policy of granting licenses or retaining the patented

20  invention as its exclusive right or whether the patent owner

21  had a policy of granting licenses under special conditions

22  designed to preserve its monopoly.

23         (3) the nature of the commercial relationship

24  between the patent owner and the licensee, such as whether

25  they are competitors or whether their relationship was that

1    of an inventor and a promoter.

2            (4) the effect of selling the patented specialty in

3    promoting sales of other products of the licensee, the

4    existing value of the invention to the licensor as a

5    generator of sales of its non-patented items, and the extent

6    of such derivative or convoyed sales.

7            (5) the established profitability of the product

8    made under patents, its commercial success, and its current

9    popularity.

10           (6) the utility and advantages of the patented

11   invention over the old modes or devices, if any, that had

12   been used for achieving similar results.

13           (7) the nature of the patented invention, the

14   character of its commercial embodiment as owned and produced

15   by the licensor, and the benefits of those who have used the

16   invention.

17           (8) the extent to which the infringer has made use

18   of the invention and any evidence probative of the value of

19   that use.

20           (9) the portion of the realizable profit that

21   should be credited to the invention as distinguished from

22   non-patented elements, the marketing (sic) process, business

23   risks, or significant features or improvements added by the

24   infringer.

25           (10) the opinion and testimony of qualified

1   experts.

2           (11) the amount that a licensor, such as the

3   patentee, and a licensee, such as the infringer, would have

4   agreed upon at the time the infringement began if both sides

5   had been reasonably and voluntarily trying to reach an

6   agreement, that is, the amount which a prudent licensee who

7   desired as a business proposition to obtain a license to

8   manufacture and sell a particular product or article

9   embodying the patented invention would have been willing to

10  pay as a royalty and yet be able to make a reasonable profit

11  and which amount would have been acceptable to a prudent

12  patentee who was willing to grant a license.

13          Now, no one of these factors is dispositive, and

14  you can and you should consider the evidence that is

15  presented to you in this case on these factors.

16          You may also consider any other factors which in

17  your minds would have increased or decreased the royalty the

18  infringer would have been willing to pay and the patent

19  owner would have been willing to accept acting as normally

20  prudent business people.

21          The law requires that any damages awarded to

22  Biscotti correspond to the value of the alleged invention,

23  not to the value of the features of Microsoft's products

24  that are not covered by Biscotti's asserted patent claims.

25  This is particularly true where the accused product has

1   multiple features and multiple components.

2         The Plaintiff, Biscotti, bears the burden to

3   establish the amounts attributable to the patented feature

4   or features.  That is, Biscotti must give evidence tending

5   to separate or apportion between the patented features and

6   the unpatented features, and such evidence must be reliable

7   and tangible and not conjectural or speculative.

8         In determining the amount of damages, you must

9   consider when damages began.  Damages commence on the date

10  that Microsoft began the alleged infringement of the '182

11  patent.  The parties in this case agree that damages do not

12  begin prior to October of 2013.

13        Now, ladies and gentlemen, having given you these

14  instructions, we will now hear closing arguments from the

15  attorneys for both of the parties in this case.

16        The Plaintiff may now present its first closing

17  argument to the jury.

18        Mr. Alper, would you like a warning on your time?

19        MR. ALPER:  Yes, Your Honor, five minutes, please.

20        THE COURT:  When five minutes is left or when five

21  minutes has been used?

22        MR. ALPER:  I'm sorry, when five minutes is left.

23        THE COURT:  All right.  You may proceed.

24        MR. ALPER:  Thank you, Your Honor.

25        Ladies and gentlemen, I want to begin on behalf of

1    Biscotti and I'm sure Microsoft, as well, by thanking you

2    for your time, attention, and dedicated service over the

3    course of this week.  It's very meaningful to everyone in

4    this courtroom, so thank you.

5            I'd like to begin where I started a week ago at the

6    beginning of all of this --

7            We can go to the next slide.

8            -- with Dr. Shoemake, the founder and inventor of

9    the '182 patent.  And for his inventions, he was awarded the

10   '182 patent by -- by experts at the United States Patent

11   Office.  And that is meaningful, and it's very meaningful

12   here.  And his technologies were immediately recognized by

13   the industry.

14           If we go to the next slide.

15           This is PTX-265.  I'm going to call out the exhibit

16   numbers as I go through this so you'll have the exhibits

17   back in the jury room when you go to deliberate, so I'm

18   going to call out the important exhibits as I go through

19   this for you.  This is PTX-265, Biscotti's press release

20   where Biscotti was being recognized for having the world's

21   first high-definition TV phone.

22           And remember why that was, if we look at the

23   bottom, the unique ability to pass through video and

24   cable -- or from cable and satellite boxes.  That's the TV

25   pass-through feature.

1          We talked about it at the beginning.  We talked

2    about it throughout the trial.  And this is the same feature

3    that we saw years later Microsoft was focusing on in their

4    internal documents when they were developing the accused

5    Xbox One products.

6          So if we go to the next slide.

7          This is PTX-875, an internal Microsoft development

8    document.  And you can see it right here, the same thing.

9    It is absolutely the case that for Input-1 - Pole Position

10   strategy, we want HDMI set-top boxes or STBs to plug into

11   our HDMI in.  That's exactly what the claim elements say, a

12   video input interface from a set-top box.

13         And they're recognizing the exact thing that Dr.

14   Shoemake had invented years before because it's going to let

15   them add value to the live TV experience, including Skype

16   and all these other applications that they could now bring

17   in through their Xbox console.

18         If we go to the next slide.

19         You'll remember, we said this in the beginning, we

20   said this throughout.  This is not any ordinary HDMI

21   pass-through.  This is HDMI pass-through for TV.  This is TV

22   pass-through that Dr. Shoemake came up with, and you can see

23   it in the internal Microsoft documents.  They say it right

24   here in PTX-875:  Most boxes that have HDMI in and HDMI out

25   provide a relatively simple HDMI pass-through.  What we are

1    doing here -- this is talking about the Xbox One video

2    communication technology.  What we are doing is using the

3    HDMI in for a full media foundation pipeline, the full

4    Durango or Xbox One entertainment experience.  And they say,

5    this is very powerful but also requires a lot of work and

6    provides many -- many, many ways that things can go wrong.

7            Well, Dr. Shoemake, years before this, had already

8    done that work and he had already gotten a patent on it.

9            If we can go to the next slide.

10           Microsoft -- you saw this.  Mr. Henshaw.  They had

11   an opportunity they recognized.  They went out and saw the

12   Biscotti while they were developing their Xbox One product.

13   This is in 2011.  Mr. Henshaw, he looked at the Biscotti.

14   He's one of the senior leads of the Xbox One development

15   team.  He said:  They did HDMI pass-through on the TV as we

16   have specified for Durango.  They saw that what was in the

17   Biscotti, the TV pass-through technology, was exactly what

18   they were planning to put in their own Xbox One product.

19   And what did they do about it?

20           Well, if we go to the next slide.

21           Now, this is some testimony from the trial.  You

22   won't have the transcripts back with you in the jury room.

23   You will have the exhibits but not the transcripts.  You'll

24   have to rely on your memories of what happened.  But this is

25   what was said by Mr. Henshaw.  He acknowledged that Biscotti

1   could have patent rights on the product he was looking at.

2   He knew that it was inventive, yet he didn't do anything to

3   check if there was an actual patent.  And they put it in the

4   product anyway.

5           And if we go to the next slide.

6           You saw this over the course of the trial.  It's an

7   email from Dr. Shoemake to Mr. Hassan at Microsoft.  And he

8   sent a PowerPoint identifying the patent to Microsoft.  And

9   if you'd look at PTX-887, that's Mr. Hassan's reply to this

10  email, he said:  Looks like you've got some big things going

11  on.

12          And my -- what did Microsoft do next?  They knew

13  that they were putting Biscotti's technology in their

14  product.  They put it in the product anyway.  They launched

15  it.  And you remember what I said in my opening, and we

16  showed you at the trial, they called it amazing.

17          Is that responsible?

18          Let's look at the next slide.

19          Mr. Del Castillo, he was here at this trial.  He

20  testified.  What did you do, we asked him, what did you do

21  about the fact that you recognized that the Biscotti

22  technology was being -- you were putting it in your product?

23          We asked him:  Did you -- you just -- did you

24  continue to do whatever you wanted to do regardless of

25  Biscotti's patent?

1          His answer is:  That's correct.

2          That was here live in court.

3          After the litigation, after they knew about the

4    patent, they continued to do whatever they wanted to,

5    regardless of Biscotti's patent.  They continued to do it

6    here at this trial.

7          If we go to the next slide.

8          You'll remember, Mr. Del Castillo on his direct

9    examination when he was being questioned by his counsel, he

10   was asked about what the future of the Kinect was.  And he

11   testified that in order to show that this was a -- that

12   there was a low value associated with the patented

13   technology, in order to make you think that it wasn't a

14   technology that Microsoft cares about, he said that they

15   were ending production of the Kinect.  They were just going

16   to sell off the last few remaining things.

17         But we had a chance to cross-examine him.

18         If we go to the next slide.

19         They are planning to substitute that with a

20   different camera.  They are keeping the technology.  You can

21   see it right here.  You're planning to use a different

22   camera; isn't that the truth?

23         Yes.

24         And you didn't tell the jury about that, did you?

25         No.

1          Only when he was confronted with the internal

2    documents did the truth come out because it is a valuable

3    technology.  They need it.  They said it in their internal

4    documents that they need it, and they still need it to this

5    day.

6          Let's go to the next slide.

7          All right.  I told you that I -- we'd -- we'd come

8    back to these bedrock facts.  I'd like to go through them

9    now.  We've proved them to you, and I want to show you how.

10          First bedrock fact is that the Xbox One technology

11   uses Biscotti's novel patented technology.  This is going to

12   cover infringement, and I'm also going to cover invalidity

13   here.

14          Let's talk about infringement.

15          Next slide.

16          The vast majority of the claims and claim elements

17   are undisputed.  Microsoft uses them.

18          Two things I want to point out here.  When you look

19   at the elements that they have not disputed, those go to the

20   key inventions of the patent.  The set-top box video input

21   interface that allows you to do the TV pass-through,

22   undisputed.  They agree they use it.

23          The wireless, undisputed.  They agree they use it.

24          Consolidated video streams, all that coordination

25   and synchronization, undisputed, they use it.  They're using

1   the invention.

2           What do they say?  They point to the -- the

3   requirements of a storage medium, a processor, and some

4   software instructions, and they say they're on the video

5   communication device, just not in the right place on the

6   video communication device.  Well, I'm going to show you

7   they are in exactly the right place on the video

8   communication device.  And what they're saying is not a

9   defense to infringement, but they are using the invention.

10  That is undisputed.

11          Let's go to the next slide.

12          This is the claim.  These are elements in the claim

13  that they're disputing.  First of all, it's a comprising

14  claim.  The Judge instructed you comprising means that there

15  could be additional things on -- on the product.  And that

16  doesn't matter.  That's going to be relevant in a minute.

17          But here's what it requires, the part of the claim

18  that they're focusing on.  A storage medium, a processor,

19  and various instructions for controlling the video

20  communication device, and those all have to be on the video

21  communication device.

22          Let's see if that's there.

23          Absolutely there.  We've proved this to you.

24          Let's go to the next slide.

25          This is Dr. Wicker for the -- the -- this is

1    PTX-218.  He showed you this.  You can see in green that's

2    the processor, the system on a chip, the main processor.

3    You can see in the boxes the memories.  That's the storage

4    medium.  And those have the instructions.

5            And did he show you the instructions?  If we go to

6    the next slide.  He certainly did.  Start the camera.  He

7    told you how that's on the Xbox One that controls the camera

8    to get it started.  Of course, that's control.  You can't do

9    anything with the camera until it's started.  That's

10   controlling the camera.

11           And if we go to the next slide, Dr. Orchard, their

12   expert, agreed.  He said -- we asked him:  Isn't there a

13   signal that causes the Kinect to begin capturing video and

14   audio data on the Xbox One console?

15           He said:  Yes.

16           He -- he fought it here in court, but before the

17   trial in his deposition, he admitted it, that the Xbox One

18   is actually controlling the Kinect.

19           If we go to the next slide.

20           What about the instructions for encoding?  Dr.

21   Wicker meticulously walked through them.  You can see them

22   here.  EncodeFrame, this is the source code.  These are the

23   actual instructions, encode source code, EncodeInputBuffers,

24   StartEncodeFrame.  That's the source code.  That is the

25   encoding that is on the Xbox.

1           And you know what, to this day, not Dr. Orchard,

2    not Microsoft, no one has disputed that those instructions

3    are doing encoding.

4           So what does Microsoft argue?

5           If we go to the next slide.

6           Microsoft says:  Well, Dr. Wicker's processor,

7    storage medium, and instructions are on the Xbox One

8    console, but the actual ones, processor, storage medium, and

9    instructions, are on the Kinect.  You remember Dr. Orchard

10   testified to that.

11          But here's the thing, the requirement of the claims

12   is that the processor, storage medium, and the instructions

13   be on the video communication device.  That's all that's

14   required.

15          And everyone agrees, including Dr. Orchard, and I

16   put his testimony down here, that the Kinect plus the Xbox

17   One are the -- are the video communication device here.  So

18   whether you have the instructions on the Xbox One, which Dr.

19   Wicker proved, they are definitely there, or you have

20   additional instructions on the Kinect, that's just

21   additional infringement.  That's just more infringement on

22   the video communication device.  That is not an excuse, and

23   that is not non-infringement.  And Dr. Orchard, he confirmed

24   this in his testimony right here in court.

25          If we go to the next slide.

1          He said -- we asked him for the -- the three --

2    remember, there were three instructions at issue here, the

3    video capture instructions, the audio capture instructions,

4    and the instructions for controlling the encoding.

5          And we asked him with respect to video capture:   Is

6    there a storage medium, processor, and instructions for

7    controlling the video capture on the video communication

8    device in the Xbox?

9          He said:   Look, that's correct.

10         You can check that element off.   That's an

11   admission that they meet that element.

12         Then instructions to capture audio, is there a

13   storage medium, a processor, and instructions for

14   controlling the capture of audio on the video communication

15   device?

16         He said:   That's correct.

17         That means that element is met.

18         And the instructions to encode, is there a storage

19   medium, a processor, and instructions for controlling the

20   encoding of the captured video stream on the video

21   communication device?

22         He says:   Yes, it's on the video communication

23   device.

24         That's all that's required.   Those elements are

25   met.

1          What about -- let's go to the next slide.

2          Let's go to the instructions for transmitting.

3    First point, very important.  When it comes to Skype,

4    Microsoft does not dispute that the Xbox products with Skype

5    meet this element.  That means there's infringement.  That

6    means you check off this element.  They don't dispute it.

7    They don't have a defense to it.

8          What about Twitch or Beam?  And we proved that,

9    too.

10         What about Twitch or Beam?

11         If we go to the next slide.

12         They say for Twitch or Beam -- you'll remember, Dr.

13   Orchard talks about how the IP addresses in the packets

14   change because they go through a server.  Well, I have two

15   things to say about that.

16         One, it doesn't matter.  Dr. Wicker identified

17   another identifier.  It's the broadcast ID or the channel ID

18   that is what's actually used in the Twitch and Beam service

19   to get from the broadcaster out to the audience, the

20   destination.  Of course, you want to get out to the

21   audience.  Those are the people who are watching it.

22         And Microsoft never challenged that.  But No. 2, if

23   you go to Figure 2 of the '182 patent, is this server thing

24   not something that Dr. Shoemake thought of?  Of course, it's

25   part of his invention.  You can see it right there.  The

1   video communication device on the left can go through a

2   communication server and go right on down to the audience on

3   the right.   That's already something Dr. Shoemake thought of

4   years before.   It's not a defense to infringement.   But it

5   doesn't matter because they admit Skype infringes that

6   element.

7            Okay.   Let's go to the next slide.

8            Let's talk about validity.   Microsoft started this

9   all off.   When they started this all off, they said we did

10  it first.   You'll remember that at the very beginning, we

11  did it first.   The fact is, we proved that to be untrue.

