**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION**

| | | |
|---|---|---|
| BISCOTTI INC., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | **CIVIL ACTION NO. 2:13-CV-01015-JRG** |
| | § | |
| MICROSOFT CORPORATION, | § | |
| | § | |
| Defendant. | § | |
| | § | |

## MEMORANDUM OPINION AND ORDER

Before the Court is Plaintiff Biscotti, Inc.'s ("Biscotti") Motion for Judgment as a Matter

of Law and New Trial (the "Motion") (Dkt. No. 318). Having considered the Motion, and for the

reasons set forth herein, the Court concludes that the Motion should be and hereby is **DENIED**.

## I.    Background

### A.  The Asserted Patent

Biscotti accuses Microsoft Corporation ("Microsoft") of infringing claims 12, 13, 23, 27,

28, 35, and 86 (the "Asserted Claims") of U.S. Patent No. 8,144,182 (the "'182 Patent" or the

"Asserted Patent"). (Dkt No. 318 at 6.) The '182 Patent is titled "Real Time video

Communications System" and it covers systems and methods for video calling. (PTX-1.)

## B. Procedural History

Biscotti originally filed this case on November 26, 2013, asserting infringement of several claims of the '182 Patent. (Dkt. No. 1.)

### 1. *Inter Partes* Review ("IPR") Proceedings

On September 6, 2014, Microsoft filed three petitions for *inter partes* review ("IPR") challenging 53 claims of the '182 Patent, including all of the claims which had been asserted by Biscotti in its Complaint. (Dkt. No. 88 at 1; Dkt. No. 98 at 1–2.) At this point, the Parties jointly moved to stay this case pending resolution of the IPRs. (Dkt. No. 88.) The Court agreed and stayed the case. (Dkt. No. 89.)

On March 19, 2015, the Patent Trial and Appeal Board ("PTAB") instituted IPR proceedings on claims 6, 7, 12, 17–26, 28, 29, 31, 36, 37, 38, 39, 41, 42, 44, 45, 50, 52, 53, 69–71, and 74 and declined to institute on claims 1, 4–5, 8, 13–16, 27, 32–35, 40, 46, 72–73 and 82–86. (Dkt. No. 98 at 1–2.) Microsoft then filed a second round of IPR petitions challenging the claims on which the PTAB had declined to institute in the first round of IPRs. (*Id.*) The PTAB again denied institution on these claims. (*Id.* at 2.)

On March 17, 2016, the PTAB issued Final Written Decisions upholding the patentability of each challenged claim on which IPRs had been instituted. (*Id.*)

### 2. Subsequent District Court Litigation

On August 22, 2016, the Court lifted the stay, set the case for trial, and referred it to Magistrate Judge Roy S. Payne for pretrial proceedings. (Dkt. No. 101.) The Parties then engaged in extensive motion practice.

The Court held a jury trial from June 5–9, 2017. After the jury retired to deliberate and outside of their presence, the Court conducted a bench trial as to Microsoft's inequitable conduct defense. (Dkt. No. 294 at 96:1–135:20.)

Ultimately, the jury found that Microsoft did not infringe any of the Asserted Claims. (Dkt. No. 276 at 2.) The jury also found all of the Asserted Claims to be "anticipated or obvious." (*Id.* at 4.) Further, the Court rejected Microsoft's inequitable conduct defense. (Dkt. No. 310.)

### 3. Post-Trial Motions

On October 3, 2017, the Court entered its Final Judgment in accordance with the jury's verdict. (Dkt. No. 311.) Biscotti then timely filed the instant Motion seeking either entry of judgment as a matter of law to obviate the jury's verdict or, alternatively, granting of a new trial. (Dkt. No. 318.)

## II. Legal Standard

After a jury trial on the merits, a party may file a motion for judgment as a matter of law or in the alternative for a new trial. Fed. R. Civ. P. 50(b).

### A. Judgment as a Matter of Law

"A motion for judgment as a matter of law [under Rule 50(b)] is a challenge to the legal sufficiency of the evidence supporting the jury's verdict." *Erfindergemeinschaft UroPep GbR v. Eli Lilly & Co.*, 276 F. Supp. 3d 629, 643 (E.D. Tex. 2017) ("UroPep") (Bryson, J., sitting by designation). Entry of judgment as a matter of law is therefore only appropriate when "there is no legally sufficient evidentiary basis for a reasonable jury to find as the jury did." *Guile v. United States*, 422 F.3d 221, 225 (5th Cir. 2005); *see also Baisden v. I'm Ready Prods., Inc.*, 693 F.3d 491, 498 (5th Cir. 2012) ("A district court *must* deny a motion for judgment as a matter of law unless the facts and inferences point so strongly and overwhelmingly in the movant's favor that

reasonable jurors could not reach a contrary conclusion." (emphasis added, internal quotation marks removed)).[1]

"In evaluating a motion for judgment as a matter of law, a court must 'draw all reasonable inferences in the light most favorable to the verdict.'" *Metaswitch Networks Ltd. v. Genband US LLC*, No. 2:14-CV-00744-JRG, 2017 WL 3704760, at *2 (E.D. Tex. Aug. 28, 2017) (quoting *E.E.O.C. v. Boh Bros. Const. Co., L.L.C.*, 731 F.3d 444, 451 (5th Cir. 2013)). Courts must also avoid the temptation of revisiting credibility determinations or reweighing evidence. *Id.* Such determinations are, appropriately, left to the jury. *Montano v. Orange Cty., Texas*, 842 F.3d 865, 874 (5th Cir. 2016) ("[I]t is for the jury alone to judge the credibility of witnesses and weigh the evidence.").

### B. <u>Motion for a New Trial</u>

A motion for a new trial under Rule 50(b) is essentially an invocation of Rule 59, which provides that a new trial may be granted on all or part of the issues on which there has been a trial by jury for "any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. P. 59(a). Notwithstanding the broad sweep of Rule 59, "courts do not grant new trials unless it is reasonably clear that prejudicial error has crept into the record or that substantial justice has not been done, and the burden of showing harmful error rests on the party seeking the new trial." *Metaswitch*, No. 2:14-CV-00744-JRG, 2017 WL 3704760, at *2; *UroPep*, 276 F. Supp. 3d at 643. "A new trial may be granted, for example, if the district court finds the verdict is against the weight of the evidence, the damages awarded are excessive, the trial was unfair, or prejudicial error was committed in its course." *Smith v. Transworld Drilling Co.*, 773

---

[1] *See also Finisar Corp. v. DirectTV Group, Inc.*, 523 F.3d 1323, 1332 (Fed. Cir. 2008) ("The grant or denial of a motion for judgment as a matter of law is a procedural issue not unique to patent law, reviewed under the law of the regional circuit in which the appeal from the district court would usually lie.").

F.2d 610, 612–13 (5th Cir. 1985); *see also Laxton v. Gap Inc.*, 333 F.3d 572, 586 (5th Cir. 2003) ("A new trial is warranted if the evidence is against the great, and not merely the greater, weight of the evidence.").[2]

## III. Discussion

### A. Infringement

At trial, Microsoft raised three non-infringement arguments. Biscotti now moves for judgment as a matter of law on the basis that no reasonable jury could have credited these non-infringement theories.

#### 1. Instructions for controlling

Claim 6, from which all the Asserted Claims depend, recites a "first video communication device" including "a storage medium . . . having encoded thereon a set of instructions executable by the at least one processor." (PTX-1 at 32:62–33:25.) These "instructions" further comprise "instructions for controlling the video capture device to capture a captured video stream" and "instructions for controlling the audio capture device to capture a captured audio stream." (*Id.*)

At trial, Microsoft argued that it did not infringe the '182 Patent in part because the "at least one processor" and "storage medium" located on the Xbox One[3] do not contain instructions for controlling the audio and video capture devices located on the Kinect. (*See, e.g.,* Dkt. No. 288, 6/6/17 P.M. Trial Tr. at 17:6–18:25; Dkt. No. 294, 6/9/17 Trial Tr. at 71:1–75:22.) Instead, Microsoft argued that the instructions for controlling the audio and video capture devices on the Kinect were located on the Kinect's own processor. (*Id.*)

---

[2] *See also Z4 Techs., Inc. v. Microsoft Corp.*, 507 F.3d 1340, 1347 (Fed. Cir. 2007) (regional circuit law controls the decision to grant a new trial under Rule 50(b) and Rule 59).

[3] Specifically, Biscotti pointed to the CPU and GPU of the Xbox One as "the at least one processor" and the hard drive/flash memory of the Xbox One as the "storage medium." (Dkt. No. 287, 6/6/17 A.M. Trial Tr. at 54:3–11, 68:3–9, 69:15–24.)