12           Let's go to the next slide.

13           Mr. Del Castillo in court, he admitted that the

14  ability to pass cable set-top box signals through an Xbox

15  One to the TV was in no prior version before the Xbox One.

16  They did not invent it first.   That TV pass-through just

17  came up with these products.

18           And what about Dr. Orchard?   Did he offer any

19  opinions that any prior Microsoft product was invalidating

20  of the claims?   The answer is no because they didn't have it

21  before.

22           So what do they rely on instead?   A third-party

23  product, as you saw, called Lifesize Express.

24           Let's talk about that a bit.   Now, Lifesize -- Mr.

25  Malloy testified that there were thousands of Lifesize

1   Expresses sold over the years, and you'd expect if this was

2   a well-known technology that when Microsoft was developing

3   the technology internally, it would be just talking about it

4   as if it was old hat.  But when you look at the internal

5   Xbox One development documents, you see the exact opposite.

6           So if we go to the next slide.  Again, this is

7   PTX-875 and PTX-228.

8           And you can see when it comes to the video

9   communication technology we're talking about, Microsoft

10  calls it ambitious and unconventional.  That wouldn't be the

11  case if it was already out there.  We have to use our common

12  sense here.  They call it a one of a kind architecture, and

13  it was unprecedented.  That's Microsoft.  And remember --

14          If we go to the next slide.

15          Remember, Lifesize making all these sales out

16  there, and Microsoft doing competitive intelligence about

17  the video communication technology of -- that they're

18  planning to put in their Xbox One.  Well, you'd certainly

19  expect that Microsoft would identify the Lifesize Express as

20  a key competitor if it had the exact same technology that

21  we're talking about.

22          But go look at PTX-916.  Look at the chart of key

23  competitors.  You will not see Lifesize mentioned there

24  because even Microsoft -- here at trial, they say Lifesize

25  Express is the same thing.  Back when -- before the

1   litigation, before they thought they had a problem with

2   Biscotti, when they had no reason to -- to tell that story,

3   you won't see Lifesize mentioned as a key competitor because

4   they knew the Lifesize Express had nothing to do with this

5   technology.

6           Who will you see Microsoft talking about as a key

7   competitor because they're exactly the same, Biscotti.

8   That's on 916 in that chart.

9           All right.  Now, what about the Lifesize Express?

10  Is it close here?

11          If we go to the next slide.

12          You look at Column 1 in the very beginning, Dr.

13  Shoemake says:  Systems like the Lifesize Express,

14  professional grade systems are complex and expense.  That's

15  not what he was trying to invent.  He right there says this

16  is something different.

17          If we go to the next slide.

18          On your verdict form -- I'm sorry, the standard is

19  clear and convincing evidence.  That's a high standard.

20  They haven't proven it.

21          Let's go to the next slide.

22          This is the verdict form.  You're going to have to

23  go through each claim.  For infringement, if any claim

24  infringes, you check the box yes.  For invalidity, you're

25  being asked to go through each individual claim to decide

 1    whether each individual claim is invalid.  You're going to

 2    start with 12.  Let's start with 12 here.  There are two --

 3              If we go to the next slide.

 4              Two requirements on 12 that I want to talk about.

 5    The first is the wireless local area network element.

 6    Remember, they can't show invalidity if they can't show

 7    every element of the claim is met by Lifesize Express --

 8    every element.

 9              Let's go to the next slide.

10              Lifesize Express does not have a wireless local

11    area network.  That is an undisputed fact.  Both Lifesize

12    witnesses admitted it.  You can see it here in their

13    testimony.  They did not implement wireless.

14              What is Microsoft's response to this?

15              Go to the next slide.

16              Dr. Orchard, he says:  Well, it would have been

17    obvious to plug in a wireless router to the Lifesize

18    Express.  It would have been obvious to do it.  And he puts

19    a -- a little diagram there.

20              I have two things to say about that.  The first

21    thing is that we asked him:  In all of the history of the

22    Lifesize Express, he didn't -- couldn't point to a single

23    instance where anyone had done that, in all of the thousands

24    of sales, let alone any sales before 2008 when you'd need to

25    find it for prior art purposes, couldn't find a single

1    instance of anyone doing that.  Definitely not obvious.

2    You'd think Microsoft could dig up one instance, but they

3    couldn't.

4           Next thing.

5           And there's a reason for it.  The Lifesize people,

6    the Lifesize witnesses, they said they didn't think they

7    could do it.  They said:  You didn't think you could get the

8    high-definition video over the wireless connection back in

9    2008, right?

10          And the answer:  That's right.  We didn't think we

11   could make wireless work.  It wasn't reliable enough.

12          How could this be obvious, if the people who came

13   up with the Lifesize Express didn't even think that they

14   could get their Lifesize Express to work with wireless?  Of

15   course it couldn't be obvious back then.  They didn't think

16   they could get it to work.

17          I'll tell you someone who did know how to make it

18   work.

19          Go to the next slide.

20          Dr. Shoemake with all of his experience as an

21   inventor, original developer of WiFi, he knew how to make it

22   work.  And that's why that's an invention of the -- of the

23   '8 -- '182 patent.  That's a requirement of Claim 12.  Claim

24   12 is valid on that basis alone, and that's it.  It's a

25   valid claim.  They didn't prove -- that is nowhere close to

1   clear and convincing evidence of invalidity.

2           If we go to the next slide.

3           What about the set-top box requirement?  You got to

4   show a set-top box input stream coming into a video input

5   interface.  That's those requirements in Claim 6 on the

6   left.  It's a very important requirement of the claims.

7   They didn't prove it.

8           I want to say one thing here.  If you find that

9   this element is not met because it's in 6, then every single

10  one of the other claims is not -- is not invalidated by

11  Lifesize Express because every single one of the other

12  claims requires you to find all the elements in Claim 6.

13          So if this one isn't met by Lifesize, none of the

14  claims are invalid.

15          But let me show you why it's not invalid.  Let me

16  tell you why.  The -- you'll remember we talked about this.

17  In 2008 and 2007, set-top boxes were mandated, required to

18  put out their video streams with encryption.  And that

19  encryption was called HDCP.  And if you -- in order to

20  display that -- a signal, you had to be able to decrypt.

21  You had to be able to decode that HDCP signal and support

22  HDCP.  And if you didn't, it would just -- you would get a

23  blank screen.  You couldn't receive that set-top box, and it

24  is undisputed that the Lifesize Express did not support

25  HDCP, didn't have that ability because they weren't for the

1    purpose of looking at TV.

2           Let me show you the evidence on that because we

3    proved this.

4           Go to the next slide.

5           PTX-999, take a look at it.  As of 2005, all

6    OpenCable high-definition set-top boxes must have HDCP, must

7    have it as of 2005.  This is the cable industry consortium

8    mandating it.

9           And if you look at the internal documents, this is

10   875 -- PTX-875 at Page 1.  Look at what Microsoft says.

11   They say they have to be certified for HDCP because they

12   won't be able to pass through the content otherwise.  And

13   hence, our HDMI input won't even be used.  You can't even

14   use it if you don't have HDCP.  That's what Microsoft says.

15   How can you meet the claim element for receiving a set-top

16   box signal if you don't have HDCP?  Microsoft says:  You

17   can't even use it.

18          So the only other question remaining is did

19   Lifesize Express have HDCP.  The undisputed evidence is no.

20          If we go to the next slide.

21          Oh, but first, we asked Dr. Orchard:  Isn't it

22   correct that all commercial cable boxes were required to

23   have HDCP on their HDMI outputs?

24          He said:  It's his understanding that it's true.

25   That's what he said in his deposition.  We had to read it to

1   him at the trial.  He said:  That's true.

2          Now, did Lifesize have HDCP?

3          Let's go to the next slide.

4          They did not.  Both witnesses say they did not

5   support HDCP.  That means when the set-top box, at least as

6   of 2008, was sending its signal, Lifesize would not be able

7   to decrypt it.  It would just be nonsense.  Your TVs may

8   have been able to decrypt it because those did have HDCP.

9   But the Lifesize couldn't do it, and when they tried to pass

10  it through, it would have just been nonsense.

11         Let's go not next slide.

12         You want to know why that was?  Mr. Malloy said it

13  in open court, is because the Lifesize Express was never

14  intended for watching TV.  It was never intended.  This is

15  his trial testimony here in -- at trial.

16         That is not clear and convincing evidence.  It's

17  not even close to clear and convincing evidence to show that

18  it could do TV pass-through.  Not even close.

19         Let's go to the next slide.

20         What about the demonstration?  This is really

21  simple.  First of all, it's not evidence.  You heard the

22  instruction on that.  It's not evidence.  It's a

23  demonstrative.

24         Second of all, it's not prior art.  There isn't a

25  single shred of evidence of anyone using the Lifesize

1  Express for TV before 2008.  Not a single shred of evidence.

2  The fact that -- that there's a demonstrative that -- by the

3  way, we weren't invited to -- and you can't even see where

4  the set-top box is there -- happened two weeks ago.  That's

5  not prior art.  That's not evidence that this happened 10

6  years ago.

7         Let's go to the next slide.

8         When -- I want to make a note here.  Mr. Malloy, he

9  prepared his testimony, he prepared the slides with the

10 Microsoft lawyers, he did the tests with Microsoft lawyers

11 two weeks ago, and he practiced his testimony with Microsoft

12 lawyers.  I want to tell you why that's important.

13        Let's look at the next slide.

14        He was asked back in 2008:  Did you connect a

15 Lifesize Express to a set-top box in your home?

16        And he said:  Yes, back in 2008, I connected a

17 set-top box to a Lifesize Express in my home.

18        But at his deposition, before he prepared his

19 testimony with the lawyers, before the lawyers prepared his

20 demonstratives --

21        THE COURT:  Five minutes remaining.

22        MR. ALPER:  -- what did he say?  Did you attach any

23 devices to the high-definition video port?

24        I don't think so.  That wasn't the use case -- use

25 case in my home.  He said he didn't think so.  You have to

1    take that into account.

2          Let's go to Slide 44 -- 43.

3          I want to note this.  Dr. Orchard did not provide

4    testimony on 23, 27, 28, and 35.  He didn't provide an

5    opinion -- specific opinion on those that -- those -- those

6    claims require software instructions.  They put us to our

7    proof on software instructions.  They didn't prove it up.

8    Those claims immediately valid, valid, valid, valid.  They

9    didn't prove their case.  It also tells you how seriously

10   they're taking their invalidity case.

11         And lastly on invalidity --

12         Go to the next slide.

13         -- Dr. Orchard, we asked him about the claim

14   elements.  He was asked on direct -- you remember this?  Do

15   the claims -- are they met by the Lifesize Express?  And you

16   remember, he paused.  And this is what he said:  I'm not

17   sure.  This is his trial testimony.  He said:  I'm not sure.

18   Is that clear and convincing evidence?  Not even close.

19         Let's go on to the next slide, Bedrock Fact No. 2.

20         This has to do with willfulness.  Biscotti --

21   Microsoft knew Biscotti invented this technology.  They

22   continued to use it.

23         If we go to the next slide.

24         You can see this right here.  They said, Mr. Del

25   Castillo -- you saw it.  They did nothing to investigate.

```
 1    They just continued on their way.  That is absolutely --
 2    I've seen a lot of cases.  Sometimes willfulness is a close
 3    call.  This is not a close call.  They are utterly
 4    disregarding my client's patent rights.  It's not even
 5    close.  He said this at trial.  They just continue to do
 6    whatever they want to do.
 7             Lastly on damages --
 8             If we go to the next slide.
 9             -- the last bedrock fact is damages.
10             Next slide, please.
11             That's the damages bedrock fact.
12             Go to the next slide.
13             Dr. Perryman, he offered an opinion.  He started
14    with the cost of the box.  He then attributed Biscotti's
15    fair share to it.  Then Dr. Perryman had two major
16    reductions from 24.65 all the way down to $9.65 a unit.  Two
17    major reductions, highly conservative in Microsoft's favor,
18    using the Georgia-Pacific analysis.  And he took those --
19    that dollar amount, he multiplied it by the units sold with
20    the Kinect.  This is Kinect plus Xbox One, 4.4 million
21    units, and he came up with the number 43.2 million units.
22             If we go to the next slide.
23             That compare to --
24             If we go to the next slide.
25             Microsoft, they said they were going to bring an
```

1    expert.  They never brought their experts.  They're not

2    taking this seriously.  They -- a zero damages amount is not

3    a reasonable royalty when they are clearly infringing a

4    valid patent.

5            I'm going to reserve the rest of my time, Your

6    Honor, if I may.

7            And I will see you after counsel's closing.  Thank

8    you.

9            THE COURT:  All right.  The Defendant may now

10   present its closing argument.

11           Mr. Bettinger, would you like a warning on your

12   time?

13           MR. BETTINGER:  Yes, Your Honor.  Five minutes,

14   please.  Thank you.

15           THE COURT:  Thank you.  You may proceed.

16           MR. BETTINGER:  Thank you, Your Honor, Court

17   personnel, and counsel.  And mostly thank you, ladies and

18   gentlemen of the jury.

19           We've all been working hard behind the scenes on

20   our side, on behalf of Microsoft, but not as hard as you.

21   It's been late nights.  It's been early mornings.  And I

22   appreciate that you've been on time, been here, and given

23   your full attention to the case.  I know I speak for

24   everyone on our team that we do sincerely appreciate that.

25           And really, as the Judge said at the beginning of

1  the case, that is what makes our country great. People like

2  you come in who do their jobs, and we get to put these

3  arguments -- these disputes to a jury of our peers. We get

4  to present the evidence. It's not a bunch of lawyers

5  arguing about it. We present it to you. And I apologize at

6  times if it's been big terminology, tough words, hard to

7  understand. We've done our best to break it down. But if

8  you go back and remember, it was only four days ago when we

9  were doing opening statements. I -- it sometimes seems much

10  longer. Four days ago, and we told you three basic points

11  that we had in this case. And we really -- we thought about

12  those. We stuck with them throughout the case, and we --

13  and we set them out for you.

14         Look, we had our own design for the '182 patent.

15  We don't infringe. We didn't take or steal anything. We

16  didn't get it from Biscotti or anybody else. And then on

17  the invalidity, we came in and said, you know, bring in

18  Malloy. He's the guy that designed the Lifesize. Put

19  him -- let him tell you about the Lifesize. You can hear

20  about it from experts. You can hear about it from a bunch

21  of lawyers. Bring the guy in, former naval officer. Let

22  him take the stand. Biscotti can ask him whatever they

23  want. We thought that's the better way to present the

24  invalidity case.

25         So we told you that last Monday, and we believe

1   that as the case unfolded, we didn't waiver.  You'll see we

2   haven't changed our non-infringement position.  We haven't

3   come up with a new theory the day before closing.  We

4   haven't done that.  We've told you up front, here's how we

5   see the case, and we've tried to give you the evidence along

6   those lines.

7          And we started with this timeline, and the real

8   reason for starting with it is, it's an insight into

9   Microsoft.  We innovate.

10          You heard from Mr. Del Castillo, we have millions

11  of engineering hours.  Folks who spend time coming up with

12  ideas, coming up with new products, and that's why we put

13  the timeline up there for a perspective, and -- of all the

14  years we've done it.  And -- and you see we also get patents

15  for our technology.

16          And I thought one of the telling moments in the

17  case, Mr. Del Castillo was on the stand, and we asked him:

18  Do you have any patents?  And he said:  Yeah, I've got this

19  patent for the Kinect and how it works with the illumination

20  with the sensor and all.  And you could see his enthusiasm

21  for that.  And I think it's -- it's a reflection on

22  Microsoft itself.  That is the culture of the company.  That

23  is how the engineers act, and they're proud of their --

24  their work, and that is reflected in that timeline of all

25  the products we have brought to market on behalf of

1   Microsoft.

2          So if we could put the slides up.

3          We told you a week ago -- or not even that, four

4   days ago -- Microsoft designed its own system based on that

5   timeline and all the work that went into it.  And we

6   provided you with that evidence as the case unfolded.