Biscotti now argues that no reasonable jury could have found for Microsoft on infringement because the Xbox One processor *does* include instructions for controlling the audio and video capture devices in the Kinect. In particular, Biscotti relies on several statements by Microsoft's witnesses that the Xbox One sends instructions to the Kinect Sensor that cause the Kinect to start and stop recording. (Dkt. No. 318 at 24–25.) Biscotti maintains that Microsoft "never denied the existence of these instructions or explained why they do not [satisfy] the claims." (*Id.* at 25.)

Microsoft responds by pointing to the testimony of Plaintiff's infringement expert, Dr. Wicker, who explained at trial that "the Kinect device . . . actually do[es] the video capture." (Dkt. No. 287, 6/6/17 A.M. Trial Tr. at 74:6–13.) According to Microsoft, the jury could have reasonably concluded based on this testimony that the instructions on the Xbox One signaling the Kinect's audio and video capture devices to turn on/off are neither "instructions for controlling the video capture device to capture a captured video stream" nor "instructions for controlling the audio capture device to capture a captured audio stream." (Dkt. No. 322 at 6–7.)

Whether the instructions on the Xbox One actually control audio and video recording by the Kinect was a factual dispute the jury resolved in favor of Microsoft. To overcome this, Biscotti needs to demonstrate that the way the jury resolved this dispute was unreasonable. It has not. Biscotti's own expert admitted the instructions that "actually" control audio and video capture by the Kinect are found in the Kinect and not, as Biscotti argued, in the Xbox One. (Dkt. No. 287, 6/6/17 A.M. Trial Tr. at 74:6–13.) Based upon that alone, a reasonable jury could have concluded that "the at least one processor" and "storage medium" identified by Biscotti do not include "instructions for controlling the video capture device to capture a captured video stream" or "instructions for controlling the audio capture device to capture a captured audio stream."

Biscotti attempts to sidestep the jury's verdict by raising, for the first time, a new claim construction dispute regarding the meaning of "instructions for controlling." However, "[i]t is too late at the JMOL stage to argue for or adopt a new and more detailed interpretation of the claim language and test the jury verdict by that new and more detailed interpretation." *Wi-Lan, Inc. v. Apple, Inc.*, 811 F.3d 455, 465 (Fed. Cir. 2016) (internal brackets removed). Given that neither party sought more specific constructions for these limitations, the question now is whether the plain and ordinary meaning, combined with the evidence, supports a finding of non-infringement. *Id.* (reversing a district court for providing new post-trial constructions in ruling on a JMOL and concluding that "[w]hen tested by the [original] construction the court provided, it was reasonable for the jury to conclude that the 'first computing means' need not include the complex multiplier"). In this case, it does. For example, the jury could have concluded that merely providing instructions to turn the Kinect's audio/video capture devices on and off is not equivalent to "controlling the video capture device *to capture a captured video stream*" or "controlling the audio capture device *to capture a captured audio stream*" as required by Claim 6. (PTX-1 at 32:62–33:25 (emphasis added).)

Biscotti also argues that even if the processor on the Xbox One does not include the required instructions for controlling the audio/video capture devices on the Kinect, this is irrelevant because the Xbox One and Kinect are part of the same "video communication device." (Dkt. No. 318 at 24–26.) According to Biscotti, the Kinect processor, the Xbox One processor, and the Kinect's audio/video capture devices taken together still infringe. (*Id.*)

In response, Microsoft argues that even if the Xbox One and Kinect are part of the same "video communication device," Claim 6 of the '182 Patent still "requires that a set of instructions

for various capabilities all be stored on *one* storage medium and executed by *one* processor." (Dkt. No. 322 at 8.)

Biscotti replies that Claim 6 does not require a single processor or a single storage medium. (Dkt. No. 324 at 9–10.)    In particular, Biscotti argues that "[t]he ['182] patent explicitly contemplates embodiments with multiple processors and memories."  (*Id.* at 10.)  Thus, Biscotti accuses Microsoft of seeking an untimely and unsupportable construction of the '182 Patent.  (*Id.*) Of course, Microsoft in turn accuses Biscotti of seeking the same thing.  (Dkt. No. 322 at 8.)

Given that neither party sought a construction of "a storage medium" or "the at least one processor" before trial, the Court will not provide a new construction now.  *Wi-Lan*, 811 F.3d at 465.  Instead, the Court considers whether a reasonable jury could have found no infringement based on the evidence presented at trial and the claims themselves.  At trial, Biscotti's expert, Dr. Wicker, testified that the "at least one processor" and "storage medium" limitations were satisfied by a particular processor and a particular storage medium in the Xbox One, not a combination of various processors and storage mediums.  (Dkt. No. 287, 6/6/17 A.M. Trial Tr. at 54:3–11, 68:3–9, 69:15–24.)  A reasonable jury could have therefore concluded that to find infringement the instructions had to be contained on the processor and the storage medium about which Dr. Wicker testified.  This conclusion is consistent with the claims, which refer, as Dr. Wicker did, to a particular storage medium and a particular processor rather than various processors and storage mediums in separate computer systems.[4]  This conclusion is also consistent with the evidence, as explained above.

---

[4] Biscotti has also previously made representations that are consistent with how Dr. Wicker testified at trial.  As an example, during the intervening IPRs in this case, Biscotti expressly distinguished a prior art reference because the reference "disclose[d] that only a 'subset' of the instructions may be encoded on a given memory medium . . . and that separate computer systems with separate memory media can provide instructions to each other."  *Microsoft Corp. v. Biscotti Inc.*, IPR2014-01457, Paper 25 at 21 (PTAB June 9, 2015).  This statement, combined with testimony from Dr. Orchard that the Xbox One and Kinect have separate processors with separate instructions written in different languages, further supports the jury's verdict.  *See Aylus Networks, Inc. v. Apple Inc.*, 856 F.3d 1353, 1359–61 (Fed.

## 2.   **Instructions for encoding the captured video stream**

The Asserted Claims also require the storage medium to include, and the "at least one processor" to be able to execute, "instructions for encoding the captured video stream and the captured audio stream to produce a series of data packets."  (PTX-1 at 33:15–17.)

At trial, Microsoft argued that the processor on the Xbox One did not satisfy this limitation because it does not encode the video stream actually captured by the Kinect.  (Dkt. No. 322 at 9.) According to Dr. Orchard, Microsoft's expert, the original video stream captured by the Kinect is altered by the Kinect before it is encoded by the XboxOne.  (Dkt. No. 288, 6/7/17 P.M. Trial Tr. at 119:13–120:4.)  At this point, the newly encoded video is not the same as the original captured video.  (*Id.* at 128:21–132:20 ("[Y]ou would not say – you cannot say that you are encoding the captured video stream . . . ."); Dkt. No. 322 at 9 ("[T]he 'captured video stream' obtained by the Kinect camera is *not* the video stream (or even the same content) that the Xbox One console receives . . . [a]ny *subsequent* encoding by the Xbox One itself therefore is not 'encoding the captured video stream.'").)

Biscotti argues that nothing in the language of Claim 6 requires the "captured video stream" to not have been previously processed when it is encoded by the "at least one processor."  (Dkt. No. 318 at 27–28.)  Biscotti further argues that Claim 6 cannot include such a requirement because Claim 50, which depends from Claim 6, recites "wherein the instructions for encoding the captured video stream comprise instructions for processing the captured video stream prior to encoding the captured video stream."  (*Id.*)  According to Biscotti, this means that Claim 6 is still infringed even

---

Cir. 2017) (cautioning against allowing patent owners to "argue[] one way in order to maintain their patentability and in a different way against accused infringers"); *In re Katz Interactive Call Processing Patent Litig.*, 639 F.3d 1303, 1324–25 (Fed. Cir. 2011) (finding no error where claim construction relied on arguments made during reexamination to avoid prior art).

if the raw video captured by the Kinect is encoded or processed before it is subsequently encoded by the Xbox One processor. (*Id.*)

Microsoft responds that Biscotti's argument improperly raises a claim construction dispute, for the first time, regarding what "captured video stream" encompasses. (Dkt. No. 322 at 10–11.) As to Claim 50, Microsoft responds that Claim 50 is irrelevant because the processing prior to encoding mentioned in Claim 50 is part of the same set of instructions on the same processor that does the encoding. (*Id.*) By contrast, according to Microsoft, the prior encoding and subsequent encoding in the Xbox One and Kinect happen on separate processors and as part of separate sets of instructions. (*Id.*)

As with several other issues in this case, the dispute here turns, at least in part, on competing constructions for a term that neither party sought to have construed prior to trial. The Court therefore considers whether the plain and ordinary meaning, combined with the evidence, supports a finding of non-infringement. *Wi-Lan*, 811 F.3d at 465. It does. Claim 6 requires the instructions on the storage medium to relate to "encoding the captured video stream." (PTX-1 at 33:18–19.) Dr. Wicker acknowledged that because of the encoding that takes place on the Kinect, the video stream that is captured by the Kinect is not the same as the video stream encoded by the Xbox One. (Dkt. No. 288, 6/6/17 P.M. Trial Tr. at 43:1–7 ("Q. But the trade-off in an MJPEG is when you compress it down, it's small, but when you go to open it back up, it's not going to be the same thing because you've lost certain of your pixels; is that fair? A. Yes. When you – by allowing for a little loss, you can compress a lot more. And what you get back is slightly different. That's the price you pay.").) From this testimony, and the evidence generally, a reasonable jury could have concluded that the Xbox One processor does not include instructions for encoding "the captured video stream" that is captured by the Kinect. Moreover, even if "the captured video stream" refers

to a previously encoded or processed stream, a reasonable jury could have concluded that the extent of processing in this case means that the two streams are not the same, as Dr. Wicker admitted, or even sufficiently similar.[5]

### 3. Instructions for transmitting

The Asserted Claims require the storage medium to include, and the "at least one processor" to be able to execute, "instructions for transmitting the series of data packets . . . for reception by a second video communication device." (PTX-1 at 33:24–26.)