7          The next thing we said was Xbox One + Kinect does

8   not infringe.

9          If we could go to the next slide.

10         There it is.  It's an Xbox One console on the left,

11  the Kinect on the right, and we have a version right here

12  in -- in -- the live version right there on the desk, and

13  the control.  And that is the -- the product at issue in

14  this case.

15         And it -- and why don't we infringe?  Well,

16  honestly, it really starts with the Kinect, that device on

17  the right, and -- and it's a separate device.  It was built

18  for something quite complex.  As a result, we had to make

19  design decisions as to how it should be built, where the

20  processors would go, where the instructions would go, how it

21  would operate.

22         And we put up the question to Mr. Del Castillo --

23         If we could go to the next slide.

24         We put the question to Mr. Del Castillo:  You know,

25  why is it?  Why do you put all that processing in the

1  Kinect?

2         And he said:  Well, it's important because if you

3  put it over there in the console, which is playing the

4  games, it takes up a lot of processing power.  It takes up a

5  lot of what you have to do for the games -- to play the

6  games.  So you put it over in the Kinect, and that was his

7  testimony.

8         If we could go back a slide.

9         And that was reflected in the video you saw where

10  the Kinect has all sorts of applications.

11         And if you could just go back real quick.

12         You see the Kinect -- no and replay that videoclip,

13  Mr. Simmons.

14         You see the Kinect up above.  There it is.  See it

15  up above the screen.  That's capturing all that video in

16  real-time and having to process it.  And that's just the way

17  it was designed by -- by Microsoft.

18         So when Mr. Del Castillo takes the stand and tells

19  you, yeah, this is why we did it, it's not just that we did

20  it, it's why, why is all that processing over there in the

21  console.

22         So you might ask yourself, why does that matter?

23  So what?

24         If we could go to the next slide, please, Mr.

25  Simmons.  Claim 6.

1          Because this is a patent case.  That's what this

2     case has always been is a patent case, and Claim 6 requires

3     that a set of instructions be executable by at least one

4     processor.  That's what it requires.  It can't be any

5     processor.  It can't be some new theory that you hear from

6     Biscotti yesterday, oh, it can be anywhere in the device.

7     No, it can't.

8          The claim clearly says that it has to be a set of

9     instructions executable by the at least one processor.

10    That's what the claim has always said.  No clever lawyering.

11    No new arguments on the eve of closing are going to change

12    the claim language.

13          So if we could go to the next slide.

14          What was the evidence?  What -- what is that at

15    least one processor because the claim requires it.  What's

16    the processor?  We pointed to you four days ago in the

17    opening statement, it's the processor on the Xbox One.

18    That's the one on the left.

19          What did Dr. Wicker come in, Plaintiff's expert --

20          If you could go back, please, Mr. Simmons.

21          Plaintiff's expert over on the right, what did he

22    do?  Pointed to the same processor.  Okay.  Now the experts

23    agree, that is the processor, the at least one processor.

24          Now what you have to find is the instructions that

25    are executed on it.  When the experts agree it's the same

1  processor, it's over here in the console right here in this

2  big box, where are the instructions?

3          We go to the next slide.

4          Dr. Wicker could not have been more clear, that the

5  code for controlling the Kinect camera -- and the code is

6  the instructions -- the code for controlling the Kinect

7  camera and microphone is found on the Kinect.  That's

8  this -- put the source code up at the top of this particular

9  diagram.  That's what SELA means.  That was Dr. Wicker's

10  testimony.

11          Dr. Orchard agreed.

12          Well, what does that mean?  Okay.  Now, you've got

13  a processor over near, this big box, but you've got your

14  instructions for controlling capture of audio and video over

15  there.  Okay.

16          Now, to meet the claim, those instructions have to

17  be executed on the processor.  That's what the claim says,

18  doesn't it?  That's what the claim says those -- that --

19  those instructions have to be executed on the processor.

20          So what -- what did -- what was the evidence on

21  that?

22          And if we go to the next slide.

23          Mr. Choudhry, the engineer from Microsoft

24  explained, and we highlighted in yellow, this -- we wanted

25  to give you his full testimony, but we highlighted in yellow

1   that the Kinect is a fairly complex device and his its own

2   software that it uses to control its own operation.  Those

3   were his words way back when his deposition was taken, to

4   control its own operation.

5          But we didn't stop there.  We asked Dr. Wicker

6   about the same testimony.

7          If we could to the next slide.

8          Where we asked Dr. Wicker:  Hey, what about

9   Choudhry where he said it's a fairly complex device and it

10  has software that it uses to control its own operation, our

11  Kinect?

12         And he said:  Yeah, that's right.

13         And you don't have any reason to doubt him, do you?

14         And Dr. Wicker said:  No, I actually went out and

15  verified it.  It isn't just that Choudhry said it.  I, Dr.

16  Wicker, went out and verified it.  The software on the

17  Kinect controls its own operation.

18         Why does that matter?  If you go back to Claim 6,

19  it's the exact words of the patent.  That's what it

20  requires, that those instructions have to be executable on

21  one processor to control operation.  And here we have

22  Choudhry, on behalf of Microsoft, saying:  Yeah, that's what

23  happens.  It controls the operation, and then we have

24  Biscotti's expert Wicker saying:  Yeah, I went out.  I

25  looked into that.  And I verified it.  I confirmed that's

1    exactly what happens.

2           Well -- well, in light of that, when you -- if you

3    look at the next --

4           If we could go to the next slide.

5           -- where Dr. Wicker has now said:  The code's all

6    over there on the Kinect.  That code controls the operation

7    of the Kinect.  And I verified it.  I -- I cited that SELA

8    code.  I agree with you.  There's only one conclusion you

9    can reach when that's the case, and the reason there's only

10   one reason is that code on the Kinect cannot run on the

11   processor -- the central processor in the console.  It can't

12   do it.  And it isn't just me telling you that.  It's both

13   experts.

14          If we could go to the next slide, please.

15          This was a question put to Dr. Wicker during the

16   trial:  That code on the Kinect is not executed on the AMD

17   processor -- that's the big chip on the console.

18          And he says:  This -- this particular code that

19   we've been looking at is only -- only executed on the Kinect

20   device.

21          It won't run.  It won't run on the other processor.

22   Okay.  Well, then we can't meet the claim language because

23   that code has to be executable on the at least one

24   processor.  That processor's in the console.  The code's in

25   the Kinect, and it won't run.

1        If we could go to the next slide.

2        That's why we put up this slide.  During our

3   opening, we've maintained this position from the get-go.

4   We've heard all kinds of arguments to try to attack it, but

5   at the end of the day, it's engineering.  Lawyers can have

6   all these arguments they want.  The engineers designed it.

7   This is how they designed it.  Lawyers' arguments aren't

8   going to change that fact.  All this blah, blah, blah.  This

9   is how the system was designed.  And those instructions on

10  that Kinect cannot and do not execute Kinect instruct -- on

11  the -- cannot be executed by that processor.

12       We asked Dr. Orchard --

13       If you could go to the next slide, please.

14       -- why is that?  Why can't those instructions over

15  there on the Kinect work on the processor?  He says:  It's

16  in a different language.  It just won't communicate.

17  Remember, he said it would be like trying to read Russian or

18  French, if you didn't know it.  It just doesn't work.

19       And there was no dispute.  You saw from Dr. Wicker,

20  he said:  Well, hey, will those instructions on the Kinect

21  work over there on the console's processor?  He said:  No.

22  I've confirmed it.  They will not.

23       So then what are we left with?  I think it's two

24  things.  The first, what we heard yesterday for the first

25  time and counsel mentioned in his closing, was, oh, wait a

1    sec.  We'll just draw the box.  We'll call this thing the

2    video communication device.  We'll draw the box now around

3    the console and the camera and the Kinect.

4         So what?  Draw it as big as you want.  Draw it

5    around anything else you want.  You still have to show that

6    those instructions are executed on the at least one

7    processor.  They're not.  The instructions are in the

8    Kinect.  The processor is in the console.  They don't

9    communicate.  They can't be executed.

10        So then it seems we're left with one last argument.

11   Oh, but there's a start instruction over there in the

12   console.  We found that if the console says start, and then

13   that gets sent over to the Kinect, somehow that that

14   controls the operation of the Kinect.  No engineer, no

15   credible engineer would take the position that a start

16   signal is controlling operation of anything.

17        And, in fact, if you go back and use common

18   sense -- you know, when we grew up, sometimes when it was

19   cold in the winter, you'd go out and start the car early so

20   it'd warm up before you got in and had to go to school, but

21   if you were going to school -- driving to school and someone

22   went in and started the car, would they have gotten to

23   school?  No.  There's all those steps that have to be

24   performed afterward.  And that's exactly what capturing the

25   audio and video code and then encoding it is all about.

1          It's just like saying, oh, starting the car, oh,

2    that gets -- I'm at school now.  No, you're not.  You have

3    to perform all those other steps, and those are the

4    important steps.

5          All right.  Let me talk for a minute --

6          If we could go to the next slide.

7          You heard testimony about Skype, Twitch, Beam.

8    Somewhat confusing.  It's like what is all that?  It doesn't

9    matter.  For purposes of this case, if those instructions on

10   the Kinect can't be executed on the console's processor,

11   which they can't, we don't infringe.  It doesn't matter if

12   we're running Skype, Twitch, or Beam, we don't infringe.

13         So one word on some other parts of the evidence.

14         The next slide, please.

15         We were accused of, oh, we've on stolen, we've

16   taken everything, we're bad -- we're bad folks because we've

17   done that.  What are the facts here?  And -- and you --

18   you'll have an opportunity to review documents back in the

19   jury room if you need them.

20         Document 652, this is the adopters of the HDMI

21   standard.  These are -- when you become -- and you can now

22   use HDMI-qualified products, you become an adopter.

23   Microsoft -- facts are, go ahead, look at Exhibit 652, if

24   you like.  Microsoft became an adopter in 2005.  The same

25   document will show you Biscotti became an adopter of HDMI in

1  2013 -- 2013, eight years later.  And you're going to come

2  into this court and accuse us of taking something with

3  respect to HDMI?  It just doesn't add up.  We -- we've been

4  with HDMI for eight years before Biscotti ever signed up

5  with the HDMI board.

6          And if we could just put this timeline up just to

7  give you some perspective.  So we become an HDMI adopter in

8  2005.  By 2007, we have an HDMI port on our Xbox 360 Elite.

9  We've already started working on HDMI.  For HD -- for the

10 Xbox One, by June of 2011, we've now -- we've now designed

11 in a pass-through for the Xbox One.

12         Why is that important?  No one had ever heard of

13 Biscotti by then.  We had -- you heard from Mr. Del

14 Castillo.  There's like -- by 2010, we were starting Xbox

15 development because once you start it, you have to go get

16 the parts, order everything, it takes a long time.

17         By June of 2011, we had made the decision to put

18 that in.  That's what the evidence was, and the documents

19 show.

20         Biscotti then came out with its product in November

21 of 2011, and you heard in court, oh, you know, Henshaw had

22 this memo where he -- or email where he saw that product and

23 he didn't go look for the patent.  Well, first of all, there

24 was no patent.  It didn't issue for another five months.

25 What patent was he supposed to look at?  There wasn't one.

1          And then there was nothing on the product to

2     indicate there was a patent because there was no patent in

3     the first place.  So the accusation that, oh, when -- when

4     Henshaw saw that Biscotti product in -- when he referred to

5     an email, he should have checked into the patent.  There was

6     no patent to look at, and -- and the testimony was it's not

7     the engineers at Microsoft.  That's what the legal does.

8          So to now accuse, oh, that's -- now we're bad folks

9     for not looking to see if there was a patent, there was no

10    patent that even existed at the time.

11         With respect to the HDMI pass-through --

12         If we could go to the next slide.

13         You were here in court.  Biscotti didn't invent

14    HDMI pass-through, and it's rare that you get four experts,

15    two from Biscotti, Dr. Orchard from Microsoft, and

16    independent Mr. Malloy.  Mr. Malloy doesn't -- he's not

17    involved in this dispute.  He's independent.  And they all

18    confirm Biscotti didn't invent HDMI pass-through.  It was

19    around before then.  And -- and so from the perspective of

20    the Henshaw email, oh, look, it has HDMI pass-through, okay.

21    There's HD televisions out there.  You need HDMI

22    pass-through to get to it.  If the HD televisions are now

23    being built, you need HDMI pass-through to get to it.  There

24    was no surprise in the industry.  We didn't take it from

25    anybody.  And the experts all agree, Biscotti didn't invent

1  that.  It was around.

2         So then the other thing about the Henshaw email is,

3  oh, you looked at the product, therefore, we're evil.  We're

4  bad somehow because we looked at the product, so we provided

5  evidence in the case.

6         If we could go to the next slide.

7         This is Mr. Gauer.  Remember, he's the investor,

8  the Biscotti investor.  And we saw him by videotape.  And --

9  and he just point blank came out and explained the

10  situation.  He said:  Yeah.  You know, we go to these

11  electronic -- consumer electronic shows, and Nadeem, who is

12  the other inventor, Nadeem Ahmed, and Matthew, who is

13  Mr. Shoemake, would go and look at the competing products

14  and come back to board meetings and report what was out

15  there.  That's the way it worked in the industry.

16         You have a product, you want to find out who

17  your -- what your competitors are doing, you go out and you

18  look, you look at their products.  That was nothing new.

19  That's just how the industry works.

20         If we go to the next slide.

21         Mr. Malloy said the same thing.  And, you know, the

22  beauty of him is he graduated from the Naval Academy, kind

23  of just came in here as a common sense person, and said, you

24  know, whether you're making cars or coffee machines, you

25  want to know what the competitive products look like.

1          Because -- because Henshaw says, hey, let's go get

2    one of these Biscottis, that's just the way it was done in

3    the industry.  So we tried to provide that testimony to give

4    you some perspective, to let you know what goes on on a

5    day-to-day basis for us.  And then it wasn't -- it wasn't

6    just those two, but even Mr. Shoemake himself.

7          If we go -- and this is DX-754 and 780.  DX-754 and

8    780.

9          Remember, this is the email where Mr. Shoemake is

10   telling Mr. Gauer's daughter, Bryn Gauer:  Hey, you're going

11   to CES at Las Vegas, that consumer electronics show.  Go

12   check out the products.  Look, see what's out there, go do

13   it.

14         Mr. Shoemake is not a bad guy for doing that.

15   That's just how the industry works.  We -- everybody does

16   that.  There's nothing wrong.  You can go buy a product.

17   You can look at it, see how it's designed.  That's just the

18   way the industry worked.

19         So -- so why are we being called a bad guy for just

20   doing what you normally do?  That's the way we operate.

21         If we could go to the next slide.

22         I think this has some insights into it.  You heard

23   the testimony early in the case from Mr. Shoemake, remember

24   for that 14-month period early on from 2011 through 2012 --

25   they were estimating they wanted to sell 75,000 Biscotti

1    units.  Great.  That's what America is founded on.  You come

2    up with a product, go sell it.  If it does well, terrific.

3    But it didn't work out.  It just didn't work out.  They only

4    sold 1700.

5          Okay.  By any measure that's not good.  If you're

6    thinking you're going to sell 75,000 and you sell 1700,

7    that's not good.

8          And so what we showed was, if you look through the

9    emails --

10          If we go to the next slide.

11          This is Mr. Gauer.  He's the investor.  He's the

12   guy who put the money into it, gave the money and got some

13   stock in return for Biscotti, the fellow from Southern

14   California, and he appeared by deposition.  And he -- you

15   know, I think he was a little maybe embarrassed, but he

16   said, look, they didn't seem to know what they were doing.

17   They just didn't seem to know what they were doing.

18          If you go the to the next slide.

19          You see from Mr. Shoemake himself, hey, look, you

20   know, our customers do not view the Biscotti as a value.

21          What's being suggested here?  You know, maybe the

22   product wasn't working out.  Sometimes it doesn't.  You can

23   have the best of intentions.  Sometimes the product just

24   doesn't working out -- work out.