Prior to trial, but after the claim construction phase of this case, the Parties disputed whether the "instructions for transmitting" limitation meant that the data packets transmitted by the first communication device needed to include some specific reference to a second communication device. (Dkt. No. 228 at 9–11.) Biscotti argued that a specific reference was not necessary and that the claims could be infringed so long as the first communication device sent data that ended up on the second communication device. (*Id.* at 10.) By contrast, Microsoft argued that the instructions must reference a specific second communication device. (*Id.* at 9–10.) Ultimately, the Court agreed with Microsoft, at least in part, by construing the "instructions for transmitting" limitation to require "some reference to a second video communication device." (*Id.* at 11; *see also* Dkt. No. 260.)

At trial, Microsoft argued that, at least with respect to Twitch and Beam,[6] the Xbox One does not include "instructions for transmitting . . . for reception by a second video communication device." (Dkt. No. 322 at 12.) Instead, the Xbox One transmits packets to external servers,

---

[5] Microsoft argues that Biscotti waived any challenge to the jury's finding of non-infringement as to the encoding step because it was not raised in sufficient detail in Biscotti's Rule 50(a) motion. The Court disagrees, but finds the argument itself unavailing.

[6] Twitch and Beam are third-party video streaming applications that can be used on an Xbox One. (*See also* Dkt. No. 228 at 2–3 (providing an overview).)

managed by Twitch and Beam, rather than a second video communication device. (*Id.*) According to Microsoft, it is the servers maintained by Twitch and Beam, not the Xbox One, that include the instructions for transmitting to the receiving second video communication device. (*Id.*) In particular, Microsoft focused on the fact that the data packets sent from the Xbox One are subsequently modified by Twitch and Beam servers, which add a new IP address (for the receiving second video communication device) along with other modifications to optimize for streaming to different device types, connection types, etc. (*Id.* at 12–15.)

In its Motion, Biscotti argues that Microsoft's non-infringement positions are premised on a flawed reading of the relevant "instructions for transmitting" limitation. In particular, Biscotti argues that the '182 Patent specifically describes how transmitting from a first video communication device to a second may involve intermediate servers. (Dkt. No. 324 at 13–14.) According to Biscotti, sending data packets to an intermediate server which then relays the packets to a final destination must be covered by Claim 6 even if some alterations are made to the underlying packets. (*Id.*) Biscotti maintains that Microsoft's "the packets are different" argument is flawed because it reads in a requirement that the data packets transmitted from the first communication device cannot be altered before they arrive at the second video communication device. (*Id.* at 13–14.) In addressing the requirement that the "instructions for transmitting" reference the receiving video communication device or devices, Biscotti points to the testimony of Dr. Wicker regarding the "channel ID" and "stream key" variables, which Dr. Wicker said refer to the receiving device or devices and therefore satisfy the limitation. (*Id.* at 14–15.)

In response, Microsoft argues that the trial testimony did not indisputably establish that the data packets sent by the Xbox One include "some reference" to the receiving device or devices. (Dkt. No. 327 at 7 ("Dr. Wicker never explained what the data.stream_key actually is, or how it

accomplishes anything, let alone ensuring that data packets reach particular viewers.").) Microsoft also argues that Biscotti is attempting to raise a claim construction dispute, for the first time, by arguing that the "data packets" sent from the first communication device to the second may be altered, even substantially, along the way. (*Id.* at 8–9.)

The Court agrees with Microsoft. Although Dr. Wicker presented evidence that the data packets sent from the Xbox One include information relating to "everybody who's listening," (Dkt. No. 324), a reasonable jury could have concluded that this information does not actually reference a second video communication device as required by the Court's construction. Indeed, the evidence shows that this information is included in the transmitted packets even if nobody is viewing a transmitted stream, *i.e.* even if there is no second video communication device receiving anything. (Dkt. No. 288, 6/6/17 P.M. Trial Tr. at 68:17–69:8.) A reasonable jury could have concluded, based on this testimony and the rest of the evidence, that the data packets transmitted from the Xbox One to the Twitch and Beam servers do not include instructions that reference a second communication device simply because they include information about "channel ID" and "stream ID." Likewise, a reasonable jury could have concluded that the data packets transmitted from the Xbox One are not the same as the data packets transmitted to the second video communication device because the Twitch and Beam servers make substantive modifications to the data being transmitted.[7] (Dkt. No. 327 at 8.) The Xbox One processor would therefore not include the necessary "instructions for transmitting" because, at most, the processor includes instructions for transmitting packets to the Twitch and Beam servers, which in turn transmit

---

[7] Biscotti's argument that the packets can be substantially altered at the intermediate server and still infringe is essentially an infringement argument masquerading as a claim construction argument. The Parties argued extensively about how to properly construe "instructions for transmitting." At no point during this process did Biscotti seek a construction like the one it now argues (for the first time) compels a finding of infringement.

different packets to the receiving communication device or devices. This conclusion is supported by the plain and ordinary meaning of the claim language and the evidence in this case.[8]

**B. Invalidity**

At trial, Microsoft argued that the Asserted Claims were anticipated and/or obvious in light of the LifeSize Express device. In its Motion, Biscotti argues that the LifeSize Express is not prior art, that it does not anticipate the '182 Patent, and that it does not render Claim 12 of the '182 Patent obvious.

**1. Whether the LifeSize Express was prior art**

Biscotti argues that it is entitled to judgment as a matter of law, or at least a new trial, because "[t]he record is devoid of any evidence or testimony that the version of the LifeSize Express source code that Dr. Orchard presented was present on LifeSize Express devices in 2007." (Dkt. No. 318 at 34.)

Microsoft responds by arguing that the record clearly establishes that the LifeSize Express was prior art and the source code discussed by Dr. Orchard was available on these prior art devices. (Dkt. No. 322 at 29–30.) Microsoft also argues that Biscotti waived this argument because it was not raised in Biscotti's Rule 50(a) Motion. (*Id.*)

The Court agrees with Microsoft that Biscotti waived this argument by not raising it in a Rule 50(a) motion. The LifeSize Express and the source code discussed at trial were produced in discovery. (Dkt. No. 327 at 19.) The source code was then relied on by Dr. Orchard, among others. (*See, e.g.,* Dkt. No. 174.) The source code was also discussed extensively at the pretrial conference. Both sides even discussed the fact that the source code was "from 2007" without

---

[8] Microsoft also argues that Biscotti waived any challenge to the jury's finding of non-infringement as to the "instructions for transmitting" limitation because this argument was not raised in sufficient detail in Biscotti's Rule 50(a) motion. Again, the Court disagrees, but is unmoved by Biscotti's argument.

Biscotti ever raising an objection. (Dkt. No. 257, Hearing Tr. at 45:16–46:11, 66:5–11.) The source code was further discussed at trial, with both experts acknowledging that they had reviewed and relied on it. (Dkt. No. 290, 6/7/17 Sealed Trial Tr. at 21:20–22:4; Dkt. No. 291, 6/7/17 P.M. Trial Tr. at 54:18–19.) At no point in this process did Biscotti object or argue that the source code was not prior art. Biscotti also did not raise this argument in its Rule 50(a) Motion. (Dkt. No. 269.) Such a failure is fatal. *Morante v. Am. Gen. Fin. Ctr.*, 157 F.3d 1006, 1010 (5th Cir. 1998) ("It is well-settled in this circuit that a motion for judgment as a matter of law filed post-verdict cannot assert a ground that was not included in the motion for judgment as a matter of law made at the close of the evidence.").