25          And then Dr. Perryman, if you go -- we asked him:

 1   So before Microsoft ever launched Xbox, before we were ever

 2   in the market with our product, it's like, you know, that

 3   Biscotti had already lost seven million, huh?

 4          And he says:  Yes, ma'am, I do.

 5          Okay.  I think it's an insight into what was really

 6   going on.  The Biscotti product was not doing well in the

 7   market.  They had lost $7 million before our product ever

 8   came out, and it was a tough financial situation for them.

 9          And we gave you that testimony to kind of give you

10   some insights, providing what was going on, to try to

11   understand what was real facts and motives are in the case.

12          The third point, then, that we talked about was the

13   '182 patent is not valid.  On this one, I hear a lot of

14   attorney argument.  Oh, you didn't show this and you did you

15   not show this and this wasn't there and that wasn't there.

16   Come on.  We brought in Malloy.  We brought in Malloy.  They

17   could have asked him any question they wanted.  The guy --

18   he took the stand.  We're being accused of, oh, somehow we

19   coached him.  We did this.  Really?  We took a guy that

20   graduated from the Naval Academy and run -- ran a nuclear

21   sub for four years.  He's going to have the lawyers tell him

22   what to do?  That's just nonsense.  It's just nonsense.  He

23   came in here, he told -- he stood -- he sat in that chair,

24   and he told you the truth.  That's what -- that's what he's

25   trained to do.  That's what he does.  And so to go after

1   him, I personally have trouble with that, that you would

2   start to attack Malloy and say, oh, he made up a story

3   because the lawyers told him to.  Really?  The guy who is

4   running the nuclear sub for us?  I don't think ever.  And --

5   and -- sorry.  I -- I just think -- I have a problem with

6   that.

7           So what do we see when we get into invalidity?

8   First, the Lifesize Express.  Malloy told you it was sold by

9   October of 2007.  It's a year before Biscotti is ever in the

10  market.  To sit here and tell you it's not prior art, it's a

11  lawyer telling you it's not prior art makes no sense.  It's

12  prior art.  It was before their product.

13          If you go to the next slide, please.

14          So then what do you do?  Well, they know it's prior

15  art.  They know that their patent is not valid because every

16  claim is met.  So what did they do?  Oh, you know, it wasn't

17  made for the living room.  It was too high a price.  Where

18  is that in the claim language?  That may be a marketing

19  strategy.  We're not going to market to the same folks

20  that -- that Lifesize is, but that's not a patent defense.

21  There's nothing in the patent claims that require a living

22  room or a price or anything else.

23          THE COURT:  Five minutes remaining.

24          MR. BETTINGER:  Thank you, Your Honor.

25          So then if we could go to the next slide.

1          We show -- we walked through the steps with Mr.

2     Malloy.  He took the hardware steps and explained that they

3     were all met.  Lifesize had them.

4          The next slide.

5          We then took Dr. Orchard through the source code

6     steps.  And he -- and he articulated the source code steps.

7          If we could then -- and Dr. Orchard kind of put it

8     in perspective.  And he said:  Look, with this patent, one

9     skilled in the art would know these were known parts.  They

10    were just sort of put together.  They were just -- this is

11    the way that Biscotti put them together.  There was

12    really -- there wasn't a lot of novelty to it.  So the fact

13    that Lifesize had those same parts kind of makes sense.

14    There -- it wasn't anything special about it.

15         What was different is they put the processor and

16    the instructions in the console, in the same box.  So they

17    did do that part.  They practiced that or do what -- what

18    Biscotti's patent says, unlike us because our instructions

19    are over there in the Kinect and just won't work on the

20    processor in the console.

21         But otherwise, it's just putting parts together for

22    a videoconference system.  They're kind of known parts.

23         With respect to some of the arguments that counsel

24    raised this morning --

25         If we could go to the next slide about Claim 12.

1        -- the claim requires a wireless local network

2   interface.  All you've got to do is plug something in to

3   have an interface.  That's all -- that's all that needs to

4   be done, and that's exactly what Dr. Orchard explained.

5        With respect to the next slide, the argument is,

6   oh, it didn't -- it didn't have a set-top box because it

7   didn't have HDMI.  Really?  Craig Malloy sat on the stand

8   and told you, plugged it into his home television.  It had

9   HDMI.  Go ahead, attack him all you want, but then don't

10  come here, ignore the testimony, and say from a legal

11  standpoint, oh, there's no HDMI in there, there's no set-top

12  box.  He told you he set it up.  To do that --

13       And if we go to the next slide.

14       It makes sense.  You know why?  Lifesize had the

15  same HDMI chips in its device that Biscotti did.  Same HDMI

16  chips that Biscotti did.  Go -- look at DX-25.  And it will

17  show you that -- that the Analog Device, HDMI chips are also

18  Analog Device in the Lifesize.  They know darn well that

19  those -- it has HDMI capability with the set-top box.

20       Similarly, with regards to Claims 23, 27, 28,

21  Mr. Malloy explained how you could have the video come in

22  and the set-top box feeds from -- together.  And the

23  evidence on all of those was compelling.  Yes, they did it

24  first.  There was nothing new.

25       With respect to Claim 86 at Slide 41, Dr. Orchard

1   explained that, hey, if you practice HDMI with those -- with

2   those consumer electronics controls, you practice Claim 86.

3   That was the evidence.

4        So I need to take a minute because counsel's going

5   to get back up here and probably talk to you about damages.

6   We don't think there's any damages in this case.  We don't

7   think there's any.  But he's going to talk about it.  I need

8   to say something quickly.

9        The first is, here's -- here was the damage case,

10  Dr. Dhar and Dr. Perryman.  And you heard really three

11  numbers in this case.  $5, that's what it cost to take the

12  survey; $400,000, that's what Dr. Perryman was paid for his

13  work; and $43,244.54 (sic), that's the amount that is being

14  requested by Biscotti in this case.

15       I would submit, ladies and gentlemen, those numbers

16  do not add up.  And what the real damage number is in this

17  case --

18       If we could go to the next slide.

19       -- is zero.  And here's why.  The last four

20  questions that we asked of Mr. Perryman:

21       Before Microsoft launched Xbox One, they had lost 7

22  million?

23       Yea.

24       You know that Microsoft had been in the gaming

25  business for 20 years?

1           Yeah.

2           You know that Microsoft had been providing

3  videoconferencing for 20 years?

4           Yeah.

5           But you're telling these jurors that Microsoft

6  would have paid $43 million for taking their own Skype --

7  they own Skype -- putting it on the Xbox?

8           He's like:  Yeah, that's what I'm saying.

9           When you -- when you go back in the jury room and

10  think about that, it makes no sense.

11           If we could go to the next slide, please.

12           With respect to the jury form that you'll be

13  filling out, the first question will be asked:  Was there

14  infringement?  Was there infringement?

15           We believe that the evidence we've presented -- the

16  question -- the answer to that is no.  We don't infringe.

17  Our processor cannot and does not execute the instructions

18  on the Kinect.

19           The -- the second question then.

20           THE COURT:  Counsel, your time has expired.  Take

21  about 15 seconds and wrap up.

22           MR. BETTINGER:  Thank you, Your Honor.

23           Second question is a no.

24           When you get to the third question, invalidity, you

25  do a checkmark, yes.  That's Malloy's testimony.  He got up

 1   here and told you where each of the elements was.

 2           Then on Question 4, which is the final one, no need

 3   to fill it in.  There are no damages in this case.

 4           We thank you for your time this morning and

 5   throughout the week, and we invite you to look at the

 6   evidence as you consider rendering a verdict in this case.

 7   Thank you very much.

 8           THE COURT:  All right.  Mr. Alper, you may present

 9   your final closing argument.  You have three minutes

10   remaining.

11           MR. ALPER:  May I have my Slide 19, please?

12           I'll begin now.  Just a couple of remaining points,

13   ladies and gentlemen.  You're -- you're almost at the end of

14   this.  Thank you again for your patience.

15           First, nothing that counsel said changes anything,

16   and it doesn't change any of the bedrock facts.

17           First, infringement, look at the slide.  Dr.

18   Orchard admitted there was a processor, storage medium, and

19   instructions on the Kinect.  The Kinect is part of the video

20   communication device.

21           That's not us just drawing circles.  That's

22   something Dr. Orchard agreed with, and it's mandated by the

23   Court's claim construction in this case.  You'll see it.  A

24   video communication device is what covers both of these

25   things.  I didn't draw the circle.  Dr. Orchard and Dr.

1  Wicker did.  That means they're infringement.  They're just

2  pointing to additional processor, additional storage medium,

3  and additional instructions.  That's not non-infringement.

4  That's more infringement.

5          Invalidity.  Did they prove by clear and convincing

6  evidence?  There is no rebuttal.  They -- they -- they

7  concede Dr. Orchard did not respond on Claims 28, 35, and

8  several of the claims -- the instruction claims.  They have

9  no opinion from an expert.

10          He couldn't get behind it.  Why?  You saw it.  I

11  showed it to you.  He doesn't know.  He's not sure whether

12  that shows invalidity.

13          As far as Mr. Malloy's testimony goes, he -- it's

14  accurate.  He said it didn't have wireless, and it couldn't

15  do HDCP.  That means it couldn't support a set-top box

16  signal back in 2008.

17          You can rely on his testimony because he said it.

18  What he says it could do today is irrelevant for invalidity.

19  And I just saw -- we just saw slides.  That's all what it

20  could do today.  That's not what it could do for purposes of

21  prior art 10 years ago when Dr. Shoemake was doing his

22  invention.

23          All right.  Next thing, they say it's okay to look

24  at competitor's products.  You heard it.  But what's not

25  okay is to look at a competitor's product, see that your

1    product, that your planning has the same thing in it, and

2    then go ahead and in utter disregard to the small guy's

3    patent rights, put it in there anyway and hope that they'll

4    either go away, dissolve, or never say anything about it.

5    That's not okay.  That's not ordinary competitive analysis.

6           Last thing, whether or not Biscotti's sales were

7    high -- we said this in the beginning.  Biscotti is not

8    running from this.  It's not an excuse to knowingly infringe

9    Biscotti's patents without compensating Biscotti.  If that

10   were the case, only the big guys could benefit from patents.

11          And you heard Microsoft talk about how important

12   patents are to it.  Well, the patents are important to

13   Biscotti, too.  And they're important to Biscotti's

14   business.  And Microsoft should not be allowed to infringe

15   without compensation of Biscotti.  And if you want to find

16   out where the value is --

17          THE COURT:  Counsel, your time has expired.  Take

18   the additional 15 seconds and --

19          MR. ALPER:  Thank you, Your Honor.

20          If you want to look where the value is, go back and

21   look at Microsoft's documents and look at how important they

22   were saying at the time of infringement this was.  Go look

23   at the internal documents, not what they said here, the

24   internal documents.  And you'll see how important this was

25   to them and why the royalty -- the very reasonable royalty

1   that we proposed is the appropriate royalty in this case.

2          Thank you very much for your time again.

3   Appreciate it.  Good luck with your deliberations.

4          THE COURT:  All right.  Ladies and gentlemen, I'd

5   like to give you a few final instructions before you retire

6   to the jury room and begin your deliberations.

7          You must perform your duty as jurors without bias

8   or prejudice as to any party.  The law does not permit you

9   to be controlled by sympathy -- sympathy, prejudice, or

10  public opinion.

11         All parties expect that you will carefully and

12  impartially consider all the evidence, follow the law as I

13  have given it to you, and reach a just verdict regardless of

14  the consequences.

15         Answer the questions in the verdict form from the

16  facts as you find them to be from this case, following the

17  instructions that I have given you.  Do not decide who you

18  think should win and then answer the questions accordingly.

19  Remember, your answers and your verdict must be unanimous.

20         You should consider and decide this case as a

21  dispute between persons of equal standing in the community,

22  equal worth, and holding the same or similar stations in

23  life.  That's true in patent cases between corporations,

24  partnerships, and individuals.

25         A patent owner is entitled to protect its patent

1    rights under the United States Constitution.  This includes

2    bringing a suit in a United States District Court for money

3    damages for infringement.  The law recognizes no distinction

4    between types of parties.  All corporations, partnerships,

5    and other organizations stand equal before the law

6    regardless of their size, regardless of who owns them, and

7    they are to be treated as equals.

8           When you retire in a few moments to the jury room

9    to deliberate on your verdict, as I told you, you're each

10   going to have a copy of these final jury instructions to

11   take with you.

12          If during your deliberations at any time you desire

13   to review any of the exhibits which the Court has admitted

14   into evidence, you should advise me by a written note

15   delivered to the Court Security Officer, and I will send

16   that exhibit or those exhibits to you.

17          Once you retire, you should select your foreperson,

18   and then conduct your deliberations.

19          If you elect to recess during your deliberations,

20   follow all the instructions the Court has given you about

21   your conduct during the trial.

22          After you have reached your verdict, your

23   foreperson is to fill in the verdict form, reflecting your

24   unanimous answers to the questions, sign it, and date it.

25   Do not reveal your answers until such time as you're

1    discharged, unless you're otherwise instructed by me.  And

2    you're never to disclose to anyone, not even to me, your

3    numerical division on any question.

4           Any notes that you've taken during the course of

5    the trial are only aids to your memory.  If your memory

6    should differ from your notes, you should rely on your

7    memory and not your notes.  The notes are not evidence.  A

8    juror who has not taken notes should rely on his or her own

9    independent recollection of the evidence and should not be

10   unduly influenced by the notes of other jurors.  Notes are

11   not entitled to any greater weight than the recollection or

12   impression of each juror about the testimony.

13          If you want to communicate with me at any time

14   during your deliberations, you should give a written message

15   or a question to the Court Security Officer who will bring

16   it to me.  I'll then respond to you as promptly as possible,

17   either in writing or by having you brought back into the

18   courtroom where I can address you orally.

19          I will always first disclose to the attorneys in

20   the case your question and my response before I answer any

21   question.

22          After you've reached a verdict and I've discharged

23   you from your duty as jurors, you're not required to talk

24   with anyone about your service as a juror in this case.  By

25   the same token, after I've discharged you from your duty as

jurors, you are totally free to discuss your service in this case with anyone of your choosing.  Whether you discuss your service as a juror in this case or whether you don't, ladies and gentlemen, is totally and completely up to you at that point in time.

I'm now going to hand eight copies of these final jury instructions and one unanswered and clean copy of the verdict form to the Court Security Officer to deliver to you in the jury room.

Ladies and gentlemen of the jury, you may now retire to the jury room to deliberate upon your verdict.  We await your decision.

COURT SECURITY OFFICER:  All rise for the jury.

(Jury out.)

(Recess.)

THE COURT:  All right.  The Court is going to take a short recess.

Counsel, I'd like you to take about 10 minutes, and then meet me in chambers.

The Court stands in recess.

COURT SECURITY OFFICER:  All rise.

(Recess.)

(Jury out.)

COURT SECURITY OFFICER:  All rise.

THE COURT:  Be seated, please.

1          All right.  As indicated during pre-trial, the

2    Court now intends to take up the Defendant's allegations of

3    inequitable conduct, which are -- which is an issue for

4    presentation to the Court and not the jury.

5          And as I indicated during the process of getting

6    ready to select the jury and go to trial in this case, the

7    Court intended to proceed to take up inequitable conduct

8    after the jury went out to deliberate and while they were

9    conducting their deliberations.

10         That being said, Mr. Bettinger, this is the

11   Defendant's requested relief.  What evidence do you have to

12   present?  Do you have witnesses to call?  Let me hear from

13   you as to how you intend to proceed on the inequitable

14   conduct defense.

15         MR. BETTINGER:  Yes, Your Honor.  Thank you.

16         Microsoft has -- Microsoft has identified certain

17   exhibits, Your Honor.

18         THE COURT:  Please go to the podium.

19         MR. BETTINGER:  Yeah, sorry.

20         Thank you, Your Honor.

21         Microsoft has identified certain exhibits that it

22   will use in the examination of Dr. Shoemake.  All but one of

23   the documents had been pre-admitted in the case, and we'll

24   just refer to them by the -- the exhibit numbers they've

25   been assigned.