However, even if Biscotti's argument had been properly raised, the record provides a sufficient basis from which a reasonable jury could conclude that the LifeSize Express was on sale and publicly available prior to 2008. (Dkt. No. 322 at 29–31.) The record also provides sufficient evidence for the conclusion that the LifeSize Express devices on sale or publicly available prior to 2008 included the anticipating and obviating features discussed by Dr. Orchard and exemplified by the source code he discussed. (*See, e.g.,* DX-0660 (an actual LifeSize Express device, available prior to 2008); DX-59 (presentation on development of LifeSize Express, dated prior to 2008); DX-60 (press release describing features of LifeSize Express, dated 2008); DX-67 (LifeSize Express source code, dated prior to 2008); DX-90 (LifeSize User Manual describing features, dated prior to 2008); Dkt. No. 289, 6/7/17 A.M. Trial Tr. at 118:17–119:4, 133:2–134:16, 148:11–149:12; Dkt. No. 294, 6/9/17 Trial Tr. at 4:5–23.) On this record, the Court concludes that it would have been reasonable for a jury to view the LifeSize Express or the related source code discussed at trial as a prior art reference.

## 2. **Obviousness**

Question 3 in the verdict form asked the jury to determine, for each asserted claim, whether the relevant claim was "invalid as anticipated ***or*** obvious." (Dkt. No. 276 (emphasis added); *see also* Dkt. No. 293, 6/8/17 P.M. Trial Tr. at 45:19–46:5 (Biscotti raising no objection to the wording of Question 3).) Accordingly, the jury's invalidity determination could have rested solely on a finding of obviousness. *Therasense, Inc. v. Becton, Dickinson & Co.*, 593 F.3d 1325, 1337 (Fed. Cir. 2010) (concluding that "[t]he erroneous jury instruction on the law of anticipation" did not upend a verdict of invalidity based on "'anticipation or obviousness'" because the jury could have found the patents obvious).

However, in its Motion, Biscotti focuses on attacking the jury's invalidity determination on anticipation grounds. For example, in addressing Claim 6, Biscotti emphasizes that Mr. Malloy's testimony was inadequate as a matter of law because "[t]estimony concerning anticipation must be testimony from one skilled in the art and must identify each claim element." (Dkt. No. 318 at 34–35.) Further, Biscotti addresses its validity arguments as to claims 27, 28, and 35 by arguing that Microsoft "Provided No Evidence of Anticipation." (*Id.* at 35.) Otherwise, except as to Claim 12, Biscotti makes no reference to whether the jury had a reasonable basis to find a motivation to combine elements in the prior art or other aspects of the obviousness analysis.

By contrast, but only with respect to Claim 12, Biscotti directly challenged the jury's implied *obviousness* finding. (*Id.* at 44 ("Microsoft also failed to adduce evidence to support a finding of obviousness of claim 12 by the LifeSize Express system in combination with 'a Linksys hub' or wireless router.").) Biscotti also argued that Microsoft did not provide sufficient evidence of a motivation to combine with respect to Claim 12. (*Id.*)

Against this backdrop, Microsoft argues that "Biscotti has waived any argument that no reasonable jury could find the asserted claims obvious, and the invalidity verdict as to all claims other than claim 12 should stand on that basis alone." (Dkt. No. 322 at 32.)

Biscotti maintains that its Motion did challenge the jury's obvious finding. (Dkt. No. 324 at 15 (citing Dkt. No. 318 at 33).) However, quite puzzlingly, the only page of its Rule 50(b) Motion that Biscotti cites to support this point does not mention obviousness. (Dkt. No. 318 at 33.) Biscotti also argues that regardless of whether they addressed obviousness in their Motion, obviousness was raised in its Rule 50(a) motion. (Dkt. No. 324 at 15 (citing Biscotti's arguments on Rule 50(a) motions).) As Microsoft points out, however, this is irrelevant. *See, e.g., Unitherm Food Sys., Inc. v. Swift-Eckrich, Inc.*, 546 U.S. 394, 404 (2006) (failure to raise issue on Rule 50(b) motion is fatal even if issue was properly raised in a Rule 50(a) motion).

Accordingly, the Court will only address whether an obviousness finding as to Claim 12 is reasonable.[9] To the extent Biscotti has properly raised any other obviousness challenge, it has done so on grounds that mirror arguments the Court rejects below with respect to anticipation.

As to Claim 12, Biscotti argues that the LifeSize Express lacked a wireless local area network interface because it could only achieve wireless functionality by being plugged into a wireless router. (Dkt. No. 318 at 44.) Biscotti also maintains that "Dr. Orchard's conclusory opinion that it would have been obvious to plug a LifeSize Express into a wireless router, even if accepted, would not satisfy the limitations of claim 12, which, as discussed above, requires that the video communication device itself include a 'network interface.'" (*Id.* at 44.)

Microsoft responds that the jury could have invalidated Claim 12 based on the fact, supported by Dr. Orchard's testimony among other things, that "[o]ne of skill in the art would

---

[9] The Court also addresses whether an anticipation finding as to Claim 12 is reasonable below.

know that a wired network interface could be replaced by or supplemented with a wireless network interface." (Dkt. No. 322 at 31–32.) Microsoft also points to evidence in the record showing that LifeSize considered adding built-in wireless functionality to the LifeSize Express. (*Id.* at 32.) According to Microsoft, this is direct evidence of a motivation to combine "known wireless technologies with the LifeSize Express," which supports an obviousness finding. (*Id.*)

Ultimately, the Court concludes that a finding of obviousness is reasonable and supported by the record. LifeSize considered adding a built-in wireless interface to the LifeSize Express. While LifeSize ultimately decided against adding this functionality, the jury heard testimony that this was not because adding a build-in wireless network interface was not technically feasible. (Dkt. No. 289, 6/7/17 A.M. Trial Tr. at 150:15–18 ("Q. Now, did the LifeSize Express have wireless? A. We did not implement wireless in the LifeSize Express. That was the – a design choice that could have been done, however."). A reasonable jury could have concluded from this evidence, in addition to other testimony, (*see, e.g., id.* at 150:15–151:1; Dkt. No. 292, 6/8/17 A.M. Trial Tr. at 58:19–59:2), that to the extent the LifeSize Express did not include a built-in wireless network interface, substituting a built-in wireless network interface for the Ethernet port on the LifeSize Express was technically feasible and obvious. *See, e.g., In re Mouttet*, 686 F.3d 1322, 1332 (Fed. Cir. 2012) ("It is well-established that a determination of obviousness based on teachings from multiple references does not require an actual, physical substitution of elements."). A reasonable jury also could have concluded that the ability to connect a LifeSize Express to a wireless router rendered obvious a limitation that merely covered taking this functionality and putting it into the device itself, something LifeSize explicitly thought about doing. *Wyers v. Master Lock Co.*, 616 F.3d 1231, 1240 (Fed. Cir. 2010) ("[T]he ultimate inference as to the existence of a motivation to combine references may boil down to a question of 'common sense' . . . .").

### 3. **Anticipation**

#### a. **Claim 6**

Claim 6 was neither asserted nor directly addressed by the jury. However, all of the Asserted Claims depend from Claim 6. Biscotti therefore challenges the jury's implicit finding that Claim 6 was anticipated by the LifeSize Express.

Claim 6 recites, among other things, a video communication device comprising "a video input interface to receive video input from a set-top box" and "an audio input interface to receive audio input from a set-top box." (PTX-1 at 32:62–67.)

Biscotti argues that Microsoft's evidence that the LifeSize Express satisfied these limitations was either conclusory, "wholly uncorroborated," or "not tied to any particular claim language." (Dkt. No. 318 at 34.) Biscotti also argues that Microsoft failed to show that the LifeSize Express could receive and decrypt HDCP-encrypted content, which Biscotti argues the LifeSize Express would have needed to do to handle input from a set-top box. (*Id.* ("Biscotti and Dr. Wicker presented unrebutted testimony that set-top boxes in the 2007 time frame were required to transmit HDCP encrypted content to prevent content piracy.").)

Microsoft argues that the jury could have found this claim limitation satisfied based on the actual LifeSize Express device in evidence, which had an HDMI input, and several corroborating documents entered into evidence. (Dkt. No. 322 at 20–21 ("The physical LifeSize Express device in evidence (DX-0660) has an HDMI input . . . and corroborating documentation, DX-0061, DX-0059, DX-0088, confirmed that this input satisfies this claim limitation.").) Microsoft also argues that whether the LifeSize Express could handle HDCP-encrypted content is "irrelevant" because accepting HDCP-encrypted signals is not part of the claim language or the Court's construction of

the claim language.[10]  (*Id.* at 21 ("There is no requirement that in order to infringe or anticipate, the video/audio interface must be capable of receiving HDCP.").)