1          Yeah, there -- there -- the one exhibit, DX-24, has

2    not yet been admitted in this case.  We'll see where the

3    testimony goes and whether we need it.

4          THE COURT:  All right.  It was not -- it was not

5    disclosed as a marked exhibit and considered during

6    pre-trial earlier by the Magistrate.

7          MR. BETTINGER:  I'm -- I'm misinformed.  It has

8    been pre-admitted.  I'm sorry, Your Honor.

9          THE COURT:  Are there any exhibits you intend to

10   use that have not previously been pre-admitted?

11         MR. BETTINGER:  No, Your Honor.

12         MS. HOLLIS:  Objection, Your Honor.  None of these

13   exhibits were disclosed as part of the pre-trial process to

14   be used with witnesses today.  So this is the first I'm

15   hearing that there are exhibits disclosed -- exhibits to be

16   used in connection with testimony today.

17         THE COURT:  Well, Ms. Hollis, as the -- the Court's

18   practice is that exhibits should be offered, argued, and

19   pre-admitted in advance of the trial to save time and to

20   streamline the process and avoid confusion.  But they're not

21   required to be linked to any particular witness or to be

22   identified as to how the parties might use them.  It's

23   simply to allow the Court an opportunity to take up

24   objections as to their admissibility under the rules of

25   evidence.

1              So the fact that Defendant has not identified any

2    pre-admitted exhibits as targeted toward its inequitable

3    conduct case is not a -- is not a sustainable objection.

4    That's overruled.

5              MS. HOLLIS:  Thank you, Your Honor.

6              THE COURT:  All right.  What else do you have, Mr.

7    Bettinger?

8              MR. BETTINGER:  Your Honor, because Mr. Shoemake

9    has been called as a witness in this case, we will try to

10   streamline this process, but we would -- because it's part

11   of the same process, the testimony from -- that Mr. Shoemake

12   has already been given, would be part of our offer of proof

13   in the case.

14             THE COURT:  The Court will take notice of all the

15   evidence that's been offered before the jury as a part of

16   the trial that we're awaiting a verdict on now.

17             MR. BETTINGER:  Thank you, Your Honor.

18             THE COURT:  You wish to call Dr. Shoemake for

19   further testimony?

20             MR. BETTINGER:  Yes, Your Honor.

21             THE COURT:  Dr. Shoemake, you need to return to the

22   witness stand, please.

23             THE WITNESS:  Yes, Your Honor.

24             THE COURT:  And I remind you, you remain under

25   oath.

1          THE WITNESS:  Yes, Your Honor.

2          All right.  You may proceed, Mr. Bettinger.

3          MR. BETTINGER:  Thank you, Your Honor.

4     MATTHEW SHOEMAKE, Ph.D., PLAINTIFF'S WITNESS,

5                    PREVIOUSLY SWORN

6                    DIRECT EXAMINATION

7  BY MR. BETTINGER:

8  Q.  Good morning, Dr. Shoemake.

9  A.  Good morning.

10  Q.  Sir, you were involved in the preparation and

11  prosecution of the patent application that issued as the

12  '182 patent, correct?

13  A.  I was.

14  Q.  And you were involved in the filing of the provisional

15  application -- the original provisional application in 2008,

16  correct?

17  A.  Yes, sir, I was.

18          MR. BETTINGER:  If -- if we could, Mr. Simmons,

19  that's Exhibit DX-675 -- DX-675.

20  Q.  (By Mr. Bettinger)  And I believe we have a binder for

21  you, sir.  And we'll also post them for the convenience on

22  the screen.

23  A.  Thank you.

24  Q.  Looking at Exhibit 675, sir, is that the application

25  that you were involved in preparing some time in or about

1  September of 2008?

2  A.  Yes.  This is the provisional application for the '182

3  patent.

4  Q.  Okay.  And did you participate in drafting Exhibit 675?

5  A.  Yes, portions of it.

6  Q.  All right.  Did Dr. Ahmed, who is also listed as an

7  inventor on the '182 patent, was he also involved in

8  preparing Exhibit 675, sir?

9  A.  To the best of my recollection, he was.

10  Q.  All right.  Can you describe for us just briefly what

11  the process was as to how you and Dr. Ahmed went about

12  preparing Exhibit 675?

13  A.  I can.  We used -- I put together an invention

14  disclosure form to be used in the company.  And if you go

15  to -- I don't see a Bates number at the bottom, but in this

16  document, there's a page -- I don't know, about seven, eight

17  pages back that has at the top of it Invention Disclosure

18  Form.  And our process was to fill out this Invention

19  Disclosure Form, and then provide it to the -- to the

20  attorneys to facilitate filing for a provisional patent.

21  Q.  Okay.  Turning halfway through Exhibit 675, there's a

22  document entitled:  Invention Disclosure Form.  And I

23  apologize, as you note, there's no page number.

24  A.  Okay.

25  Q.  Put it on the screen.  Do you have that?

```
 1   A.  I do.
 2   Q.  If you turn to the second page, State of the Art.  Do
 3   you see that?
 4   A.  I do.
 5   Q.  All right.  You participated in drafting this state --
 6   this language in The State of the Art, didn't you, sir?
 7   A.  That's correct.
 8   Q.  All right.  And at the time in September of 2008, you
 9   knew of Corporate Videoconferencing Solutions?
10   A.  I did know of that market segment, that's correct.
11   Q.  All right.  And you knew of PC Webcam Solutions?
12   A.  I knew that market segment, as well, that's correct.
13   Q.  And you knew of Countertop Video Phones, correct?
14   A.  I -- I did, that's correct, in September of 2008.
15   Q.  All right.  And with respect to the Corporate
16   Videoconferencing Solutions, you knew that they were
17   extremely expensive, right?
18   A.  Amongst other things, yes.  You can see right there, I
19   knew they were extremely expensive.
20   Q.  And that's because you knew what they sold for?
21   A.  I knew general price -- price ranges.
22   Q.  All right.  So you had seen Corporate Videoconferencing
23   Solutions in order to know what they would sell -- at what
24   price they would sell, hadn't you, sir?
25   A.  I disagree.
```

1    Q.  Well, how did you know the price?

2    A.  Oh, because I had seen, like, advertisements, like Cisco

3    marketing advertisements, so I was distinguishing between

4    seeing products and seeing advertisements and hearing what

5    systems cost.

6    Q.  Okay.  So you -- you obtained your information about

7    Corporate Videoconferencing Solutions from seeing

8    publications?

9    A.  Well, seeing -- seeing, for example, a Cisco corporate

10   conferencing system marketing.

11   Q.  Oh, I'm -- so it was a Cisco document that you saw, as

12   opposed to just a general publication, sir?

13   A.  Oh, no, I don't have a clear memory on it.  I'm just

14   telling you that I remember seeing marketing in general with

15   respect to corporate conferencing solutions, and that

16   marketing, to me, indicated that they were very expensive.

17   Q.  I see.  And you were reviewing the marketing and general

18   literature because you were attempting to purchase one for

19   your business; is that right?

20   A.  No, I wouldn't characterize it that way.

21   Q.  What caused you to be reviewing marketing information

22   from Corporate Videoconferencing Solutions prior to 2008,

23   sir -- September of 2008?

24   A.  Oh, I wouldn't call it reviewing.  I would -- I would

25   call it more like running across, as I do my standard read.

103

1  Q.  Okay.  What -- what was causing documents that were

2  discussing Corporate Videoconferencing Solutions to come

3  across your desk prior to September 2008, sir?

4  A.  I'm not sure what you -- I disagree that they came

5  across my desk.  I'm not sure I understand your question.

6  Q.  You said you read them.

7  A.  So I'd seen -- I'd seen marketing for corporate

8  conferencing solutions.

9  Q.  Right.  And is this information that you received at

10  your home?

11  A.  I don't remember where I was whenever I -- I saw it.

12  Q.  Okay.  In addition to the marketing literature, were

13  there other publications that you read at the time in which

14  video -- Corporate Videoconferencing Solutions were

15  discussed?

16  A.  Not that I recall.

17  Q.  Did you provide any of the literature that you had

18  reviewed prior to September 2008 on Corporate

19  Videoconferencing Solutions to your attorney who was

20  prosecuting or assisting with the filing of the provisional

21  application, sir?

22  A.  Well, so I -- I'm sorry.  I don't understand how to

23  answer your question as asked.

24  Q.  Did you provide any of the marketing and general

25  information that you had received prior to September 2008,

1   did you provide that material to the attorney who assisted

2   you in drafting this patent application in September 2008,

3   sir?

4   A.   I didn't provide any information about corporate

5   conferencing marketing that I'd seen to the attorney that

6   helped draft the -- this provisional application, if that

7   answers your question.

8   Q.   Had you been involved in filing for a patent application

9   before this -- prior to this time, sir?

10  A.   I had.

11  Q.   On how many occasions, roughly?

12  A.   I -- I would estimate 15 to 20 at this point in my

13  career.

14  Q.   In any of those other 15 to 20 occasions, had you ever

15  provided information -- and I don't need to get into

16  attorney-client, but just at a general level, information in

17  the form of publications or marketing materials to the

18  attorneys who were assisting you in the prosecution of the

19  patents, sir?

20  A.   I may have.  I don't recall.

21  Q.   Are you saying you may have?  Is it possible you did?

22  A.   It's possible that I did, that's correct.

23  Q.   And why would you do that?  Why would you give materials

24  that are information about something that you're filing for

25  a patent application on, why would you give those to the

1   attorney that would be drafting the application, sir?

2   A.  Well, in -- in general, I think you're just asking a

3   general question, you would do it due to the duty to

4   disclose.

5   Q.  No, I'm asking why you did it?

6   A.  Oh, I didn't testify that I did it.

7   Q.  Okay.  You thought you might have done it?

8   A.  I said I may have, that's correct.

9   Q.  Why -- why -- what caused you to think you may have?

10  A.  Because I'd been the inventor on a number of patents up

11  to that -- to that point, and I may have.  I just don't

12  recall if I had or hadn't -- hadn't.

13  Q.  So as an inventor up to that point, you're aware of what

14  you refer to as the duty of disclosure?

15  A.  I'm sorry.  Up to that point in September -- September

16  of 2008, I was aware of duty to disclose, that's correct.

17  Q.  Okay.  When did you first become aware that you needed

18  to do disclosure in connection with the filing of a patent

19  application, sir?

20  A.  When I was an employee at Texas Instruments.

21  Q.  When was that?

22  A.  The second time I worked for Texas Instruments, so it

23  would have been between 2000 and 2003.  And to tell you the

24  truth, maybe correct my answer a little bit, I may have been

25  told about it at Alantro Communications, the company I was

1   at 1998 to 2000 who was acquired by Texas Instruments.

2   Q.  Okay.  Did Texas Instruments have a policy for its

3   employees when filing a patent application that would be

4   adhered to?

5   A.  I couldn't tell you one way or the other.

6   Q.  Did you -- were you involved in filing patent

7   applications when you were at Texas Instruments, sir?

8   A.  I was involved in -- in the process of applying for

9   patents while I was at Texas Instruments.

10  Q.  All right.  And you recall that Texas Instruments had a

11  process by which its engineers would follow in order to file

12  patent applications?

13  A.  Yes, I recall in -- in general there was a process.

14  Q.  And did that process include providing any relevant

15  information that you may have with respect to a particular

16  patent application?

17  A.  I don't recall.

18  Q.  How about the process -- was there a process at Alantro

19  that was in place for the filing of patent applications,

20  sir?

21  A.  I don't know if I'd call it a process.  We were a

22  startup.  I remember a few things about it.  But I don't

23  think we -- as a startup, I don't think we had a lot of

24  formal processes in place.

25  Q.  All right.  At Texas Instruments, were you required to

1    fill out an Invention Disclosure Form as part of a process

2    for filing for a patent application?

3    A.  I don't have a clear memory of that.

4    Q.  You don't recall that requirement at Texas Instruments,

5    sir, is that your testimony?

6    A.  I -- I don't recall.  I don't have memory of that.

7    That's my testimony.

8    Q.  And do you recall a requirement at Texas Instruments

9    that in order to file a patent application, you were to

10   provide any information or documents that you thought might

11   be relevant to the particular application, sir?

12   A.  I don't have memory of how that worked at Texas

13   Instruments.

14   Q.  At Texas Instruments -- and when was the period at Texas

15   Instruments, sir?

16   A.  Between 2000 and 2003.

17   Q.  Okay.

18   A.  Just -- so the record is clear, that was the second time

19   that I worked there in my career, but it was the only time I

20   was -- worked with -- for Texas Instruments and would have

21   been involved with patents in any way.

22   Q.  In -- in the instances where you did have patent

23   applications at Texas Instruments, what was the process you

24   used in order to work that application through the Texas

25   Instruments chain of command in order to get a patent, sir?

1    A.   The -- the process was there was a committee.  And if

2    you had a -- the committee had a regular conference call,

3    and so engineers knew about that.  And if you thought you

4    had an idea that you wanted to discuss with the committee,

5    you could join that conference call and tell the -- tell the

6    committee about it.

7    Q.   And -- and did you participate in the process of -- of

8    filing for patents during this period, 2000 to 2003, at

9    Texas Instruments, sir?

10   A.   Give me one moment.  Yes, I did.

11   Q.   On how -- roughly how many occasions during that

12   three-plus-year period, sir?

13   A.   Probably -- I would say 15 plus -- plus or minus.  Maybe

14   10 to 15.

15   Q.   Okay.  On any of those 10 to 15 occasions, do you recall

16   being asked to provide information or documents you may have

17   that may pertain to whatever was being written up in the

18   patent application at Texas Instruments?

19   A.   You know, I just don't recall.

20   Q.   How is it that you're able to recall that it was 10 to

21   15 applications, sir?

22   A.   Because I have a general knowledge that -- that I got

23   about 30 issued patents.  And I know that there were a few

24   of those at Alantro, my first employer, but the majority of

25   them was at -- were at Texas Instruments.  And then at the

109

1    subsequent two companies, WiQuest and Alantro -- Alantro

2    there's about -- I'm sorry, Biscotti -- at Biscotti there's

3    about 10, and there's somewhere between -- I don't know,

4    five plus at WiQuest.  And so I'm basically -- I'm taking a

5    difference -- I'm taking out of the four places I worked,

6    I'm kind of doing some math in my head to figure out about

7    how many it was at Texas Instruments.

8    Q.  All right.  At Texas Instruments, were you involved --

9    once the patent application was filed, were you involved on

10   the follow-on process of the patent as it moved through the

11   Patent Office, sir?

12   A.  Not -- not very much.  The lawyers took care of it

13   from -- from there.

14   Q.  Okay.  And were those in-house lawyers at Texas

15   Instruments?

16   A.  Yes and no.

17   Q.  Okay.  What -- on the yes side of that answer, sir, what

18   was that?

19   A.  On the yes side of that answer, there were -- there

20   certainly were in-house attorneys that -- that were involved

21   in this process.

22   Q.  And as you sit here today, you don't recall that Texas

23   Instruments had any manuals that it provided to its

24   engineers?

25   A.  I do not.  I don't recall any of that.

1  Q.  I'm sorry.  Let me -- let me finish the question.

2  A.  My apology.

3  Q.  It's all right.

4        During your time at Texas Instruments, you don't

5  recall any manuals that were provided to engineers or other

6  employees for how -- the steps to take in order to file a

7  patent application?

8  A.  I do not.

9  Q.  And as you sit here today, is it your testimony that

10  that didn't exist?

11  A.  No.  I don't know one way or the other.

12  Q.  Okay.  There came a time, sir, when you made a

13  presentation to Austin Ventures in March of 2008.  Do you

14  recall that?

15  A.  I think you may have the date wrong.  I think you said

16  March.  I think it was February of 2008.

17  Q.  You're right.  February 2008?

18  A.  Yes, that's correct.

19  Q.  You recall that presentation?

20  A.  I do.

21  Q.  Okay.  When did you first learn of Austin Ventures?

22  A.  Oh, I won't be able to give you a precise date, but I

23  probably may have known about them -- I guess my official

24  answer is I don't recall, but I could estimate for you.