At trial, Mr. Malloy, the CEO of LifeSize, which made the LifeSize Express, testified extensively about whether and how the LifeSize Express could receive audiovisual content from a set-top box.  (Dkt. No. 289, 6/7/17 A.M. Trial Tr. at 119:15–122:25, 134:9–16, 134:17–135:19, 136:3–137:14, 138:20–139:9.)   In particular, he testified that LifeSize had actually tested a LifeSize Express device at their headquarters, prior to 2008, to ensure that it could receive audiovisual content from a set-top box.  (*Id.* at 135:16–19 ("We had a Time Warner Cable box installed in our office in Austin, and we connected the Lifesize Express.  Utilizing the HDMI pass-through feature, we put the Lifesize Express in between the TV and the – and the set-top box."), 134:17–137:14.)   Moreover, far from being uncorroborated, Mr. Malloy pointed to several technical documents, in evidence, showing that the LifeSize Express could receive video and audio content from a set-top box.  (*See, e.g., id.* at 137:10–14 (discussing design schematics), 138:20–139:9 (discussing HDMI certified chip included in LifeSize Express).)

Biscotti's focus on HDCP encryption does not compel a different result. Neither Claim 6 nor the construction of "set-top box" requires the video communication device to decrypt anything. The claim language only requires the video communication device to be configured "to receive" audio or video content from "a set-top box," which the Court construed to mean "a device that can provide video tuning, decryption **and/or** decoding functionality, especially as that functionality relates to reception of broadcast, cable, and/or satellite television signals."  (Dkt. No. 109 at 50 (emphasis added).)  Based on this language, there was a sufficient basis for a reasonable jury to

---

[10] Microsoft also argues that Biscotti waived this argument by failing to raise it in a Rule 50(a) Motion with sufficient specificity.  The Court disagrees.

conclude that the LifeSize Express, whether or not it could decrypt HDCP-protected content, satisfied this limitation.

Biscotti's argument that Microsoft's evidence was not tied to specific claim language is also without merit. Dr. Orchard specifically walked the jury through the claim elements, including this specific limitation, alongside a discussion of the LifeSize Express' functionality. (Dkt. No. 291, 6/7/17 P.M. Trial Tr. at 66:25–67:18, 80:15–80:25, 87:6–88:1; *see also* Dkt. No. 292, 6/8/17 A.M. Trial Tr. at 46:3–6 ("Q. (By Mr. Alper [for Biscotti]): One of the elements that you reviewed was the video input interface to receive an input from a set-top box, right? A. That's correct. Q. And you compared that with the LifeSize Express for purposes of invalidity? A. That's right.").) Biscotti's expert also discussed these same claim elements alongside the same functionality, albeit advancing Biscotti's argument that the LifeSize Express did not anticipate because it could not decrypt HDCP-encrypted content. (*See, e.g.,* Dkt. No. 293, 6/8/17 A.M. Trial Tr. at 86:5–87:25.) Finally, Mr. Malloy testified at length about the LifeSize Express while using the language of Claim 6 to discuss the device's functionality. (*See, e.g.,* Dkt. No. 289, 6/7/17 A.M. Trial Tr. at 135:16–19 ("We had a Time Warner Cable box installed in our office in Austin, and we connected the Lifesize Express. Utilizing the HDMI pass-through feature, we put the Lifesize Express in between the TV and the -- and the **set-top box**." (emphasis added)).) In sum, this is not a case in which the jury was not told how the LifeSize Express performed the steps recited in Claim 6. They were told, and they were told with sufficient specificity to support the verdict. Accordingly, the Court is persuaded that the evidence in the record supports the jury's finding that the LifeSize Express anticipates Claim 6.

### b. **Claim 12**

Claim 12 recites "[t]he video communication system of claim 6, wherein the network interface comprises a wireless local area network ('WLAN') interface." (PTX-1 at 33:43–45.)

Biscotti argues that Microsoft's evidence of anticipation as to Claim 12 is inadequate as a matter of law because it relied on evidence that the LifeSize Express included an Ethernet port, *i.e.* a wired network interface, to anticipate a limitation describing a wireless network interface. (Dkt. No. 318 at 43–44.) Biscotti also argues that two LifeSize engineers admitted that the LifeSize Express lacks a wireless network interface. (*Id.* at 44.)

Microsoft offers no contrary argument. Instead, Microsoft argues that Biscotti waived this argument for failure to raise it in a motion under Rule 50(a). (Dkt. No. 322 at 37.)

Biscotti offers no response on this point, instead focusing in its Reply on Microsoft's evidence as to *obviousness*. (Dkt. No. 324 at 19–20 ("This is insufficient to render obvious a device that includes a WLAN interface.").)

Ultimately, the Court agrees with Microsoft. Biscotti's motion under Rule 50(a) argued that it was entitled to judgment as a matter of law because "Microsoft [did] not provide[] sufficient evidence to support a finding that the LifeSize Express system combination with 'wireless adapter' renders obvious Claim 12." (Dkt. No. 269 at 6.) There is no mention or discussion of anticipation with respect to Claim 12. (*Id.*) This argument therefore cannot now form the basis for judgment as a matter of law or new trial. *See Morante*, 157 F.3d at 1010 ("It is well-settled in this circuit that a motion for judgment as a matter of law filed post-verdict cannot assert a ground that was not included in the motion for judgment as a matter of law made at the close of the evidence.").

c.  **Claim 13**

Claim 13 recites "[t]he video communication system of claim 6, wherein the video input interface comprises a high-definition multimedia interface ('HDMI') to receive high definition video input from the set-top box."  (PTX-1 at 33:46–49.)

Microsoft argues that the jury heard extensive testimony that the LifeSize Express satisfied this limitation, including testimony about the HDMI-In port on the LifeSize Express and the HDMI-certified Analog Devices chip included in the LifeSize Express.  (Dkt. No. 322 at 37–38.) Biscotti offers no specific discussion of Claim 13 in its Motion or Reply.[11]

Ultimately, a reasonable jury could have concluded that the LifeSize Express satisfies this limitation.  (*See, e.g.,* Dkt. No. 289, 6/7/17 A.M. Trial Tr. at 119:15–122:25, 134:9–16, 134:17–135:19, 136:3–137:14, 138:20–139:9.)  The evidence presented is adequate to support the verdict in this respect.

d.  **Claim 23**

Claim 23 recites "[t]he video communication system of claim 6, wherein instructions for transmitting the series of data packets comprise instructions for transmitting the series of data packets over a private content delivery network."  (PTX-1 at 34:8–12.)

Biscotti argues that Microsoft failed to identify a "private content delivery network" in the LifeSize Express.  (Dkt. No. 318 at 40.)  In particular, Biscotti focuses on the fact that neither Mr. Malloy nor Dr. Orchard ever mentioned the term "private content delivery network."  (*Id.*)

While Microsoft concedes that its witnesses did not use the term "private content delivery network," it maintains that the jury had sufficient evidence to conclude that this limitation was met by the LifeSize Express.  (Dkt. No. 322 at 38.)  According to Microsoft, the jury could have found

---

[11] To the extent Biscotti even mentions Claim 13, it is in relation to arguments the Court has already rejected herein.

anticipation based on the testimony of Plaintiff's expert, who explained what a private content delivery is and how the Court construed this term, together with the testimony of Mr. Malloy as to how a LifeSize Express can connect to "private business network[s]." (*Id.*) Microsoft also argues that Biscotti waived this argument by failing to include it in a Motion under Rule 50(a). (*Id.*)

Biscotti maintains that because its expert's testimony about "private content delivery network[s]" referenced "multiple servers to deliver content" as opposed to the "private IP network" mentioned by Mr. Malloy, the jury had no basis to combine "these two disparate pieces of testimony to fill in the gaps in Microsoft's trial presentation." (Dkt. No. 324 at 18.)

The Court agrees with Microsoft. At trial, Plaintiff's expert, Dr. Wicker, extensively discussed the private content delivery network limitation. (Dkt. No. 287, 6/6/17 A.M. Trial Tr. at 104:25–107:16.) As an example, Dr. Wicker explained that a private content delivery network is "a network that interconnects the video communication device here with the video communication device over there." (*Id.* at 105:5–7.) He went on to explain that a private content delivery network involves exchanging information through an intermediate sever: "So instead of just my packets going straight from me to you, they're going to go from myself to a server, perhaps another server, and so forth. There might be firewalls. That's a form of protection to ensure against hackers and other things in between that require that the data gets re-routed. You might go from different servers to other servers. It gets relayed." (*Id.* at 106:26–107:6, 107:13–16 ("[T]hat's what content delivery networks constitute. They're a series of relays that are arranged in such a way so that they can deliver content to lots of users in an efficient way.").)

Mr. Malloy, likewise, explained that a LifeSize Express device could transmit data "over a private network, a private IP – a private IP network." (Dkt. No. 289, 6/7/17 A.M. Trial Tr. at 141:1–4.) He then provided an example of this functionality using "a law firm that offices in

multiple locations . . . us[ing] the LifeSize Express exclusively to communicate over that private net – Internet." (*Id.* at 141:8–22.)