25  Q.  Please do.

1  A.  Well, I became I think aware of the venture capital

2  community in the late 1990s, so I may -- when I was at

3  Alantro Communications, that California startup, and so I

4  may have become aware of them in that time period.

5  Q.  Did you have particular contacts at -- at Austin

6  Ventures?

7  A.  At certain points of my career, I did.

8  Q.  All right.  In this 2000 -- late 2007, early 2008 time

9  period, who were your contacts at Austin Ventures?

10 A.  You're going to challenge my memory.  Give me one

11 moment.

12        The names are going to -- the names are going to

13 escape me.  There was one of them that I knew because he had

14 also gone to A&M.  He was an Aggie.  And there were a couple

15 of other gentlemen, as well, that I'm having -- I'm drawing

16 a blank on their names right now.  I'm sorry.

17 Q.  Okay.  In February of 2008, you knew that Austin

18 Ventures had funded Lifesize, correct?

19 A.  Can you ask the question again, please?

20 Q.  Yeah.  In February of 2008, you knew that Austin

21 Ventures, the venture capital firm you just described, had

22 -- had funded Lifesize?

23 A.  I -- I found out at that time that they were an investor

24 in Lifesize, that's correct.

25 Q.  All right.  And you found out from someone at Austin

1  Ventures, correct?

2  A.  That's correct.  Austin Ventures told me the name, and

3  they had invested in Lifesize.  My apology.

4      THE COURT:  Let's make sure you each talk one at a

5  time, gentlemen.  We've had this discussion in front of the

6  jury.  We don't need to go through it again.  Let's just be

7  careful that you speak one at a time.

8      Go ahead, counsel.

9      MR. BETTINGER:  Thank you, Your Honor.

10  Q.  (By Mr. Bettinger)  And who was that gentleman at Austin

11  Ventures who informed you about Lifesize?

12  A.  I don't recall exactly who it was.

13  Q.  Who do you recall knowing at the time?  Who was --

14  A.  I'm sorry, I'm having trouble recalling their names.

15  Q.  Was it the fellow from Texas A&M?

16  A.  It was likely either him or one of the two

17  Indian/American gentlemen that were partners there.  But I'm

18  sorry, I'm having trouble with their names.

19  Q.  Okay.  Do you recall that one or more of them was

20  involved in assisting in the funding of Lifesize?

21  A.  I do not.

22  Q.  Who -- who was responsible for the funding of Lifesize

23  at Austin Ventures?

24  A.  I don't know.

25  Q.  Okay.  Who told you about Austin -- at Austin Ventures,

1   who told you about Lifesize?

2   A.  Some of these gentlemen that I -- one of these gentlemen

3   that I was in communication with around February of 2008,

4   but I don't -- I don't recall their names.

5   Q.  All right.  How long had you known these gentlemen?

6   This is perhaps the fellow from Texas A&M and the two

7   Indian/Americans?

8   A.  Give me one second to think about that.  I think I'd

9   known them since my -- my previous company, WiQuest.  I'd

10  raised significant venture capital for that company, and I

11  think I probably -- I may have been introduced to them in

12  that -- in that time frame.

13  Q.  Okay.  In February of 2008, and was it -- let me ask

14  it --

15        MR. BETTINGER:  Mr. Simmons, if you could put up

16  DX-6 -- DX-6.

17  Q.  (By Mr. Bettinger)  I believe you have one in your

18  binder as well, Dr. Shoemake.

19  A.  I have it, thank you.

20  Q.  Is this a copy or draft of the presentation you

21  submitted to Austin Ventures sometime in or about February

22  of 2008?

23  A.  Well, I don't recall submitting it to them.  I gave a

24  presentation to them that -- that looks similar to this.

25  Q.  Okay.  And who -- who had invited you to give the

1   presentation?

2   A.  Oh, I'm sorry, a name came back to me.  The gentleman --

3   I don't want to get in trouble with the Judge, but the

4   gentleman's name from A&M is Clark Jernigan.

5   Q.  Okay.

6   A.  And who had invited me was Clark Jernigan and/or some of

7   this is partners around this time frame.

8   Q.  Okay.

9           THE COURT:  Mr. Bettinger, let me ask a question.

10          MR. BETTINGER:  Yes.

11          THE COURT:  Was Dr. Shoemake not deposed on these

12   issues prior to today?  Has there been -- have there been

13   depositions taken on these issues?

14          MR. BETTINGER:  It did come up in a deposition.  It

15   was a part of the questioning that was --

16          THE COURT:  All right.  This examination sounds

17   more like a deposition to me than it does a planned direct

18   examination in court.  But if -- if these are areas of new

19   inquiry that haven't been discussed before, fine.

20          MR. BETTINGER:  All right.

21          THE COURT:  Let's continue.

22          MR. BETTINGER:  Thank you, Your Honor.  Yeah.

23   Q.  (By Mr. Bettinger)  You said it was Clark Jernigan?

24   A.  Yes, that's his name.

25   Q.  All right.  Was Mr. Jernigan the one that had told you

1   about Lifesize?

2   A.  I don't recall which one of the individuals from Austin

3   Ventures told me about Lifesize.  I just know it was someone

4   from Austin Ventures.

5   Q.  All right.  And when you went to the meeting in February

6   of 2008 at Austin Ventures, it was for the purpose of

7   attempting to raise funds for a new venture that you were

8   considering, correct?

9   A.  That was one of the reasons for going -- for doing down.

10  Q.  And that was in the videoconferencing space, the new

11  venture that you were proposing?

12  A.  Yeah.  I think that's a fair characterization.  I might

13  word it slightly differently, but I think that's fair.

14  Q.  And do you recall that Mr. Jernigan was at that meeting

15  where you made the presentation?

16  A.  I think he -- I can't tell you unequivocally that he was

17  there.

18  Q.  Do you have a recollection of talking to Mr. Jernigan

19  about the presentation?

20  A.  Not Mr. Jernigan specifically.

21  Q.  All right.  One of the -- one of the other two

22  colleagues on his team?

23  A.  I recall meeting with individuals from Austin Ventures.

24  Q.  If you look on Page 32 of the document.  And this is

25  DX-6, DX-6.  Do you see there under Related Companies,

1  you've identified Lifesize?

2  A.  I -- yes, I see Lifesize on this page.

3  Q.  Okay.  And this is information you put on Exhibit 6, the

4  presentation, isn't it, sir?

5  A.  I -- I put this slide together.

6  Q.  All right.  And as of February of 2008, you knew that

7  Lifesize could place HD calls over the Internet, didn't you?

8  A.  This is what I had been told by Austin Ventures.

9  Q.  And you know that it was corporate and business focused,

10 correct?

11 A.  I had been told that it was corporate and business

12 focused.

13 Q.  Well, by being told, you knew, didn't you?

14 A.  Well, that's -- that's what I had been -- been told.

15 Q.  Yeah.  And that's why you put it in the document, right?

16 A.  I put it in the document because that's what I had been

17 told, and I knew that -- that I wanted to talk about this

18 corporate segment as kind of adjacent market segments, and I

19 knew that Austin Ventures had invested in them.

20 Q.  Well, you put it in the -- in the document because you

21 were going to Austin Ventures to try to raise money for your

22 own videoconferencing company, correct?

23 A.  I'm not sure I would word it that way.

24 Q.  You were trying to raise money from Austin Ventures for

25 a videoconferencing company that you were contemplating

1  forming, correct?

2  A.  That's one of the things I wanted to talk about with

3  them.

4  Q.  Right.  And in doing -- in talking to the folks at

5  Austin Ventures, you learned about Lifesize, right?

6  A.  I did, that's correct.

7  Q.  And you learned that they had actually funded Lifesize,

8  right?

9  A.  I was told by them that they had invested in a corporate

10  conferencing company named Lifesize.

11  Q.  Right.  And they told you how that funding had taken

12  place, didn't they?

13  A.  No, I had no details of that.

14  Q.  You were trying to raise money yourself for

15  videoconferencing space, right?

16  A.  That's one of the things we discussed.

17  Q.  And you had no -- you didn't ask any questions about,

18  hey, if you funded Lifesize, what did you do?  How did do

19  you that?

20  A.  No, I did not.

21  Q.  How is it, sir, that you were able to remember and place

22  in the document, Exhibit 6, that the Lifesize product could

23  place HD calls over the Internet?

24  A.  Oh, because that's what Austin Ventures had told me

25  before this meeting.

1   Q.  And you asked them the question, and they provided you

2   that answer, sir?

3   A.  No.

4   Q.  They provided you that information, and you wrote it

5   down?

6   A.  I want to make sure I understand what information you're

7   talking about.  Can you help me?

8   Q.  Sure.  Your language:  Lifesize places HD calls over the

9   Internet.  Corporate and business focused.  And HDTV

10  connected.

11        That information.

12  A.  What is the question?

13  Q.  You wrote that information down when it was provided to

14  you by someone at Austin Ventures, right?

15  A.  That's correct, I put it in this slide.

16  Q.  And did you write it down when you first received the

17  information?

18  A.  I don't recall writing it down.

19  Q.  Did -- did knowing that Austin Ventures had funded a

20  company that was in the videoconferencing space have any

21  impact for you on the fact that you were asking for your own

22  funding for videoconferencing with Austin Ventures?

23  A.  No, it did not.

24  Q.  Ask you to take a look at DX-15.

25  A.  Okay.  I'm there.

1   Q.  Do you have it in front of you, sir?

2   A.  I do.

3   Q.  All right.  This is a document that's been produced by

4   Biscotti in this case.  Do you recognize that, sir?

5   A.  I rec -- I see the document.  I recognize it as I sit

6   here today.

7   Q.  Okay.  If you look on the back on page -- ending in

8   BISC137777.

9   A.  Okay.  I'm there.

10  Q.  You see that that has a copyright 2007 date there just

11  above on the right-hand side, bottom of the third column?

12  A.  Oh, I see it.  Yes, copyright 2007.

13  Q.  All right.  You were here for the testimony of Mr.

14  Malloy that this document was passed out in connection with

15  the sale of the Lifesize Express sometime in the 2007/2008

16  time frame?

17  A.  I was here for the testimony of Mr. Malloy.

18  Q.  And you recall him testifying about that?

19  A.  I don't have a clear memory of exactly what he said.

20  Q.  And this document was in your files, correct?

21  A.  I understand that this document was produced as part of

22  Biscotti's production in this lawsuit.

23  Q.  Sir, this document was in the files of Biscotti, wasn't

24  it?

25  A.  I don't know exactly where it came from.  It came from

1  our production.

2  Q.  And "our production" is Biscotti's production, right?

3  A.  It's Biscotti's production, that's correct.

4  Q.  In the Austin Ventures document there on Page 32, you

5  also list related -- other related companies other than

6  Lifesize.  Do you see that?

7  A.  I do.

8  Q.  All right.  And was that information you obtained from

9  Austin Ventures about those other companies?

10  A.  No.

11  Q.  You -- you had that information yourself on --

12  A.  I -- I knew about these other companies and -- and

13  segments myself, somehow.

14  Q.  Okay.  If you look -- the last entry is vBox, correct?

15  A.  Yes.

16  Q.  And that's your proposed product vBox?

17  A.  Well, it's -- it's a working name for technology product

18  that would be based on the technology that I'm talking about

19  in this presentation.

20  Q.  Well, that's -- that's the product that was the subject

21  of the patent application -- the provisional patent

22  application, correct?

23  A.  I wouldn't word it that way.

24  Q.  You -- you provide in -- in Exhibit 6 -- DX-6, that it's

25  the vBox that your proposed product would be HDTV connected,

1  right?

2  A.  That's correct, I say that on this Page 32.

3  Q.  Just like Lifesize, which is HDTV connected, correct?

4  A.  I also say HDTV connected for Lifesize and also Apple

5  TV.

6  Q.  In connection with the patent application, do you recall

7  providing what's called a declaration?

8  A.  I do.

9  Q.  All right.  If you could --

10        MR. BETTINGER:  If we could please put up on the

11  screen, sir, DX-21 -- DX-21.

12  Q.  (By Mr. Bettinger)  I believe we have it on the screen

13  if that makes it --

14  A.  Yes, I'm there.  I'm there.

15  Q.  All right.  And that's your signature that appears down

16  at the bottom there, Matthew Shoemake, dated November 2009;

17  is that correct?

18  A.  Yes, Matthew B. Shoemake.

19  Q.  All right.  And did you read and understand Exhibit 21

20  before signing it?

21  A.  Yes.

22  Q.  And you state:  I acknowledge the duty to disclose to

23  the United States Patent and Trademark information (sic) all

24  information known to me to be material to patentability as

25  defined in 37 CFR 1.56 -- and it goes on, correct?

1   A.  Give me one second.  This is hard to read.  Yes, I see

2   that.

3   Q.  Okay.  Now, in connection with the patent application --

4   provisional patent application, which is Exhibit 675, you

5   did not provide any materials to the Patent Office other

6   than the application, correct?

7   A.  I don't know if our attorney provided anything else.  I

8   think that -- that document, and I'm not sure what the

9   exhibit number is -- the one we look at -- it's my

10  understanding that that's what was provided to the Patent

11  Office.

12  Q.  Which document, sir?

13  A.  I'm sorry, the one that we looked at as the provisional

14  application.

15  Q.  Exhibit 675?

16          THE COURT:  Just a minute.  Go ahead and answer the

17  question.

18  A.  It's my understanding that this is what was provided to

19  the Patent Office as our provisional application.

20          THE COURT:  Before you ask your next question, Mr.

21  Bettinger, the Court's received a note from the jury.  I'll

22  read the note.  I'll also mark it as No. 1 for

23  identification.  And after I've read it, I will deliver it

24  to the courtroom deputy to be included in the papers of this

25  case.

1          The note reads as follows:  Could we have seven

2     additional copies of the verdict form?  It's signed by

3     Lucinda Trahan, who I call to be Juror No. 1.  I assume

4     she's the foreperson.

5          Is there any objection from either Plaintiff or

6     Defendant for the Court making seven additional copies of

7     the verdict form and having them sent in to the jury?

8          MR. ALPER:  No, Your Honor.

9          MR. BETTINGER:  No, Your Honor.

10         THE COURT:  I'll hand the note to the courtroom

11    deputy.  I'll direct my staff to make those copies.  And

12    when they're complete, deliver them to the Court Security

13    Officer.

14         Let's continue with your examination, Mr.

15    Bettinger.

16         MR. BETTINGER:  Thank you, Your Honor.

17    Q.  (By Mr. Bettinger)  So what you recall providing to the

18    attorney for the provisional patent application is the

19    invention disclosure form that we were looking at earlier;

20    is that fair?

21    A.  Yes, which is -- so the record is clear, which is a

22    subset of DX-0675.

23    Q.  Okay.  And you -- but no additional documents, correct?

24    A.  Not that I recall.

25    Q.  All right.  And then do you recall in September of 2009

1   follow -- filing an original application?

2   A.  I do.

3   Q.  And at the time, you understood that there was a duty

4   of -- to disclose all information known to me to be material

5   to patentability as defined under 37 CFR 1.56?

6   A.  I did.

7   Q.  And you had actually known that since your time at TI

8   when you first filed for applications, right?

9   A.  Well, I may not have been able to quote that specific

10  section of code, but in general -- and by that I mean

11  federal court.  But, in general, yes, I knew of the duty to

12  disclose since at least my time at Texas Instruments.

13  Q.  Okay.  And you -- in connection with the -- the original

14  application which followed the following year in September

15  of 2009, you didn't provide any additional information or

16  documents to your attorney, correct?

17  A.  I agree.

18  Q.  Yeah.  And you had had follow-on calls and discussions

19  with Austin Ventures between February 2008 and September

20  2009, correct?

21  A.  Not that I recall.  I may have.  I just don't remember

22  one way or the other.  It doesn't ring a bell.

23  Q.  All right.  And do you recall, sir -- do you recall,

24  sir, at some point learning of the bill of materials of

25  Lifesize -- the Lifesize Express?

1   A.  No.

2   Q.  Do you recall being told a number with respect to the

3   bill of materials for a Lifesize product?