In light of this testimony, and the record as a whole, a reasonable jury could have found that the LifeSize Express satisfies this limitation.[12]

### e. **Claim 24**

Claim 24 was neither asserted nor directly addressed by the jury. However, claims 27, 28, and 35, which were asserted, depend from Claim 25, which itself depends from Claim 24. Biscotti therefore challenges the jury's implicit finding that Claim 24 was anticipated by the LifeSize Express.

Claim 24 recites "[t]he video communication system of claim 6, wherein the video input interface receives a set-top box video stream, and wherein the network interface receives a remote audiovisual stream from the second video communication device, the remote audiovisual stream comprising a remote video stream and a remote audio stream." (PTX-1 at 34:13–19.)

Biscotti concedes that Mr. Malloy "testified generally about the functionality of the LifeSize Express" as to Claim 24 "using words found in the asserted claims." (Dkt. No. 318 at 36.) However, Biscotti maintains that Mr. Malloy's testimony is inadequate as a matter of law because Mr. Malloy was not a person of ordinary skill in the art and did not "identify each claim element, state [his] interpretation of the claim element, and explain in detail how each element is disclosed." (*Id.*)

Microsoft argues that Mr. Malloy's testimony, together with the expert testimony the jury heard on "all of the claim limitations," was sufficient. (Dkt. No. 322 at 38.) In particular, Microsoft argues that "Mr. Malloy explained [the LifeSize Express] could receive a set-top box

---

[12] The Court rejects Microsoft's argument that Biscotti waived this point by failing to specifically raise it in its motion under Rule 50(a). (*See* Dkt. No. 269 at 4.)

stream via the video input while also receiving a remote audiovisual stream through the network interface." (*Id.*)

The Court agrees with Microsoft. There is no "[r]igid preventative rule[]" that requires *expert* testimony as to each element for an anticipation finding to be reasonable or supportable. *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 421 (2007). Such a rule would "deny factfinders recourse to common sense." *Id.* Here, even Biscotti has conceded that the jury heard testimony about relevant LifeSize Express functionality using the language of Claim 24. The evidence presented is therefore sufficient to support the verdict in this regard.

### f.  Claim 25

Claim 25 was neither asserted nor directly addressed by the jury. However, claims 27, 28, and 35, which were asserted, depend from Claim 25. Biscotti therefore challenges the jury's implicit finding that Claim 25 was anticipated by the LifeSize Express.

Claim 25 recites "[t]he video communication system of claim 24, wherein the set of instructions further comprises: instructions for creating a consolidated output video stream comprising at least a portion of the remote video stream." (PTX-1 at 34:19–23.)

Biscotti argues that an anticipation finding as to Claim 25 is unsupported by the record because none of Microsoft's witnesses discussed this limitation. (Dkt. No. 318 at 37 ("In fact, the phrase 'consolidated output video stream' does not appear in any of Microsoft's direct testimony in relation to the LifeSize Express.").) Biscotti also argues that Mr. Malloy's testimony could not support such a finding because he is not an expert. (*Id.* ("Such generalized testimony from an unqualified fact witness is insufficient. To the contrary, the presence and operation of source code is a question where the technology is complex and beyond the comprehension of laypersons, and thus one where expert testimony is sometimes essential." (internal quotation marks omitted)).)

Microsoft argues that a reasonable jury could have relied on Mr. Malloy's testimony to conclude that the LifeSize Express satisfies this limitation. (Dkt. No. 322 at 39.) In particular, Microsoft argues that Mr. Malloy identified all the functionality discussed in Claim 25 as being embodied in the LifeSize Express. (Dkt. No. 327 at 18.) According to Microsoft, "[t]he jury could reasonably conclude that the presence of these capabilities, and both Mr. Malloy's and Dr. Orchard's testimony that the LifeSize Express implemented its capabilities in source code, meant that the required instructions were present." (*Id.*)

Again, the Court agrees with Microsoft. Mr. Malloy was familiar with the LifeSize Express and its features. (Dkt. No. 289, 6/7/17 A.M. Trial Tr. at 110:10–21 ("Although I was not an engineer, I did not write software nor design the hardware components . . . I was deeply involved in the conceptualization of the Lifesize Express, what the attributes would be, the industrial design, the feature set . . . [a]nd I would work very closely with [] our technical team, our engineering team to ensure that – that we met those goals.").) One of the features Mr. Malloy discussed at trial was the LifeSize Express' ability to "send and receive two simultaneous [] video streams" that would appear as a single output on a television or monitor. (*Id.* at 149:16–150:14.) This testimony was further supported by technical documents from LifeSize describing the features of the LifeSize Express.[13] (*See, e.g.,* DX-59.) From this evidence, and the record as a whole, a reasonable jury could have concluded that the instructions for the functionality identified by Mr. Malloy were present on the LifeSize Express and that such instructions satisfied the limitations of Claim 25.[14]

---

[13] Biscotti argues that the jury could not credit these technical documents because they showed what features LifeSize intended to implement, not those it actually did implement. (Dkt. No. 318 at 37–38.) The Court disagrees. This documentation, taken together with Mr. Malloy's testimony that LifeSize Express devices he used actually had these features, is a sufficient basis from which a reasonable jury could have found that the LifeSize Express includes this functionality.

[14] Biscotti's argument that the jury could not credit Mr. Malloy's testimony on the LifeSize Express' *functionality* in concluding that *instructions* for such functionality were present on the LifeSize Express is without merit. It is true that in some cases, the precise steps taken to achieve certain functionality is itself what is claimed. However, Claim 25 essentially recites "instructions" for achieving a particular result, *i.e.* "creating a consolidated output video stream

### g. **Claim 27**

Claim 27 recites "[t]he video communication system of claim 25, wherein the consolidated output video stream further comprises a user interface of the first video communication device." (PTX-1 at 34:27–29.)

Biscotti argues that Microsoft's evidence that the LifeSize Express satisfies Claim 27 is inadequate as a matter of law because Dr. Orchard "provided no analysis, evidence, or opinion" on the instructions recited by Claim 27. (Dkt. No. 318 at 41.) Biscotti also argues that Mr. Malloy provided "no corroborating evidence that the LifeSize Express" possessed the instructions recited by Claim 27. (*Id.*)

Microsoft argues that Mr. Malloy's testimony was adequate because it showed that everything recited by Claim 27 could be accomplished by the LifeSize Express. (Dkt. No. 322 at 39–40 ("Once Mr. Malloy testified that the LifeSize Express allowed such combinations, including user interface aspects and television signals shown on the consolidated stream sent to the display, the jury had a reasonable basis to conclude these claim limitations were satisfied." (citations omitted)).) Microsoft also argues that based on this functionality, the jury could have reasonably concluded that instructions for that functionality, *i.e.* enabling source code, were present on the LifeSize Express. (*Id.*)

Mr. Malloy testified extensively about the functionality of the LifeSize Express. His testimony was based on his own experience using the LifeSize Express and other technical

---

comprising at least a portion of the remote video stream." (PTX-1 at 34:19–23.) A reasonable jury could have therefore concluded that if the LifeSize Express was able to "creat[e] a consolidated output video stream compromising at least a portion of the remote video stream," as Mr. Malloy testified, then the device had been programmed with instructions for achieving that functionality. *See KSR*, 550 U.S. at 421 (cautioning against the adoption of rules that "deny factfinders recourse to common sense"); As Emerson said: "Common sense is genius dressed in its working clothes." *Thoughts on the Business Life,* Forbes, Aug. 2, 1982, at 116 (quoting Ralph Waldo Emerson); *see also* John McCaslin, *Inside the Beltway*, Wash. Times, Aug. 20, 1997, at A6 (same).

documents. (Dkt. No. 289, 6/7/17 A.M. Trial Tr. at 134:17–136:15, 149:16–150:14; *see also* DX-59.)  From this evidence, there was a sufficient basis from which a reasonable jury could have concluded that the instructions for the functionality identified by Mr. Malloy were present on the LifeSize Express and that these instructions satisfied the limitations of Claim 27.

### h. <u>Claim 28</u>

Claim 28 recites "[t]he video communication system of claim 25, wherein the consolidated output video stream further comprises at least a portion of the set-top box video stream."  (PTX-1 at 34:30–32.)

Biscotti again argues that Microsoft failed to demonstrate that the LifeSize Express satisfied this limitation because Microsoft offered no relevant testimony from Dr. Orchard and insufficient testimony from Mr. Malloy.  (Dkt. No. 318 at 42.)

Microsoft offers no separate response as between Claim 27 and Claim 28, simply emphasizing that Mr. Malloy explained that the functionality recited in Claim 28 was present in the LifeSize Express.  (Dkt. No. 322 at 39–40.)