4   A.  Yes.

5   Q.  All right.  And it was Mr. Jerguson (sic) that told you

6   that from Austin Ventures, right?

7   A.  No, it was not.

8   Q.  Okay.  Who was that?

9   A.  Carl Amdahl at Doll Capital.

10  Q.  And he told you that some time in 2010?

11  A.  I don't recall the -- oh, yes, I do.  Yes, it was 2010.

12  Q.  All right.  And you recognized that when you heard the

13  bill of materials information that was provided to you, that

14  that was the same Lifesize that Austin Ventures had funded,

15  correct?

16  A.  Yes, I thought it was the same company.

17  Q.  All right.  And you had continued to follow the

18  videoconferencing space as you moved forward with your new

19  venture, which I think was then called Wham!, right?

20  A.  I -- I disagree with the first part, and I agree with

21  the second part.

22  Q.  Okay.  You were not following the videoconferencing

23  space as you moved forward with your new venture, Wham!; is

24  that your testimony, sir?

25  A.  I was not following the videoconferencing space, that --

1    that's correct.  The corporate videoconferencing space.

2    Q.  That's interesting, you make a distinction between --

3    what do you mean by corporate videoconferencing space?

4    A.  Oh, I talked about it in the patent.  It's -- it's a

5    market segment that's focused on optimizing product for

6    corporate conference rooms.

7    Q.  It's a market segment, the corporate space; is that your

8    testimony?

9    A.  Yes, it's a market segment.

10   Q.  All right.  In connection with the application that you

11   and Mr. Ahmed filed in September of 2009, there were no

12   claim limitations for market segment, were there?

13   A.  There were claim limitations that related to market

14   segments.

15   Q.  And so it's your view that the application that you

16   filed September 2009 had a claim limitation that corporate

17   conferencing was not included?

18   A.  No, that's not what I said.

19   Q.  And you understood, sir, that after signing the

20   declaration, that you had an ongoing duty to provide

21   information and material to patentability with respect to

22   the -- what issued as the '182 patent?

23   A.  Yes, sir.

24   Q.  And the patent issued in March of 2012, correct?

25   A.  I believe that's correct.

1  Q.  And you understood you had that duty of -- to disclose

2  material information all the way up until the issuance of

3  the '182 patent?

4  A.  Yes, sir.

5  Q.  And you never provided any additional information, as

6  far as documentary evidence, to your attorneys, correct?

7  A.  That's correct.

8  Q.  And there were no references cited in the patent as

9  prior art references provided by the applicant, correct?

10  A.  There were none that were provided by me.

11  Q.  All right.  If you take a look at the face page of the

12  patent, which I believe is PTX-1?

13      MR. BETTINGER:  And if you could, Mr. Simmons, just

14  blow up references cited.

15  Q.  (By Mr. Bettinger)  You see there are two references

16  there?

17  A.  Yes, I do.

18  Q.  Putterman and Kurtz, right?

19  A.  Yes, I see that.

20  Q.  And they both have an asterisk next to them?

21  A.  Yes, I see that.

22  Q.  And the asterisk means that those were references cited

23  by the examiner, correct?

24  A.  Yes.  That's what it says.  That's correct.

25  Q.  So neither you nor Mr. Ahmed provided any references or

128

1  documents to the Patent Office in connection with the '182

2  patent, correct?

3  A.  I did not.  And it's my understanding that Dr. Ahmed did

4  not either.

5  Q.  And as -- as you move through 2011, you continued with

6  the development of your Biscotti product which was now

7  called Biscotti, correct?

8  A.  I believe it was some point in 2011 that the company

9  named changed to Biscotti.

10  Q.  And you continued to learn more and more about the

11  videoconferencing space as -- as the Biscotti product was

12  being developed, correct?

13  A.  No, I would not word it that way.

14  Q.  You weren't learning anything about the

15  videoconferencing space; is that your testimony, sir?

16  A.  My testimony was that I wasn't studying the corporate

17  videoconferencing space.

18  Q.  Do you recall in January of 2011 providing a document to

19  Ms. Gauer that identifies more than 10 companies in the

20  videoconferencing space that were going to appear at the

21  Consumer Electronics Show in Las Vegas and identifying for

22  her which company she should go look at their products?

23  A.  I recall providing her with a document, that's correct.

24  Q.  All right.  So you knew about all the companies that

25  were listed on that document, which is -- that particular

1  document, correct, sir?

2  A.  I think that -- I don't have the document in front of

3  me.  I think that's likely -- I think that's likely true.

4  Q.  DX-780 -- DX-780.  I'll put it on the screen for your

5  convenience.  I believe it's also in the binder, sir.

6  A.  I found it.

7  Q.  Okay.  This is the market analysis that you prepared for

8  Ms. Gauer in the -- in January of 2011 in advance of her

9  attending the CES show in Las Vegas, correct?

10  A.  Give me just one second.

11  Q.  Yes.

12  A.  Yes, I think this is that document.

13  Q.  All right.  And as of -- this was written sometime in

14  late December, early January, correct?

15  A.  I think that's true.

16  Q.  All right.  The first entry, you note for Ms. Gauer that

17  Logitech has acquired Lifesize, right?

18  A.  I do.

19  Q.  You knew that because you were following what was going

20  on in the videoconferencing space, correct?

21  A.  I knew it because -I was following kind of the consumer

22  video calling space.

23  Q.  Consumer video calling space, is that your -- is that

24  what these companies who are listed on Exhibit DX-780, is

25  that how you characterize it, they were in the consumer

1  video calling space, sir?

2  A.  No, they're not all -- as I look at this list, they're

3  not all consumer companies.

4  Q.  Okay.  So you considered Lifesize, as of late December

5  2010, early January of 2011, to be in the consumer video

6  calling space, correct?

7  A.  No, I did not.

8  Q.  I'm sorry, you just said that's why you included

9  Logitech acquired Lifesize, right?

10  A.  No, that's not what I said.  This is -- this is about

11  Logitech, which is a consumer company -- consumer products

12  company.

13  Q.  Sir, the document starts -- the sentence starts out:

14  Lifesize was focused on small and medium enterprise.

15        Right?

16  A.  That's correct.

17  Q.  It's about Lifesize.

18  A.  It's about both Logitech and Lifesize.

19  Q.  It's about Lifesize.  That's what you're --

20        THE COURT:  Gentlemen, I can read the document.

21  There's no need for you all to argue back and forth what

22  it's about.

23        Let's move on to the next question.

24        MR. BETTINGER:  Thank you.

25  Q.  (By Mr. Bettinger)  You continued to gather information

1    and learn about Lifesize up through late December 2010,

2    early January of 2011, didn't you, sir?

3    A.  No, I would not word it that way.  That's not true.

4    Q.  You had -- your patent application was still pending

5    during that period, right?

6    A.  I'm sorry, during which period again?

7    Q.  Late December 2010, January 2011?

8    A.  That's correct, it was.

9    Q.  And you knew in -- in -- in this period -- you knew from

10   your presentation that -- to Austin Ventures in 2008 that

11   Lifesize provided HDTV and also HD video calling, right?

12   A.  I'm sorry, can you repeat the question so I get all the

13   elements?

14   Q.  Yeah.  HDTV and HD video calling?

15   A.  I was HDTV connected, and my understanding was I had

16   been told it could do -- it could do HD calling.

17   Q.  All right.  And you were at that point in this -- in

18   late 2010, early 2011, following what I believe you called

19   the video calling space, correct?

20   A.  Yes, I think that's a fair paraphrase of my -- my

21   testimony.

22   Q.  And you understood that there was this ongoing duty to

23   disclose information material to patentability with respect

24   to video calling until your patent issued, correct?

25   A.  No.  I don't think it's that -- I don't think it's that

1  broad.

2  Q.  All right.

3       MR. BETTINGER:  If we could -- DX-24, please, Mr.

4  Simmons.

5       And, Your Honor, this is the document that's been

6  pre-admitted but is not yet in the record, the DX-24.

7       THE COURT:  All right.

8       MR. BETTINGER:  It's been pre-admitted.

9       THE COURT:  Well, then I'll note for the record

10  that it's being used before the Court as a part of the

11  inequitable conduct portion of the case.  And it's certainly

12  in the record for that portion of the case.

13       MR. BETTINGER:  All right.

14       THE COURT:  Thank you for calling that to my

15  attention.

16  Q.  (By Mr. Bettinger)  All right.  Do you have it on the

17  screen there, sir?

18  A.  I do.  I see it.  It looks like a Wainhouse Research

19  document.

20  Q.  Right.  And this comes from Biscotti.  That's the Bates

21  number BISC753494?

22  A.  I have been told that things that have a Bates number

23  that begins with that kind of Biscotti were produced by us.

24  I couldn't tell you one way or the other if it was or not.

25  Q.  All right.  This -- this document is directed to Life --

1   Logitech and Lifesize and videoconferencing in September of

2   2011, correct?

3   A.  It appears to be, that's true.

4   Q.  All right.  And you continued to -- to follow industry

5   trends and information with respect to video calling through

6   September of 2011, correct?

7   A.  Yes.  In general, I was watching the consumer video

8   calling space.

9   Q.  And do you recall, sir, that in connection with your

10  patent application, you actually filed an amendment where

11  you added claims?

12  A.  I don't recall a clear memory of that.  That may be

13  true.

14  Q.  In April of 2010, you added, I believe, Claims 82, 83,

15  84, 85, and 86.  Do you recall that?

16  A.  I -- this actually rings a bell.  I haven't thought

17  about this in a long time.  It may very well be true.

18  Q.  All right.  And at the time of adding those claims, you

19  recognized that you had a continuing duty to disclose

20  information that was material to the patentability of what

21  you were claiming in your patent application, correct?

22  A.  I knew I had a duty to disclose all the way up until

23  issuance.

24  Q.  And ultimately, Austin Ventures chose not to invest in

25  Biscotti, right?

1   A.  Austin Ventures did not invest in Biscotti, that's

2   correct.  They're not a shareholder.

3   Q.  And Mr. Jernigan explained to you why that decision was

4   made, didn't he?

5   A.  I don't recall that -- I don't recall exactly who -- the

6   specific person that I was talking with.  There was a group

7   of people.

8   Q.  Okay.  But you were told why they decided not to invest

9   in Biscotti, weren't you?

10  A.  I was.

11  Q.  Yes.  And what did they tell you?

12  A.  They told me that -- that they thought that we were

13  doing something very different from Lifesize, but they said

14  they'd reached out to Craig Malloy, and Craig Malloy had

15  told them that he didn't want them investing in any other

16  video companies.

17  Q.  All right.

18          MR. BETTINGER:  Your Honor, no further questions.

19  Pass the witness.

20          THE COURT:  All right.  Cross-examination by the

21  Plaintiff.

22          MS. HOLLIS:  None, Your Honor.

23          THE COURT:  No cross-examination.  Do you have

24  other witnesses to call, Mr. Bettinger?

25          MR. BETTINGER:  No, Your Honor.

1          THE COURT:  All right.  What other evidence does

2     Defendant wish to tender with regard to the issue of

3     inequitable conduct?

4          MR. BETTINGER:  We have no further evidence, Your

5     Honor.  It's in the record.

6          THE COURT:  All right.  And as I've noted earlier,

7     the Court will take notice of the entire record up until

8     this point.

9          And I assume by Plaintiff electing not to

10    cross-examine its own corporate representative, Plaintiff

11    has no other -- has no affirmative evidence to offer with

12    regard to this issue?

13         MS. HOLLIS:  None, Your Honor.

14         THE COURT:  Do both sides close with regard to the

15    issue of inequitable conduct?

16         MS. HOLLIS:  We do, Your Honor.

17         MR. BETTINGER:  Yes, Your Honor.

18         THE COURT:  All right.  The Court will consider

19    then that it has all the evidence before it with regard to

20    the issue of inequitable conduct.

21         This issue is under submission.  And the Court will

22    consider and advise the parties of its decision in this

23    regard as soon as possible.

24         Now, I have just received another note from the

25    jury.  I'll read it to counsel.  I've marked it as No. 2 for

136

 1   identification.  And after I've read it, I will give it to

 2   our courtroom deputy.

 3          May we have the following devices:  Xbox One,

 4   Kinect, and Biscotti.

 5          Signed by Ms. Trahan.  Again, I'm assuming she is

 6   our foreperson, even though she's not putting a title under

 7   her signature.

 8          These devices are admitted exhibits in the case.

 9   Counsel, can you give me those precise exhibit numbers and

10   make sure that we agree on what they are and then can we

11   produce those corresponding tangible items so that I can

12   have them delivered to the jury?  I'll give you a moment to

13   meet and confer with each other.

14          MR. BETTINGER:  Thank you.

15          THE COURT:  Let's go off the record.

16          (Recess.)

17          THE COURT:  All right, gentlemen.  Let's go back on

18   the record.

19          Have we identified the Xbox One, and can we clarify

20   on the record what the proper exhibit number is and where

21   the device is?

22          MR. BETTINGER:  For the Xbox One, Your Honor, we

23   have.  There are two exhibits --

24          THE COURT:  Just a minute.  The Xbox One in your

25   hand, what's the exhibit number on that, Mr. Bettinger?

1          MR. BETTINGER:  DX-659 and DX-903.

2          THE COURT:  All right.  And they're represented by

3    that one box that you have there?

4          MR. BETTINGER:  Yes, Your Honor.

5          THE COURT:  That's the console and the Kinect?

6          MR. BETTINGER:  Yes, it is, Your Honor.

7          THE COURT:  And that's the same packaging it would

8    be purchased as -- or purchased in a retail setting?

9          MR. BETTINGER:  That's my understanding, Your

10   Honor.

11         THE COURT:  All right.  Does Defendant have --

12   excuse me, does Plaintiff have any objection to that box

13   representing DX-659 and DX-903 being delivered to the jury

14   in response to this Note No. 2?

15         MR. DE VRIES:  No, we do not, Your Honor.

16         THE COURT:  All right.  Then if you will, Mr.

17   Bettinger, put the box on the table in front of the court --

18   courtroom deputy.

19         Now, let's go back to the next item.  The Kinect is

20   included in that box and is included in these two exhibits?

21   That's -- the box contains both the console and the Kinect?

22         MR. BETTINGER:  Yes, it does, Your Honor.

23         THE COURT:  So that covers the second item on their

24   list.

25         MR. BETTINGER:  Yes, Your Honor.

```
 1            THE COURT:  Plaintiff have any objection to that?

 2            MR. DE VRIES:  No, Your Honor.

 3            THE COURT:  All right.  What about the Biscotti

 4   device?

 5            MR. DE VRIES:  The Biscotti device is PTX-1226.

 6   The remote control is PTX-1229.  And these are admitted

 7   exhibits that were testified about during Dr. Shoemake's

 8   examination.

 9            THE COURT:  All right.  How are they packaged, Mr.

10   De Vries?

11            MR. DE VRIES:  The remote control is -- has been

12   marked separately as PTX-1229.  PTX-1226 is a box.  Within

13   the box is a device that's packaged in some kind of a --

14   foam I'd describe it as.

15            THE COURT:  That's the same packaging in which it

16   would be received from a retail purchaser?

17            MR. DE VRIES:  That's my understanding.

18            THE COURT:  Okay.  Is there objection to PTX-1229,

19   and 1 -- PX- -- PTX-1226?

20            MR. BETTINGER:  Yes, there is, Your Honor.

21            THE COURT:  What's the objection?

22            MR. BETTINGER:  There's a patent label on the

23   outside of the box marked "patent label," and we have plenty

24   of other Biscottis available where that isn't the case.  So

25   we don't object to --
```

1          THE COURT:  And that label is not a part of the

2  original packaging as made available during retail purchase;

3  is that the case, Mr. De Vries?

4          MR. DE VRIES:  So the -- so the answer is this is

5  the actual admitted exhibit with the actual box.  My

6  understanding is that this label was affixed at some point

7  on actual devices that were sold.  I don't know that I have

8  more detail about exactly when that occurred.

9          THE COURT:  Well, we have the president of the

10  company here.

11          Dr. Shoemake, does the box, as delivered to

12  consumers have that label on the outside of it that we're

13  talking about it?