Mr. Malloy testified extensively about the functionality in the LifeSize Express.  His testimony was based on his own experience using the LifeSize Express and other technical documents. (Dkt. No. 289, 6/7/17 A.M. Trial Tr. at 134:17–136:15, 149:16–150:14; *see also* DX-59.)  In particular, Mr. Malloy testified that the LifeSize Express could "take in an image from this camera [on the LifeSize Express], and also at the same time take in an image from a set-top box or a – or a computer and display both of those images at the same time."  (*Id.* at 15:5–10.)  He went on to explain that a "person on the remote site could see what you're watching on TV, or they could see the spreadsheet that you're trying to show, as well as your live image through the camera."  (*Id.* at 150:11–14.)  From this evidence, a reasonable jury could have concluded that the

instructions for the functionality identified by Mr. Malloy were present on the LifeSize Express and that these instructions satisfied the limitations of Claim 28.

      **i.**   **Claim 35**

Claim 35 recites "[t]he video communication system of claim 25, wherein the set of instructions further comprises: instructions for setting a resolution of the consolidated output video stream based at least in part on a bandwidth of a connection between the first video communication device and the second video communication device." (PTX-1 at 35:11–16.)

While Biscotti concedes that Mr. Malloy discussed "'what the LifeSize Express would do' depending 'on how good the Internet connection was,'" Biscotti asserts that Mr. Malloy's testimony was insufficient because he provided no "explanation or opinions on how this testimony . . . relates to the requirements of claim 35." (Dkt. No. 318 at 42–43.) Biscotti also argues that even if Mr. Malloy established that the LifeSize Express had certain functionality, there is no evidence that the instructions to achieve that functionality were on the LifeSize Express. (Dkt. No. 324 at 19.)

Unsurprisingly, Microsoft argues that Mr. Malloy's testimony is sufficient either on its own or in combination with Dr. Wicker's explanation that Claim 35 "encompasses 'varying the resolution of the video so that it can adjust according to the quality of the channel.'" (Dkt. No. 322 at 40 (internal brackets omitted).) Microsoft also argues that the jury could properly infer that a device with certain functionality also includes instructions for achieving that functionality.

As Biscotti acknowledges, Mr. Malloy testified that the LifeSize Express could adjust video output based on the strength of a user's Internet connection. (Dkt. No. 289, 6/7/17 A.M. Trial Tr. at 153:5–16 ("So the – the higher your – the faster your Internet connection, the better video call that you're going to get. The lower your Internet connection, we would need to lower

the resolution to maintain – to make a smooth call . . . this was a . . . configuration setting in the Lifesize Express."), 152:18–153:22; DX-59.)   This testimony was framed explicitly in the language of Claim 35.  (*Id.*)  In short, a reasonable jury could have concluded that the LifeSize Express could adjust the "resolution of the consolidated output video stream based at least in part on a bandwidth of a connection between the first video communication device and the second video communication device" as required by Claim 35.  (PTX-1 at 35:11–16.)  Further, a reasonable jury could have properly concluded that the LifeSize Express included instructions for achieving that functionality.  *See* Section III.3.f.  This evidence together with the reasonable inferences drawn therefrom supports the verdict in this regard.

### j.  Claim 86

Biscotti argues that the jury's finding as to Claim 86 is unsupportable as a matter of law because Microsoft failed to show that the LifeSize Express anticipated Claim 6, from which Claim 86 depends.  (Dkt. No. 318 at 33.)  Having rejected that argument above, *see* Section III.3.a, the Court also rejects Biscotti's challenge to the jury's finding that Claim 86 was anticipated by the LifeSize Express.

### C.  The LifeSize Express Video

Before trial, the Parties filed a Joint Pretrial Order in which they agreed to a schedule for exchanging demonstratives.  (Dkt. No. 214 at 16–17 ("The parties will exchange copies of all demonstratives they plan to use at trial for opening statements . . . and direct examination—but not for cross-examination—by 7:00 p.m. the night before their intended use.").)  Consistent with this schedule, Microsoft disclosed that it intended to play two short videos during the direct examination of Mr. Malloy.[15]  (Dkt. No. 322 at 15.)

---

[15] Microsoft only played one of the videos at trial.  That video is the subject of Biscotti's Motion.

One of these videos, approximately 38 seconds long, shows Mr. Malloy carrying out a video call between two LifeSize Express devices, one of which he identified as the actual LifeSize Express device in evidence.  (Dkt. No. 289, 6/7/17 A.M. Trial Tr. at 124:15–17.)  A screenshot of the video is shown below:



On the left screen, Mr. Malloy is shown at the top along with the user interface for the LifeSize Express.  On the right screen, the user interface appears along with the broadcast of a PBS program.  (*Id.* at 125:3–6 ("The first image on the large screen was a set-top box showing PBS Kids TV channel.").)

When Microsoft disclosed this video, Biscotti objected.  (Dkt. No. 318 at 9.)  Biscotti argued that allowing the video to be played would be unfairly prejudicial because, among other things, the video "[was] not previously disclosed" and thus "Biscotti did not have the opportunity to take any discovery regarding the video[], including questioning Mr. Malloy about [it] in deposition."  (*Id.*)  By contrast, Microsoft argued that the video was merely a "demonstrative" that was being used because of "the practical limitations" of setting up a demonstration in open-court.  (*Id.*)  The Court overruled Biscotti's objections, and the video was played for the jury.  (*Id.*)

After the jury saw the video, Mr. Malloy went on to discuss screenshots from the video. (*See, e.g.,* Dkt. No. 289, 6/7/17 A.M. Trial Tr. at 127:17–21 (Q. [by Microsoft] What is being shown on this slide [from the video]?  A. This is the same HDMI pass-through feature being shown . . . the Lifesize Express is in between the TV and the set-top box . . . .").)  In addition to discussing these screenshots, Mr. Malloy further testified about his own experience using a LifeSize Express device prior to 2008 (*see, e.g., id.* at 135:2–136:14) and several LifeSize technical documents (*see, e.g., id.* at 133:2–7).

In its Motion, Biscotti argues that it is entitled to judgment as a matter of law "or, at a minimum, a new trial," because allowing the video to be played at trial violated the Federal Rules of Civil Procedure and the Federal Rules of Evidence.  (Dkt. No. 318 at 12–20.)  As to the Federal Rules of Evidence, Biscotti argues that playing the video and allowing Mr. Malloy to testify about the functionality depicted therein allowed Microsoft to "proffer[] an expert in lay witness clothing" while evading scrutiny under *Daubert*.  (*Id.* at 13–15.)  As to the Federal Rules of Civil Procedure, Biscotti maintains that the demonstrative was "transformed into substantive evidence" because of how it was used at trial to "fill in a fatal evidentiary gap in Microsoft's invalidity case."  (*Id.* at 15–16 (citing *Baugh ex rel. Baugh v. Cuprum S.A. de C.V.*, 730 F.3d 701, 708 (7th Cir. 2013); *Barnes v. General Motors Corp.*, 547 F.2d 275, 278 (5th Cir. 1977)), 18–19.)  For example, Biscotti suggests that Dr. Orchard, Microsoft's expert, said he was "not sure" whether certain limitations were satisfied without relying on the video.  (*Id.* at 11 (citing Dkt. No. 291, 6/7/17 P.M. Trial Tr. at 147:22–148:5).)  Biscotti also claims that Microsoft's attorney, in closing, "explicitly referred to the video as 'evidence,' referred to Mr. Malloy as an 'expert,' and wept in front of the jury in a show of alleged offense at Biscotti's suggestion that Mr. Malloy's testimony about the video should not be credited or weighed heavily."  (*Id.* at 2, 15–16.)  Accordingly, Biscotti argues that

the video was untimely disclosed *evidence* rather than a properly disclosed and employed *demonstrative*. (*Id.* at 15–16.) Biscotti also argues the video was so "extremely prejudicial" that it is entitled to a new trial on invalidity *and* infringement. (*Id.*)

Microsoft argues that the video was appropriately shown to the jury as a demonstrative that "assisted the jury in understanding [Mr. Malloy's] testimony, which came after the video, and referred back to still photos showing some phases of the video call made to illustrate his testimony." (Dkt. No. 322 at 16.) On whether Mr. Malloy offered expert testimony, Microsoft argues that this argument is waived because "Biscotti made no objection when Mr. Malloy testified about connecting the LifeSize Express to a set-top box *before* showing the demonstrative video." (*Id.* at 23 (citations omitted).) Microsoft also maintains that the video was not "technical" at all. (*Id.*) According to Microsoft, the video "simply shows Mr. Malloy . . . using the properly-disclosed prior art system in an ordinary manner relevant to the limitations of the asserted claims." (*Id.*) Microsoft also argues that there was no surprise or ambush because Biscotti knew that Mr. Malloy intended to testify about the functionality depicted in the video, including the fact that a LifeSize Express device could be connected to a TV and a set-top box. (*Id.* at 16–19.) Finally, Microsoft argues that, at most, Biscotti would be entitled to a new trial on invalidity, not infringement, based on the use of the video at trial. (*Id.* at 25 ("Biscotti's complaint about the demonstrative video concerns the video and audio interfaces that may be connected to a set-top box. While the parties at trial disputed the presence of those claim limitations in the LifeSize Express, there was no significant dispute as to whether the accused Xbox One had video or audio interfaces.").)