14          DR. SHOEMAKE:  It does today, Your Honor.  Yes, it

15  does.

16          THE COURT:  So what you're telling me is the box,

17  as you're holding in your hand, represented by these PTX

18  numbers, is the same box as would be sent to me if a bought

19  a Biscotti today?

20          DR. SHOEMAKE:  Yes, sir.  If you went to our

21  website, our operations team puts a label on that's similar

22  to this.

23          THE COURT:  All right.  Then the objection of the

24  Defendant's overruled, and that device -- those two PTX

25  numbers, they need to be placed on the table with the Xbox.

1          MR. BETTINGER:  Your Honor, would it be all right

2   to put also the box that doesn't have the patent number

3   which is the one we have?  It's the same product inside.

4   Have the jurors have that one, as well, because there's a

5   dispute about this.  The product as originally sold,

6   everybody agrees, did not have patent numbers.

7          MR. DE VRIES:  Your Honor, if I may respond

8   briefly.  They've had every opportunity to come and put

9   whatever evidence they wanted to put in front the witness so

10  we could cross-examine about this issue.

11         THE COURT:  All right.  Here's what we're going to

12  do.  Take the devices out of the boxes.  Leave the boxes in

13  the courtroom.  And I'll have the CSO deliver the devices

14  only without the packaging to the jury.

15         MR. BETTINGER:  Thank you, Your Honor.

16         THE COURT:  Go ahead and take the console and the

17  Kinect out of the green box.

18

19         Do we have a -- do we have an empty box, Mr.

20  Johnston somewhere in the courtroom?

21         MR. CEDEROTH:  Your Honor --

22         THE COURT:  All right.  Let's put everything in the

23  brown empty box.

24         MR. BETTINGER:  See me do it.

25         THE COURT:  Put it in the box, counsel.

1          MR. DE VRIES:  I'll put the box over here on the

2     other side.

3          THE COURT:  All right.  Let's put the console in.

4          MR. DE VRIES:  Make sure it doesn't get crushed.

5          THE COURT:  All right.  And we're not going to

6     argue about whose exhibit was on the top and whose was on

7     the bottom, as long as they're all in the box.

8          MR. DE VRIES:  Yes, Your Honor.

9          THE COURT:  All right.  Have a seat, counsel.

10          Can I confirm for the record between the parties

11     that the items placed in the unmarked brown box that's going

12     to be delivered to the jury are DX-659, DX-903, PX-1226 and

13     PX-1229?

14          MR. DE VRIES:  Yes, Your Honor.  I'm sorry that I'm

15     standing right here.  My -- Dr. Shoemake is affirming that

16     there is a power cord that is underneath this --

17          THE COURT:  Put the power cord in the box.

18          MR. DE VRIES:  Yes, Your Honor.  And I will not

19     include the setup guide or this documentation.  There's

20     another small box, Your Honor, that contains --

21          THE COURT:  Take -- take the power cord of out of

22     the box and put the power cord in the brown box.  Just the

23     actual components themselves without packaging instructions

24     or any other material go in the brown box.

25          All right.

1           MR. BETTINGER:  Sure.

2           THE COURT:  All right.  Does either side believe

3    that the box does not contain the items requested by the

4    jury?

5           Plaintiff, what's your position?

6           MR. DE VRIES:  No, Your Honor, we agree.

7           MR. BETTINGER:  We agree, we do not believe --

8           THE COURT:  All right.  Then in compliance with the

9    request by the jury in Note No. 2, which I'm handing Note

10   No. 2 to the courtroom deputy at this time -- Mr. Johnston,

11   take the brown box to the jury.

12          Having heard all the evidence with regard to the

13   issue of inequitable conduct, the jury having been directed

14   to retire and deliberate on its verdict, which it is now

15   doing, we stand in recess awaiting either another note from

16   the jury or a verdict.

17          MR. BETTINGER:  Thank you, Your Honor.

18          COURT SECURITY OFFICER:  All rise.

19          (Recess.)

20          (Jury out.)

21          COURT SECURITY OFFICER:  All rise.

22          THE COURT:  Be seated, please.

23          We've received a third note from the jury.

24          I'll mark it as Item 3 for identification.  After

25   I've read it, I'll deliver it to the courtroom deputy.

1           It reads as follows:  If Xbox One and Kinect and TV

2    are in the off mode and a phone call comes in, does the

3    phone call automatically turn on all three devices?

4           I'll hand the question to the courtroom deputy.

5           And, counsel, if somebody from each side will

6    approach, I've got printed copies of what I believe the

7    proper response should be.  I want to give you copies, and

8    then I'll go over it with you.

9           I think I have three per side.

10          MR. ALPER:  Thank you.

11          MR. BETTINGER:  Thank you.

12          THE COURT:  This is the -- this is the Court's

13   proposed response to the jury to that question:

14          Members of the jury, in response to your most

15   recent question regarding whether an incoming phone call

16   would automatically turn on certain devices, the Court

17   cannot provide you with any information or input beyond what

18   was received by you during the course of the trial.  This is

19   why I cannot directly answer the question you have sent me.

20   Accordingly, I refer you to all the evidence produced during

21   the trial for your further consideration in this regard.

22          Does Plaintiff have any objection to that response?

23          MR. ALPER:  No, Your Honor.

24          THE COURT:  Does Defendant?

25          MR. BETTINGER:  No, Your Honor.

```
 1              THE COURT:  Then I'll sign a copy of that.  I'll
 2   hand it to the courtroom -- Court Security Officer, rather,
 3   and direct him to deliver it to the jury.
 4              And I'll hand a duplicate signed copy to the
 5   courtroom deputy for the Court's file.
 6              And with that, counsel, pending another note or
 7   verdict, we stand in recess.
 8              And, counsel, you're certainly welcome to wait in
 9   your respective locations where you've been.  You're also
10   welcome, should you choose to, to wait here in the
11   courtroom.  If you're not here and we need you, we will call
12   you.  But feel free to stay or return to where you've been.
13   It's up to you.
14              We stand in recess.
15              COURT SECURITY OFFICER:  All rise.
16              (Recess.)
17              (Jury out.)
18              COURT SECURITY OFFICER:  All rise.
19              THE COURT:  Be seated, please.
20              Counsel, we've received a fourth note from the
21   jury.  And in this particular case, I have Xeroxed it, and
22   if one person from each side will approach, I've got two
23   copies for each side so you can look at it with me.
24              I'm going to mark my copy as No. 4 for
25   identification.
```

```
 1              MR. BETTINGER:  Thank you.
 2              THE COURT:  The jury is requesting a list of
 3   exhibits.  I think you can read the exhibits that they're
 4   requesting.  I note that two of these exhibits appear to be
 5   the same number.
 6              My reading of the note is that the jury is
 7   requesting and their note says:  May we have copies of
 8   exhibits PTX-265, PTX-875, PTX-917, PTX-884, PTX-218,
 9   PTX-875, and that's a duplication, apparently, PTX-228,
10   PTX-916 and PTX-999.
11              Does anybody read that list differently than I do?
12              MR. DE VRIES:  No, Your Honor.
13              MR. BETTINGER:  No, Your Honor, we agree.
14              THE COURT:  All right.  I have directed the
15   courtroom deputy to pull the files corresponding to these
16   eight exhibits.  There are nine listed, but PTX-875 is
17   listed twice.
18              Is there any objection to the Court directing the
19   Court Security Officer to deliver those eight exhibits to
20   the jury in the jury room?
21              MR. DE VRIES:  No objection, Your Honor.
22              MR. BETTINGER:  No objection.
23              THE COURT:  All right.  Mr. Johnston, if you'll
24   approach, the courtroom deputy will hand you these eight
25   files, and I'm directing that you deliver them to the jury
```

1   in the jury room.

2           And I will hand the fourth jury note to the

3   courtroom deputy for inclusion in the papers of this case.

4           It's obvious, counsel, that the jury is working

5   diligently on trying to reach decisions.  They've been out

6   since about perhaps slightly before 11:00 a.m. I'm not

7   prepared to give them an Allen charge or do anything at this

8   point, but by the same token, I'm not prepared to stay up

9   here late on a Friday evening, nor do I expect they probably

10  are.

11          I intend to monitor the situation for at least the

12  next hour and see if we get either further notes or a

13  verdict from the jury.  If we don't, I'll consult with you

14  at that time as to what's the appropriate thing to do.

15          But in the meantime, awaiting either another note

16  or a verdict, we stand in recess.

17          COURT SECURITY OFFICER:  All rise.

18          (Recess.)

19          (Jury out.)

20          COURT SECURITY OFFICER:  All rise.

21          THE COURT:  Be seated, please.

22          Counsel, we received the following message from the

23  jury, quote, we have a verdict.  Signed by Lucinda Trahan,

24  who apparently is our foreperson.  She was Juror No. 1.

25  It's dated today's date.  I'll hand this note to the

147

1    courtroom deputy to be included in the papers of this case.

2          And I'll direct that the Court Security Officer

3    bring in the jury.

4          COURT SECURITY OFFICER:  All rise for the jury.

5          (Jury in.)

6          THE COURT:  Please be seated, ladies and gentlemen.

7          Ms. Trahan, it's my understanding that you're the

8    foreperson of the jury; is that correct?

9          THE FOREPERSON:  That is correct, Your Honor.

10         THE COURT:  Has the jury reached a verdict?

11         THE FOREPERSON:  Yes, Your Honor.

12         THE COURT:  Would you hand the signed and dated

13   verdict form to the Court Security Officer who will bring it

14   to me?

15         Ladies and gentlemen, I'm going to announce the

16   verdict into the record at this time.  I'd like to ask each

17   member of the jury to listen very carefully as I do that,

18   because after I have announced the record -- the verdict,

19   rather, publically, I'm going to ask each of you if this is

20   your verdict so that we can confirm on the record that it

21   is, in fact, the unanimous verdict of all eight members of

22   the jury.

23         Turning to the verdict form and turning to Question

24   1 located on Page 2:  Did Biscotti prove by a preponderance

25   of the evidence that Microsoft has directly or indirectly

1  infringed any of the asserted claims of the '182 patent?

2       The answer is no.

3       Turning to Page 3 where Question 2 is located:

4  Answer the following question only if you have answered yes

5  to Question 1.  Question 2 is left blank, as instructed, and

6  is not answered.

7       Turning to Page 4 of the verdict form where

8  Question 3 is located, as follows:  Did Microsoft prove by

9  clear and convincing evidence that any of the following

10 claims of the '182 patent are invalid as anticipated or

11 obvious in view of the prior art?

12      The following answers are reflected in the jury's

13 verdict:

14      Claim 12:  The answer is yes.

15      Claim 13:  Yes.

16      Claim 23:  Yes.

17      Claim 27:  Yes.

18      Claim 28:  Yes.

19      Claim 35:  Yes.

20      Claim 86:  Yes.

21      Turning to Question 4, answer the following

22 question only if you have answered yes to Question 1 and no

23 for at least one of the claims specified in Question 3.

24      As instructed, Question 4 is left blank and is not

25 answered.

149

1          Turning to the last page of the verdict form, I

2   find that it is signed by Ms. Trahan as the jury foreperson,

3   and it's properly and correctly dated with today's date,

4   June the 9th, 2017.

5          Ladies and gentlemen of the jury, I'm going to now

6   poll you to make sure that this, in fact, is your unanimous

7   verdict as I have announced it and read it.  If this is your

8   verdict as I have read it, would you please stand at this

9   time.

10          (Jury polled.)

11          Thank you, ladies and gentlemen.  Please have a

12   seat.

13          Let the record reflect that all eight members of

14   the jury immediately rose and stood in response to the

15   Court's question to poll the jury, and the Court does find

16   that the verdict announced is the unanimous verdict of all

17   eight members of the jury.

18          I'll now hand the verdict form in this case to the

19   courtroom deputy to be included in the papers of this case.

20          Ladies and gentlemen, this now finishes the trial

21   in this case.  From the very beginning, I've repeatedly

22   instructed you about not discussing this case with anyone

23   and not discussing it among yourselves until you have heard

24   all the evidence and until you retired to deliberate on your

25   verdict.

1            I'm now releasing you from that obligation, and I'm

2      now releasing you from your position as jurors in this case.

3            You are now free to discuss this case with anyone

4      you'd like to in any way you'd like to talk about it.  By

5      the same token, you are also free not to discuss this case

6      with anyone you don't want to discuss it with.

7            Now, I do want to make one thing clear to you, the

8      practice and tradition in this court, and it's been this way

9      for at least the last 35 years since I started practicing in

10     this area, is that the lawyers and the parties are not

11     permitted after the jury is discharged and after they leave

12     the jury room, the parties and the lawyers are not permitted

13     to come up to you and initiate a conversation about your

14     jury service.

15           But I can tell you from past experience, because

16     I've done it when I was in practice, they will position

17     themselves between here and the parking lot so that you will

18     have an opportunity to talk with them if you want to.

19     Whether it's on the front steps or the sidewalk, you will

20     see them as you leave.  And if you want to talk to them,

21     they'll be more than happy for you to stop and initiate a

22     conversation with them.

23           By the same token, if you would prefer not to

24     discuss your service in the case with them, you're

25     absolutely under no obligation to do so, and you can simply

1  walk right by, and they will not stop you, and they will not

2  initiate a conversation with you.  The decision is yours,

3  and the decision is yours alone.

4         But I want you to understand with regard to the

5  lawyers and the representatives in the case -- of the

6  parties, you have to initiate a conversation with them if

7  you want to talk about it as you leave the courthouse today.

8  But with regard to everyone else, anyone else you've told

9  during the course of this trial, as I instructed you to, I

10  can't talk about that, the judge told me not to discuss it,

11  if you'd like to, you're perfectly free to discuss it with

12  anyone of your choosing any way you'd like to.  You're also

13  under no obligation to discuss your jury service with

14  anyone.  Again, ladies and gentlemen, that decision is yours

15  and yours alone.

16         I want you all to understand that you've provided

17  for the Court and you've performed very important public

18  service by being the jury in this case.  Our national court

19  system, the third branch of our federal government could not

20  operate and would not function as it's supposed to without

21  ordinary citizens like each of you all serving as jurors

22  when you're summonsed and called upon to do that.  You've

23  each performed very real and very important public service.

24  And the Court thanks you, the members of the Court staff

25  join me in thanking you, and I am confident I speak for the

1  lawyers and the parties on both sides of this case that we

2  thank you and appreciate what you've done.

3        I want to ask a small favor of you, and I do this

4  with every jury once I've received and accepted a verdict.

5  I discharged you as jurors, and you're now free to leave at

6  any time.  I know it's been a long week, I know it's

7  Friday -- I would say afternoon, it's soon to be Friday

8  evening.  But I'm going to ask you as a favor to me if you

9  will retire to the jury room for just a couple minutes and

10 allow me to come off the bench and come into the jury room,

11 I'd like to shake each one of your hands, and I'd like to

12 tell you face-to-face and in person how much the Court

13 appreciates your service as jurors in this case.

14        I promise you, I won't take more than a couple

15 minutes, and then you'll be on your way to return to your

16 homes wherever you'd like to go.  And you're not obligated

17 to do that.  If you want to leave immediately, you're free

18 to do that.  But as a -- as a favor and as a privilege to

19 me, I'd like you to give me that opportunity because I

20 believe it's warranted, I believe your work over the course

21 of this week as the jury in this case deserves it, and if

22 you would give me just a few minute -- a few minutes of your

23 personal time, I would like to do that before you leave the

24 building.

25        With that, ladies and gentlemen, the trial of this

1  case is concluded.  The verdict has been accepted.

2          Counsel, you are excused.

3          COURT SECURITY OFFICER:  All rise for the jury.

4          (Jury out.)

154

# CERTIFICATION

I HEREBY CERTIFY that the foregoing is a true and correct transcript from the stenographic notes of the proceedings in the above-entitled matter to the best of my ability.


 /S/ Shelly Holmes                     6/10/17
SHELLY HOLMES, CSR-TCRR                 Date
OFFICIAL REPORTER
State of Texas No.: 7804
Expiration Date: 12/31/18