At the outset, the Court notes that Biscotti's brash characterization of the video and the way it was used at trial is overtly misleading. As an example, Biscotti argues that Microsoft

deliberately referred to the video in its closing as "evidence." (Dkt. No. 318 at 12 (citing Dkt. No. 294, 6/9/17 Trial Tr. at 86:20–24).) This is simply wrong. The portion of closing that Biscotti cited reads in full:

> Similarly, with regards to Claims 23, 27, 28, Mr. Malloy explained how you could have the video come in and the set-top box feeds from – together. And the evidence on all of those was compelling. Yes, they did it first. There was nothing new.

(Dkt. No. 294, 6/9/17 Trial Tr. at 86:20–24.) This paragraph makes no mention of the video. Moreover, because Mr. Malloy relied on several pieces of evidence, including corroborating documents and an actual LifeSize Express device, the jury was not left to assume that "evidence" referred to the video. There is simply nothing in the record to suggest that the jury was told, by Microsoft or anyone else, that the video was evidence. Further, while the demonstrative itself is not evidence, Mr. Malloy's testimony properly employing the demonstrative as a jury aid is evidence that Microsoft could have raised in closing as being compelling.

Similarly, and contrary to Biscotti's assertion, the video was not the "substantive centerpiece of Microsoft's invalidity defense." (Dkt. No. 318 at 2.) While the video helped demonstrate how the LifeSize Express works, it was not the sole basis for any of Microsoft's invalidity arguments.[16] Nor did it need to be. Mr. Malloy testified about the functionality shown in the video before it was shown, with reference to the actual LifeSize Express device in evidence (Dkt. No. 289, 6/7/17 A.M. Trial Tr. at 121:21–123:3), and after, with reference to Mr. Malloy's personal experience using a LifeSize Express with a set-top box prior to 2008 (*id.* at 134:17–135:19).

---

[16] Unless otherwise specified, the Court did not rely on the video, or Mr. Malloy's testimony describing slides from the video, in concluding that a reasonable jury had a sufficient basis to find no infringement and invalidity. Adequate evidence exists within this record to support that conclusion without any need to rely on the video. The video only further confirms that a reasonable jury had a sufficient basis to find as the jury did in this case.

The video was also not necessary to cure an "evidentiary gap" in Dr. Orchard's testimony. While Biscotti claims Dr. Orchard said he was "not sure" certain limitations were satisfied by the LifeSize Express absent Mr. Malloy's testimony, this "admission" is taken out of context. Before making this statement, counsel for Microsoft asked targeted questions restricting Dr. Orchard's testimony to certain pieces of evidence, including "confidential documents." (Dkt. No. 291, 6/7/17 P.M. Trial Tr. at 147:11–13.) Dr. Orchard then attempted, multiple times, to clarify the universe of materials to which counsel was referring. (*See, e.g., id.* at 147:14–15 (A. "If I could have you clarify what you mean by the confidential documents. Q. The Lifesize confidential documents. A. That would include all the code? Q. No, that's what we're going to talk about, the code.").) When Dr. Orchard answered "I'm not sure," it is clear from his testimony that he was confused about how counsel was defining "confidential documents." (*Id.* at 148:8–14 ("I know that the opinions that I have formed on [the claims] included all of the – all of that which I know about the Lifesize, which included the code, as well as the – the operating device which you didn't mention, and many other things.").) Once this point was clarified, Dr. Orchard testified that based on the materials he reviewed in preparing his report before trial, the LifeSize Express either anticipated and/or rendered obvious all the Asserted Claims. (*Id.* at 148:16–149:10.) In view of the record as a whole, there is no basis to conclude that Dr. Orchard's opinion hinged upon the video demonstrative played during Mr. Malloy's testimony or Mr. Malloy's resulting testimony about the video.

In addition, the cases Biscotti relies on to argue that showing the video to the jury was inappropriate are clearly distinguishable. In *Baugh*, the trial court allowed the jury to take something designated as a demonstrative into the jury room during deliberation. 730 F.3d at 706–708. The Seventh Circuit reversed, explaining that if something is labeled as a demonstrative it

cannot then be sent into the jury room for the jury over an objection by one of the parties. *Id.* at 708 ("If we were to affirm the district court's action here . . . parties could not count on the classification of the exhibit as demonstrative during trial."). *Baugh* is therefore inapposite because the jury never had the video, or screenshots of the video, in the deliberation room.[17] In *Barnes*, a products liability case, the critical dispute focused on the engine mount in the plaintiff's car. 547 F.2d at 277 ("The contested issues in this case were whether the engine mount on the plaintiff's automobile separated prior to the accident and, if so, whether the roll-stop feature on the engine mount would have prevented the engine from lifting and binding the accelerator linkage."). As part of the plaintiff's case, its expert discussed an experiment he ran simulating the accident. *Id.* However, the car in the experiment "had no engine mounts or roll-stop feature." *Id.* Ultimately, the Fifth Circuit concluded that admitting testimony about the experiment, which even plaintiff's expert admitted was not performed under comparable circumstances, was reversible error. *Id.* By contrast, the video Microsoft played during Mr. Malloy's testimony showed him using the actual LifeSize Express device, the same device admitted into evidence. (Dkt. No. 289, 6/7/17 A.M. Trial Tr. at 124:15–17 ("I participated recently in a demonstration of [] this particular unit which is still operational [] 10 years later.").) Moreover, unlike an accident simulation, the video was not needed to show that the LifeSize Express would have performed a certain way under certain conditions. Instead, Mr. Malloy told the jury, under oath and subject to cross examination, that the LifeSize Express could perform as shown in the video based on his own experience. (*See, e.g., id.* at 134:17–137:14.) Biscotti's proffered cases therefore miss the mark — widely.

The Court is also not persuaded that the substance of Mr. Malloy's testimony regarding the video was a surprise. Biscotti may not have anticipated that Mr. Malloy would show a

---

[17] The jury was instead instructed that demonstratives "are not evidence" and that demonstratives "will not be available to you to review in the jury room during your deliberations." (Dkt. No. 294, 6/9/17 Trial Tr. at 11:13–16.)

demonstration using the LifeSize Express device since the device was admitted in evidence. However, Biscotti was aware that Mr. Malloy would testify that the LifeSize Express could be connected to a set-top box (as shown in the video). In fact, Biscotti moved *in limine* to exclude this exact testimony. (Dkt. No. 257, Hearing Tr. at 15:11–13 ("They're going to have some person from LifeSize purportedly say we had a cable box not only plugged in, but also we used it that way."), 13:15–26:18.) That motion was denied. (Dkt. No. 270.)

Finally, Biscotti maintains that it was unable to appropriately challenge the video because Microsoft offered it as a demonstrative, evading *Daubert* or similar pre-trial scrutiny. However, neither the video nor Mr. Malloy's testimony involved expert testimony. Mr. Malloy testified about how the LifeSize Express worked based on his personal knowledge as the CEO of the company that developed the LifeSize Express. (*See, e.g.,* Dkt. No. 289, 6/7/17 A.M. Trial Tr. at 107:10–16.) The video was not the *basis* of this personal knowledge, in the way that a test or simulation might serve as the basis of expert opinion, it was an *illustration* of functionality he already knew the LifeSize Express could achieve. "That is a classic and proper use of a demonstrative exhibit, and such use is properly left to the sound discretion of the judge presiding over the trial." *Baugh*, 730 F.3d at 708. Additionally, whether Mr. Malloy would testify that the LifeSize Express could be connected to a set-top box was the subject of extensive motion practice and pretrial argument. (*See, e.g.,* Dkt. No. 257, Hearing Tr. at 13:15-26:18.) Mr. Malloy was also not an expert, so a post-trial argument about evading *Daubert* simply makes no sense. The video itself was also the subject of vigorous cross-examination during trial. (Dkt. No. 291, 6/7/17 P.M. Trial Tr. at 23:17– 28:5.)

For these reasons, showing the video to the jury was consistent with the Federal Rules of Evidence and the Federal Rules of Civil Procedure, and it was consistent with the pretrial

disclosure schedule both parties agreed to in the Joint Pretrial Order. Further, the video does not present the sort of prejudice that would justify a new trial. A plethora of other evidence in this record supports the jury's verdict in this regard, as discussed above.

**b. <u>Conclusion</u>**

For the various reasons set forth herein, the Court concludes that Plaintiff's Motion should be and hereby is **DENIED**.

**So ORDERED and SIGNED this 23rd day of March, 2018.**

RODNEY GILSTRAP
UNITED STATES DISTRICT JUDGE